## Equity Buy-Out and Board of Directors Resignation Agreement

THIS EQUITY BUY-OUT AND BOARD OF DIRECTORS RESIGNATION AGREEMENT ("Agreement"), is entered into as of March 20, 2015 ("Effective Date") by and between **FLANDERS HOLDINGS LLC,** a Delaware limited liability company with an address for purposes hereof at 531 State Road 1427, Washington, North Carolina 27889 ("Flanders" or the "Company"), and **HARRY L. SMITH, JR.,** an individual ("Smith"). In consideration of the covenants and promises herein, and with the intent to be legally bound, the Company and Smith agree as follows:

1. **Resignation From the Board of Directors.** Smith has decided to resign his position as Vice Chairman of the Company's Board of Managers ("Board") and his Board membership in general as of the Effective Date. As of the Effective Date, Smith will not hold any positions with the Company or any of its affiliates, whether as manager, employee or otherwise. Smith will receive his monthly retainer payment for March 2015 in the amount of $14,583.33. Smith will also receive reimbursement for any reasonable travel, meal and entertainment expenses incurred through the Effective Date in connection with his Board service that are documented, submitted to the Company by April 1, 2015 and approved by the Company. The reimbursement payment will be made within five business days of submission. Smith will not receive any other retainer payments and will not be eligible for any performance bonus or any other payment in connection with his service on the Board.

2. **Redemption.**

    a. Redemption of Units. Subject to the terms and conditions set forth in this Agreement, Smith hereby agrees to sell to the Company, and the Company hereby agrees to purchase and redeem from Smith, the 660,000 Class A-2 Non-Voting Units (as defined in that certain Amended and Restated Limited Liability Company Agreement of Flanders Holdings LLC, dated as of May 16, 2012, as amended (the "LLC Agreement")) (the "Units") held by Smith for aggregate consideration to Smith of $660,000 (the "Purchase Price").

    b. Closing. The closing of the purchase and sale of the Units pursuant to this Agreement (the "Closing") shall occur on the date that the Purchase Price is paid pursuant to Section 10 (the "Closing Date"). On the Closing Date, (i) Smith shall deliver and surrender to the Company certificates representing the Units duly endorsed for transfer or accompanied by the appropriate powers endorsed in blank, and (ii) the Company shall deliver to Smith the Purchase Price by cashiers' check or wire transfer of immediately available funds.

    c. Representations and Warranties of Smith. Smith represents and warrants to the Company as follows:

    (i) Smith holds of record and beneficially the Units, free and clear of all liens, claims, encumbrances, proxies and restrictions of any kind or nature whatsoever. Smith is not a party to any options, warrants, subscriptions, commitments, contracts or other rights or obligations to purchase or acquire any other capital stock of the Company or any rights in any other capital stock of the Company, nor are there any outstanding securities convertible into or exchangeable for any other capital stock of the Company. Smith is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any capital stock of the



Company. None of the Units owned by Smith have ever been of record or beneficially owned by any spouse or ex-spouse of Smith. Smith is not required to obtain any consent from any person, entity or governmental authority in connection with the execution and delivery of this Agreement, the consummation or performance of any of the transactions contemplated hereby, or the sale, transfer and assignment of the Units.

(ii) Smith confirms that (A) he has conducted his own investigation into the Company and the value of the Units held by him and that Smith is relying exclusively on his own investigation, (B) he has sufficient knowledge and experience in business and financial matters in general, and with respect to transactions contemplated by this Agreement, so as to be aware of the risks and uncertainties inherent in the transactions contemplated by this Agreement, (C) he understands that the Company, from time to time, contemplates engaging in potential transactions related to the Company's business and the ownership of the Company, and that any such potential transaction or transactions could result in a value for the Company that is in excess of, or less than, the value of the Company indicated by the Purchase Price being paid pursuant to this Agreement, and (D) he has not received from the Company or from any of the Company's agents or representatives (nor has the Company or any of the Company's agents or representatives given) any investment advice or opinion concerning the transactions contemplated by this Agreement or whether the transactions contemplated by this Agreement are prudent. Notwithstanding the risks and the uncertainties inherent in these transactions as fully acknowledged by Smith, he has determined in consultation with his own independent counsel that he desires to proceed with the transactions contemplated by this Agreement without obtaining any additional information of any kind from the Company.

(iii) Smith understands and acknowledges that there may exist material nonpublic information about the Company's operations, prospects and strategic plans (whether relating to financing, acquisitions, mergers, divestitures, or otherwise) that has not been disclosed to Smith. Therefore, Smith understands that any information in his possession regarding the Company: (A) may be incomplete in whole or in part, and (B) has been provided to Smith without any representation or warranty, including, without limitation, any representation or warranty that such information (1) does not omit any fact necessary to make any such information not misleading, or (2) does not contain any omissions or misstatements that an investor would consider material in making a decision as to whether to enter into the transactions contemplated by this Agreement. Smith represents and warrants that he is not relying on any representations or warranties of the Company or any of the Company's agents or representatives and waives any claims or causes of action that he may have related to any information disclosed or not disclosed by the Company or any of the Company's agents or representatives.

(iv) Smith confirms that (A) he has had the opportunity to ask questions of management of the Company regarding the value of the Units owned by him and has been provided adequate information by the Company regarding the Units owned by him and (B) the price paid by the Company for the Units owned by him under this Agreement is within a reasonable range of fair market value for the Units owned by him in light of the fact that there is no public market for the Units and the Units owned by him represent a minority ownership in the Company.

(v) The Units represent all of the interests of Smith in any equity securities of the Company, including, without limitation, any securities exercisable, convertible or

2

exchangeable for any equity securities of the Company. Smith has not been granted and Smith does not possess any warrants, options, purchase rights, subscription rights, conversion rights, exchange rights, other contracts or commitments or other rights to acquire any securities of the Company now or in the future.

(vi) The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not result in a violation of any order applicable to Smith or, to Smith's knowledge, a violation of any statute, law, or regulation applicable to Smith.

3. **Bonus**. As set forth in his Confidential Separation Agreement with Flanders Corporation executed on July 1, 2014, as amended on March 11, 2015 ("Confidential Separation Agreement"), Smith will receive a fiscal year 2014 bonus he would have earned (if any) if he had been employed for the full 2014 calendar year. The bonus in the amount of $124,950.00 will be paid on or before April 1, 2015.

4. **Release of Claims By Smith.**

a. Except as otherwise provided herein, Smith hereby acknowledges that in consideration for the amounts to be wired to Smith pursuant to this Agreement, and other promises, agreements and valuable consideration contained herein, the receipt and sufficiency of which is hereby acknowledged, Smith hereby promises not to sue and fully, finally, and completely releases the Company and Insight Equity Holdings LLC and their affiliates, direct and indirect parents, subsidiaries, successors, predecessors, lenders, and their directors, officers, principals, owners, members, fiduciaries, partners (both general and limited), managers, shareholders, employees, agents, attorneys and representatives of each of them, and their employee benefit plans (collectively, the "Company Released Parties"), of and from any and all claims, actions, demands, and/or causes of action, of whatever kind or character, whether now known or unknown, arising from, relating to, or in any way connected with: (i) his ownership of the Units and any rights he may have by virtue of being the record and/or beneficial owner of the Units; (ii) his being an employee of the Company and/or of any of the Company's subsidiaries; including, without limitation, as an employee, director, or stockholder; (iii) his being a member of the Board; (iv) his serving in any other role to or on behalf of the Company and/or any of the Company's subsidiaries; or (v) any other occurrence, transaction or omission involving any of the Company Released Parties.

b. Smith agrees that this Agreement includes a release of any negligence claims, any tort claims, including defamation, libel, slander, fraud, tortious interference, and intentional infliction of emotional distress, contractual claims for breach or default, claims for incentive or bonus payments or other compensation, claims under any employee benefit plan or program, including the LTIC Plan, wrongful discharge claims, claims of discrimination of every possible kind, including, but not limited to, claims on the basis of race, age, sex, national origin, disability, and religion, any personal injury claims, and any related attorneys' fees and costs, if any, that he may have against any Company Released Party. Smith agrees that this Agreement includes a release of any claims for any alleged breach of fiduciary duties owed by the Company or any of the other Company Released Parties to Smith in any capacity, and any related attorneys' fees and costs, if any, that Smith may have against the Company or any other Company Released

3

Parties. Smith waives and releases the Company Released Parties from any claims that this Agreement was procured by fraud or signed under duress or coercion so as to make this release not binding. Smith understands and agrees that by signing this Agreement he is giving up the right to pursue any legal claims that he may have against any of the Company Released Parties with respect to the matters released herein.

c. Smith understands that this Agreement does not constitute a waiver of any rights or claims that arise after the date that Smith signs this Agreement.

d. Notwithstanding the foregoing, Smith is not releasing any right to enforce this Agreement or: (1) any vested retirement benefits payable to Smith under and subject to the terms of benefit plans sponsored by the Company (for purposes of clarification, this excludes the LTIC Plan referenced in Section 8); or (2) any right to unpaid severance payments as expressly set forth in the Confidential Separation Agreement.

5. **Release of Claims By the Company.**

a. In exchange for the promises and agreements contained herein, the Company promises not to sue and fully, finally, and completely releases Smith and his heirs, legal representatives, assigns and agents (collectively the "Smith Released Parties"), of and from any and all claims, actions, demands, and/or causes of action, of whatever kind or character, whether now known or unknown, arising from, relating to, or in any way connected with: (i) Smith's ownership of the Units and any rights he may have by virtue of being the record and/or beneficial owner of the Units; (ii) Smith being an employee of the Company and/or of any of the Company's subsidiaries; including, without limitation, as an employee, director, or stockholder of the Company; (iii) Smith being a member of the Board of Directors of the Company; (iv) his serving in any other role to or on behalf of the Company and/or any of the Company's subsidiaries; or (v) any other occurrence, transaction or omission involving any of the Smith Released Parties.

b. The Company agrees that this Agreement includes a release of any negligence claims, any tort claims, including defamation, libel, slander, fraud, tortious interference, and intentional infliction of emotional distress, contractual claims for breach or default, any personal injury claims, and any related attorneys' fees and costs, if any, that it may have against any Smith Released Party. The Company agrees that this Agreement includes a release of any claims for any alleged breach of fiduciary duties owed by Smith to any of the Company Released Parties in any capacity, and any related attorneys' fees and costs, if any, that the Company may have against Smith or any other Smith Released Parties. The Company waives and releases the Smith Released Parties from any claims that this Agreement was procured by fraud or signed under duress or coercion so as to make this release not binding. The Company understands and agree that by signing this Agreement it is giving up the right to pursue any legal claims that it may have against any of the Smith Released Parties with respect to the matters released herein.

c. The Company understands that this Agreement does not constitute a waiver of any rights or claims that arise after the date that the Company signs this Agreement.

4

d. Notwithstanding the foregoing, neither the Company nor its affiliates are releasing any right to enforce this Agreement nor are they releasing any other rights or obligations under any of the agreements described in <u>Section 7</u> hereof, including those set forth on <u>Schedule A</u>.

**6. <u>Restrictive Covenants</u>.**

a. <u>Acknowledgments by Smith</u>. Smith recognizes and acknowledges that the business of Flanders Corporation and its subsidiaries (collectively, "Flanders Corp.") is the design, manufacture, assembly, and marketing of air filtration products and related equipment and hardware (the "Business"). Smith further recognizes and acknowledges that by virtue of his role as the Chief Executive Officer of Flanders Corporation, a position he held until July 1, 2014, and as a lead sales executive prior to that, that he has extensive knowledge of Flanders Corp.'s confidential and proprietary business information, including, without limitation, financial information, trade secrets, business strategies, operational information, supplier information, pricing terms, and customer lists, contact information, and preferences, supplier lists, contact information and preferences, marketing arrangements, internal performance statistics, training manuals, personnel information, or intellectual property ("Confidential Information"). Smith acknowledges that as an executive officer of Flanders Corporation Smith developed direct relationships with Flanders Corp.'s key suppliers and the largest customers of Flanders Corp. for more than the past five years. Subsequent to his employment with Flanders Corp., Smith has continued to gain knowledge of Confidential Information through his service on the Company's Board of Directors and through Smith's and the Company's supplier relationship between Pronamic Industries and the Company. Smith recognizes and acknowledges the confidential nature and competitive value of the Confidential Information, recognizes and acknowledges that the competitive value has not diminished since he was Chief Executive Officer, and agrees that use of such Confidential Information in competition with Flanders Corp. would be detrimental to its business interests. Smith further recognizes and acknowledges that Flanders Corp.'s business is national and international in scope and not limited to any particular state or geographic region, and that Flanders Corp.'s customer relationships and Confidential Information persist throughout the national territory of Flanders Corp.'s business.

b. <u>Confidentiality</u>. Smith agrees that he shall not use or divulge any Confidential Information at any time after the Effective Date of this Agreement (as defined below).

c. <u>Non-Competition</u>. Smith hereby agrees that for a period of five (5) years after the Effective Date of this Agreement (as defined below), he shall not for himself or through any Person, directly or indirectly, engage in, participate in any business activity or enterprise that would compete in any way with the Business in the geographic areas and locations where: (i) Flanders Corp. carries on or transacts the Business, (ii) Flanders Corp. sells or markets its products or services, or (iii) Flanders Corp.'s customers are located; including without limitation (A) the world, (B) the United States of America, (C) each of the states of the United States of America, (D) the State of North Carolina, (E) each county within the State of North Carolina, (F) the territory within a 100 mile radius of Smith's office in Washington, North Carolina, and (G) the territory within a 100 mile radius of each other office of Smith (whether now existing or hereafter established). For purposes of this Agreement, the term "participate" includes any direct or indirect interest in any enterprise, whether as a stockholder, member, partner, joint venturer, franchisor, franchisee, executive, consultant or otherwise (other than by ownership of less than one percent

5

(1%) of the stock of a publicly held corporation) or lending money to or rendering any direct or indirect service or assistance to any person or entity.

        d.        Non-Solicitation of Customers or Suppliers. Smith shall not, for a period of five (5) years following the Effective Date, either directly or indirectly, for his own benefit or the benefit of any other person or entity, solicit, attempt to solicit, divert or attempt to divert, accept or attempt to accept the business or patronage of any customers or suppliers of Flanders Corp., or in any way interfere with, disrupt or attempt to disrupt any such relationships.

        e.        Non-Solicitation and Non-Hiring of Employees.

        (i)        Non-solicit. Smith shall not, for a period ending on the earlier of (A) five (5) years following the Effective Date and (B) six months following the date none of Insight Equity Holdings LLC or its affiliates owns an interest in the Company or its subsidiaries, either directly or indirectly, for his own benefit or the benefit of any other person or entity, solicit or attempt to solicit, induce or attempt to induce any individual who is an employee of the Company or its subsidiaries as of the Effective Date or at any point within the seven days prior to the Effective Date, to leave his or her employment with the Company or its subsidiaries.

        (ii)        No Hire. Smith shall not, for a period ending on the earlier of (A) five (5) years following the Effective Date and (B) six months following the date none of Insight Equity Holdings LLC or its affiliates owns an interest in the Company or its subsidiaries, either directly or indirectly, for his own benefit or the benefit of any other person or entity, hire or employ any individual who is a member of the management team of the Company included in the 2014 or 2015 Management Incentive Compensation Plan as of the Effective Date or at any point within the seven days prior to the Effective Date.

        f.        Enforceability. In view of the substantial harm which will result from the breach by Smith of any of the covenants contained in this Section 6, Smith agrees that such covenants are reasonable, are narrowly tailored to protect the Company's legitimate business interests, Confidential Information, and goodwill, shall be enforced to the fullest extent permitted by applicable law. Accordingly, if, in any judicial proceeding, a court shall determine that such covenants are unenforceable because they cover too extensive a geographic area or survive for too long a period of time or include scope of activities that exceeds that which the court finds enforceable, the parties hereby agree, stipulate and consent that the court shall have the power and authority to amend and/or modify any unenforceably overbroad provision to render it enforceable in the determination of the court. This judicial power of reformation is granted and intended by the parties to be to the fullest extent permitted by applicable law. Additionally, should the court decide in its discretion that it will not utilize the judicial power of reformation granted to it by this Section 6, the parties intend and agree that the same overbroad (as determined by the court) provisions shall be deemed severable and the application to other persons and circumstances shall not be affected thereby, and each remaining provision hereof shall be enforced to the fullest extent permitted by applicable law.

        g.        Injunctive Relief. Smith agrees that due to his history as the Chief Executive Officer of Company, his membership on the Board, his extensive knowledge of Company's Confidential Information, and his extensive knowledge of and relationships with key

6

suppliers and Customers of Company, his breach of any of the provisions of this Section 6 will cause irreparable damage to the Company and that the recovery by the Company of money damages will not alone constitute an adequate remedy for such breach or threatened breach. Smith agrees that the potential irreparable damage to the Company could include loss of goodwill, loss of customers, loss of suppliers, loss of future business opportunities, and disclosure or misuse of confidential information. Accordingly, the ability to obtain injunctive relief to remedy any breach or threatened breach by Smith is a material inducement for the Company to enter into this Agreement, which is expressly acknowledged by Smith. The parties intend and Smith agrees that such provisions may be specifically enforced against him and that injunctive relief, which Smith understands will include a temporary restraining order, temporary injunction and permanent injunction, would be appropriate for a court to enter against him. Smith hereby waives the defense in any equitable proceeding that there is an adequate remedy at law for any such breach or threatened breach by him of the provisions of Section 6. Smith agrees that he has had the opportunity to review this Agreement, and specifically this Section 6, with his own counsel, he understands the application and implications of Section 6 to him, and he enters into this Agreement voluntarily and with full knowledge of what it means.

      h.     Additional Provisions. In the event of a violation of the covenants contained in this Section 6, the applicable period shall be extended for an additional period equal to the duration of the violation period. In the event of litigation and/or arbitration the non-prevailing party agrees to pay all reasonable fees, costs and expenses (including, without limitation, fees, costs, and expenses of legal counsel, experts or other representatives) incurred by the prevailing party in connection with claims brought under this covenants contained in this Section 6.

      7.     **Other Obligations**. Smith agrees that nothing in this Agreement reduces or eliminates Smith's promises and obligations regarding waiver and release of claims, confidential information, non-competition, non-solicitation, non-disparagement, confidentiality, or other surviving or existing promises or obligations as set forth in: (1) his prior Employment Agreement with Flanders Corporation dated May 6, 2012; (2) his Confidential Separation Agreement with Flanders Corporation executed on July 1, 2014, as amended on March 11, 2015; and (3) any of the Agreements set forth on Schedule A.

      8.     **Forfeiture of LTIC Participation and Vesting.** Smith was previously granted an award under the First Amended and Restated Flanders Holdings LLC Equity Tracking Incentive Plan (the "LTIC Plan"), and, in connection with, and to evidence, such award, Smith received an Award Letter dated August 30, 2012 ("Award Letter") under the LTIC Plan. Smith's award under the LTIC Plan provided, among other things, for a Payment (as defined in the LTIC Plan) to be made to Smith in the form of a one-time lump sum cash payment following a Change in Control (as defined in the LTIC Plan). The amount and distribution of the Payment were determined under, and were subject to, the terms and conditions of the LTIC Plan and the Award Letter, as amended from time to time by the Company. Effective as of July 1, 2014, Smith's Award Letter was amended to increase his vested percentage under the LTIC Plan from 20% to 30%. In connection with Smith's resignation hereunder and the mutual agreements provided for herein, Smith's continued participation in the LTIC Plan, including his vested percentage, is hereby terminated and forfeited in full. Smith acknowledges and agrees that he is no longer a Participant under the LTIC Plan and that he has no further benefit, right or interest in or under the LTIC Plan, including any right to receive a Payment under the LTIC Plan, and Smith hereby waives and agrees to the

forfeiture of any such benefit, right or interest. Smith's Award Letter is hereby further amended to provide for such termination and forfeiture, effective as of the date of this Agreement.

9. **Agreements Related to Certain Payments**. The Company agrees that it shall make the payments required pursuant to Sections 2(b) and 3 on or prior to April 1, 2015. The Company further agrees that it shall cause Flanders Solutions LLC to repay principal in amount of $2,684,700 under that certain Promissory Note, dated March 31, 2015, made by Flanders Solutions LLC in favor of Pronamic Industries, LLC, on or prior to April 1, 2015.

10. **Severability**. If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application, and shall not invalidate or render unenforceable such provision or application in any other jurisdiction.

11. **No Tax Advice**. Smith acknowledges and agrees that none of the Company Released Parties has given him any financial planning, tax or similar advice with regard to the payments or benefits provided under this Agreement. Smith acknowledges and further agrees that he should obtain advice from his own financial or tax adviser, and that none of the Company Released Parties are responsible for, or obligated in any way with respect to, the financial, tax or any other consequences of his decision to accept this Agreement.

12. **Confidentiality.** Smith agrees to keep strictly confidential, and not to disclose or publish to anyone including current and former employees of the Company or its affiliates, the terms or existence of this Agreement. Notwithstanding the foregoing, Smith may make a disclosure that is necessary to effectuate the purposes of this Agreement, and/or as necessary to assert a breach of this Agreement, and/or as required by compulsory process. Smith may also consult privately with his immediate family, attorney(s), accountant(s), financial planner(s), and/or tax advisor(s) regarding the terms and financial impact of this Agreement, but he shall be responsible for any breach of confidentiality arising from such permissible disclosures.

13. **Entire Agreement**. This Agreement sets forth the entire agreement and understanding between Smith and the Company concerning the subject matter of this Agreement, and may be changed only with the written consent of both parties and only if both parties make express reference to this Agreement. Any modifications to this Agreement must be in writing and signed by Smith and an authorized employee or agent of the Company. The parties have not relied on any oral statements that are not included in this Agreement. **EACH PARTY HEREBY DISCLAIMS, COVENANTS NOT TO SUE FOR, AND WAIVES ANY CLAIM, IN ANY FORM OR UNDER ANY RUBRIC, INVOLVING, CONCERNING, RELATING TO, OR ALLEGING FRAUD IN CONNECTION WITH OR IN THE INDUCEMENT OF THIS AGREEMENT.** The Parties deny any liability of any kind or type to the other and this Agreement shall not be construed as an admission of liability or wrongdoing by either party toward the other.

14. **Public Announcements**. Smith agrees not to make any public announcement, including but not limited to statements to the Company's customers, without the Company's prior written consent.

15. **Return of Company Property**. Smith agrees that as of the Effective Date, he will have returned to the Company, and not retained any copies of, all of the Company's and its subsidiaries': documents, files, spreadsheets, manuals, and materials, including any and all Confidential Information; and property or equipment, including but not limited to, all computers, laptops, printers, fax machines, scanners, pagers, or other communication devices, passwords, credit cards, ID badges and keys. Smith may keep his cell phone but as of the Effective Date Smith assumes all responsibility for all service agreements, payments, taxes and other amounts owed relating to same.

16. **Cooperation.** For the period during which Insight Equity II LP or any of its affiliates has a direct or indirect ownership interest in the Company, Smith agrees, at no cost to the Company and its subsidiaries, to cooperate with the Company or its subsidiaries and to assist the Company and its subsidiaries as reasonably requested on transitional business needs and projects, litigation or threatened litigation, and other issues on which the Company determines Smith's assistance is necessary. The Parties agree to schedule any meetings or conference calls at mutually agreeable times and locations.

17. **Indemnification**. The Company hereby agrees to indemnify and hold harmless the Smith Released Parties from and against any and all losses, liabilities, damages, claims, penalties, costs, fees and expenses (including reasonable legal fees and disbursements) which result, directly or indirectly, from any breach by the Company of this Agreement. Smith hereby agrees to indemnify and hold harmless the Company Released Parties from and against any and all losses, liabilities, damages, claims, penalties, costs, fees and expenses (including reasonable legal fees and disbursements) which result, directly or indirectly, from any breach by Smith of this Agreement.

18. **Governing Law**. This Agreement and the transactions contemplated herein, and all disputes between the parties under or related to this Agreement or the facts and circumstances leading to its execution or performance, whether in contract, tort or otherwise, shall be governed by and construed in accordance with the laws of the State of North Carolina, without reference to the conflict of laws principles thereof.

19. **Waiver of Jury Trial**. SMITH AND THE COMPANY HEREBY ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY WHICH MAY ARISE UNDER OR RELATING TO THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE THEY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ALL RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREIN OR THE FACTS OR CIRCUMSTANCES LEADING TO ITS EXECUTION OR PERFORMANCE OR ANY ACTIONS RELATED THERETO. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OR AFFILIATE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER KNOWINGLY AND VOLUNTARILY AND (D)

IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION.

20. **Jurisdiction; Venue**. Each of the parties hereto submits to the sole and exclusive jurisdiction of the North Carolina Business Court located in Raleigh, North Carolina or, if such court shall not have jurisdiction, to any federal court sitting in the Eastern District of North Carolina, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court. Each of the parties hereto also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each of the parties hereto waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other party with respect thereto. Each party hereto agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity.

21. **Captions**. The captions in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of any of the terms or provisions hereof.

22. **Counterparts; Facsimile/PDF Execution**. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. A facsimile transmission, JPEG or PDF of a signed counterpart of this Agreement shall be sufficient to bind the party or parties whose signature(s) appear(s) thereon.

23. **Construction**. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. For purposes of this Agreement, the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Further, the word "subsidiary" or "subsidiaries" shall include any direct and indirect subsidiary and all direct and indirect subsidiaries.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

FLANDERS HOLDINGS LLC

By: *Victor L. Vescovo*

Print Name: VICTOR L. VESCOVO

Print Title: MANAGING DIRECTOR

Agreed and accepted as of the 20th day of March, 2015.

*Harry L. Smith, Jr.*
HARRY L. SMITH, JR.

## Schedule A

(1)   that certain Asset Purchase Agreement, dated February 20, 2015, by and among Pronamic Industries, LLC, Flanders Solutions LLC, Blue Goose, LLC, and those other persons party thereto;

(2)   that certain Promissory Note, dated March 13, 2015, in the principal amount of $2,983,000, made by Flanders Solutions LLC in favor of Pronamic Industries, LLC;

(3)   that certain letter agreement, dated March 13, 2015, between Pronamic Industries, LLC, Blue Goose, LLC, Flanders Solutions LLC and the other persons party thereto, related to the loan agreement and related documents by and among Pronamic Industries, LLC, Blue Goose, LLC and Beaufort County, North Carolina;

(4)   that certain letter agreement, dated March 13, 2015, between Pronamic Industries, LLC, Blue Goose, LLC, Flanders Solutions LLC and the other persons party thereto, related to certain incentive agreements by and among Pronamic Industries, LLC, Blue Goose, LLC, Oak Ridge Metals, LLC, the City of Washington, North Carolina, and Beaufort County, North Carolina;

(5)   that certain Subordination Agreement, dated March 12, 2015, by and among Flanders Holdings LLC, Pronamic Industries, LLC, and the other persons party thereto, related to the Company's revolving credit agreement;

(6)   that certain Subordination Agreement, dated March 13, 2015, by and among Flanders Holdings LLC, Pronamic Industries, LLC, and the other persons party thereto, related to the Company's term loan agreement; and

(7)   that certain Subordination Agreement, dated March 13, 2015, by and among Flanders Holdings LLC, Pronamic Industries, LLC, and the other persons party thereto, related to the Company's mezzanine loan agreement.