IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DISTRICT

CIVIL ACTION FILE NO. 4:16-CV-00289

HARRY L. SMITH, JR.,      )
                          )
          Plaintiff       )
                          )
v.                        )
                          )
FLANDERS HOLDINGS, LLC,   )
                          )
          Defendant.      )

DEPOSITION OF HARRY L. SMITH, JR.

JUNE 2, 2017 @ 9:04 a.m.

HELD AT
WARD AND SMITH, P.A.
1001 COLLEGE COURT
NEW BERN, NORTH CAROLINA

PAGES 1 THROUGH 260

REPORTED BY:  JENNIFER PATTERSON, CVR-M
CAPE FEAR COURT REPORTING, INC.
POST OFFICE BOX 10112
WILMINGTON, NORTH CAROLINA  28404-0112
(910) 616-8458
E-MAIL @ Jennifercvr@aol.COM
www.capefearcourtreporting.com

EXHIBIT - 1

# A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

KEVIN M. CEGLOWSKI, ESQ.
POYNER SPRUILL
301 FAYETTEVILLE STREET, SUITE 1900
RALEIGH, NC  27601
919-783-1075
kceglowski@poynerspruill.com

ON BEHALF OF THE DEFENDANT:

S. McKINLEY GRAY, III, ESQ.
DEVON D. WILLIAMS, ESQ.
WARD AND SMITH, P.A.
PO BOX 867
NEW BERN, NC 28563-0867
252-672-5400
smg@wardandsmith.com

Harry Smith                              June 2, 2017

## T A B L E   O F   C O N T E N T S

WITNESS:                    EXAMINATION              PAGE

HARRY L. SMITH, JR.

BY MR. GRAY          DIRECT              7

BY MR. CEGLOWSKI     CROSS              243

BY MR. GRAY          REDIRECT           247

EXHIBITS             DESCRIPTION            PAGE

1    EMPLOYMENT AGREEMENT                 122

2    CONFIDENTIAL SEPARATION AGREEMENT    126

3    AMENDMENT TO CONFIDENTIAL SEPARATION 139
     AGREEMENT

4    ASSET PURCHASE AGREEMENT             143

5    EMAIL TO R.McGARY FROM C.PORTER      149

6    11/11/16 POYNER SPRUILL LTR TO       152
     P.WHITAKER

7    STATEMENT OF REPAYMENT AND TERMINATION 159
     OF BUSINESS LOAN AGREEMENT

8    CLOSING CERTIFICATE, 3/13/15 PRONAMIC  160

9    SELLER DISCLOSURE SCHEDULES          161

10   3/13/15 PROMISSORY NOTE              162

11   3/13/15 PRONAMIC MANAGER'S CERTIFICATE 162

12   3/13/15 BLUE GOOSE MANAGER'S         163
     CERTIFICATE

13   LOAN AGREEMENT LTR FROM FLANDERS TO  163
     H. SMITH

14   INCENTIVE PAYMENT LTR FROM FLANDERS  164
     TO H. SMITH

15   3/13/15 LEASE TERMINATION AGREEMENT  164

Harry Smith                       June 2, 2017

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 16 | 3/22/13 CITY ECONOMIC INCENTIVES GRANT AGREEMENT FOR PROJECT BLUE GOOSE | 165 |
| 17 | 3/13/15 FLANDERS CLOSING CERTIFICATE | 165 |
| 18 | FIRST AMENDMENT TO PURCHASE AGREEMENT | 166 |
| 19 | CERTIFICATION OF NON-FOREIGN STATUS AND REAL ESTATE REPORTING INFORMATION | 166 |
| 20 | FIRPTA CERTIFICATION OF NON-FOREIGN STATUS, PRONAMIC | 167 |
| 21 | 3/13/15 BILL OF SALE | 167 |
| 22 | 3/22/13 LOAN AGREEMENT | 167 |
| 23 | 3/13/15 ASSIGNMENT AND ASSUMPTION AGREEMENT | 168 |
| 24 | 3/13/15 AGREEMENT OF PURCHASE AND SALE | 172 |
| 25 | SUBORDINATION AGREEMENT | 173 |
| 26 | EQUITY BUY-OUT AND BOARD OF DIRECTORS RESIGNATION AGREEMENT | 173 |
| 27 | 3/17/15 EMAIL STRING; H.SMITH & B.BUSER | 212 |
| 28 | 11/16/16 EMAIL STRING; H.SMITH TO P.WHITAKER & K. CEGLOWKSI | 223 |
| 29 | 11/15/16 EMAIL STRING; H. SMITH & P. WHITAKER | 224 |
| 30 | JAN '17 EMAIL STRING; P.WHITAKER & HIGH PURITY | 225 |
| 31 | 1/2/17 EMAIL TO P.WHITAKER FROM HIGH PURITY | 227 |
| 32 | 12/24/16 EMAIL TO P.WHITAKER FROM H.SMITH | 227 |
| 33 | 11/29/16 EMAIL TO P.WHITAKER FROM H.SMITH | 228 |
| 34 | 11/21/16 EMAIL TO P.WHITAKER FROM | 228 |

Harry Smith                              June 2, 2017

                 H.SMITH
EXHIBITS                  DESCRIPTION              PAGE
35  11/15/16 EMAIL TO P.WHITAKER FROM        228
    H.SMITH

36  11/15/16 EMAIL TO P.WHITAKER FROM        229
    H.SMITH CC; T.STEPHENSON

37  11/16/16 EMAIL STRING; P.WHITAKER        229
    FROM HL.SMITH TO K.CEGLOWSKI

38  11/29/16 EMAIL TO P.WHITAKER FROM        230
    H.SMITH

39  11/15/17 EMAIL TO B.BUSER, V.VESCOVO     230
    ET AL FROM H.SMITH

40  NOV 2015 EMAIL STRING; A.CRUTCHFIELD     231
    D. MOCK FROM H.SMITH, TO P.JONES

41  11/9/15 EMAIL STRING; C.PORTER FROM      231
    H. SMITH TO P.JONES

42  5/15/17 EMAIL TO P.WHITAKER FROM         231
    H.SMITH CC: K.CEGLOWSKI & K. GRAY

43  CC OF ENVELOPE AND LETTER TO YOSHIHIRO  232

**EXHIBITS UNDER CONFIDENTIAL SEAL**

44  7/30/12 EMAIL TO B.DAVENPORT FROM        251
    H.SMITH

45  10/10/12 EMAIL STRING; B.DAVENPORT       252
    & H.SMITH

46  8/2/12 EMAIL STRING; B.DAVENPORT &       254
    H.SMITH

47  8/7/12 EMAIL STRING; B.DAVENPORT &       255
    H.SMITH

Harry Smith                        June 2, 2017

### **S T I P U L A T I O N S**

PRIOR TO EXAMINATION OF THE WITNESS,
COUNSEL FOR THE PARTIES STIPULATED
AND AGREED AS FOLLOWS:

1.   SAID DEPOSITION SHALL BE TAKEN PURSUANT TO

N.C. RULES FOR CIVIL PROCEDURE;

2.   ANY OBJECTIONS OF ANY PARTY HERETO AS TO

NOTICE OF THE TAKING OF SAID DEPOSITION, OR AS TO

THE TIME AND PLACE THEREOF, OR AS TO THE COMPETENCY

OF THE PERSON BEFORE WHOM THE SAME SHALL BE TAKEN,

ARE HEREBY WAIVED;

3.   OBJECTIONS TO QUESTIONS AND MOTIONS TO

STRIKE ANSWERS NEED NOT BE MADE DURING THE TAKING OF

THIS DEPOSITION; BUT MAY BE MADE FOR THE FIRST TIME

DURING THE PROGRESS OF THE TRIAL OF THIS CASE, OR

ANY PRETRIAL HEARING HELD BEFORE THE JUDGE FOR THE

PURPOSE OF RULING THEREON, OR AT ANY OTHER HEARING

OF SAID CASE AT WHICH SAID DEPOSITION MIGHT BE USED;

EXCEPT AN OBJECTION AS TO THE FORM OF A QUESTION

MUST BE MADE AT THE TIME SUCH QUESTION IS ASKED OR

OBJECTION IS WAIVED AS TO THE FORM OF THE QUESTION;

4.   THAT THE SIGNATURE OF THE WITNESS TO THE

TRANSCRIPT OF HIS TESTIMONY **IS NOT WAIVED.**

Harry Smith                          June 2, 2017

1              P R O C E E D I N G S 9:04 a.m.

2              (WHEREUPON,

3                   HARRY L. SMITH, JR.

4    WAS CALLED AS A WITNESS, DULY SWORN AND TESTIFIED AS

5    FOLLOWS:)

6              D I R E C T   E X A M I N A T I O N

7              BY MR. GRAY:

8         Q    Please state your full name for the

9    record.

10        A    Harry Leo Smith, Jr.

11        Q    Mr. Smith, I know that you were at Phil

12   Whitaker's deposition a couple of weeks ago, so

13   you're obviously familiar with the deposition

14   process.

15        A    Uh-huh.

16        Q    Is that correct?

17        A    Yes, sir.

18        Q    And have you ever had your deposition

19   taken?

20        A    Yes, sir.

21        Q    How many times?

22        A    Two to three times.

23        Q    And you obviously then have been involved

24   in litigation?

25        A    Mostly mediations.

Harry Smith                         June 2, 2017

1       Q    But you've been sworn under oath to tell

2   the truth?

3       A    Correct.

4       Q    Okay.  And so you understand that this

5   process today is a deposition in which you're sworn

6   under oath to tell the truth and that I will ask you

7   questions, and you will do the best of your ability

8   to answer those questions honestly and fully?

9       A    Yes, sir.

10      Q    And as the court reporter here is taking

11  down everything that's said in the room, it will be

12  very helpful to her if you will answer questions

13  that are posed to you as a yes-no type question, as

14  either yes or no, as opposed to uh-huh or uh-uh or

15  nodding or shaking your head.  Do you understand

16  that?

17      A    Yes, sir.

18      Q    If at any time you need to take a break,

19  either to use the restroom or get -- get something

20  else to drink or have a discussion with your

21  attorney, will you just let me know that?

22      A    Yes, sir.

23      Q    And the only thing that I would ask is

24  that if a question is pending you answer the

25  question first before we take a break.

Harry Smith                          June 2, 2017

1        A    Yes, sir.

2        Q    Is there any reason that you could not

3   understand questions that I may ask?

4        A    No, sir.

5        Q    Okay.  And if for some reason you do not

6   understand a question or are confused, will you ask

7   me to repeat that?

8        A    Yes, sir.

9        Q    Are you on any medication today?

10        A    No, sir.

11        Q    Is there any other reason that you might

12   not be able to understand my questions or to answer

13   truthfully?

14        A    No, sir.

15        Q    What have you done to prepare for the

16   deposition today?

17        A    I had a phone call with my attorney, and

18   I'm obviously familiar with the material.

19        Q    Other than speaking your attorney, did you

20   speak with anybody else about this deposition?

21        A    No, sir.

22        Q    What documents did you review in

23   preparation for this deposition?

24        A    Well, I've reviewed obviously the non-

25   competes, the buy-out agreements, just from a

Harry Smith                          June 2, 2017

1    refreshing standpoint.  And I did not review all the

2    e-mails.  Once I opened them up, you know, several

3    of those e-mails were not mine and I'm swearing on

4    that in the testimony.  And I refused to get past

5    that based on some of the -- what I opened up

6    originally.  So, you know, everything else I

7    reviewed in detail.

8        Q    When you say, "everything else"?

9        A    The non-competes, the buy-out agreements,

10   the written material that's gone back and forth

11   between the parties.

12       Q    Okay.  And then you said some of the e-

13   mails are not yours?

14       A    Yeah.  The e-mails I opened up that had

15   the pornographic material, you know, I attested that

16   I'd never seen.  I've had e-mails of that caliber

17   sent to me over my career, obviously, but I've never

18   seen those e-mails.  And so I stopped at that point

19   and didn't open up anything else.  I would remember

20   those e-mails.  But when I opened up those originals

21   e-mails, I knew they were not mine and I stopped and

22   advised my attorney accordingly.

23       Q    And we can talk about those later.  Let's

24   get into just some preliminary information.  What's

25   your date of birth?

Harry Smith                          June 2, 2017

```
 1        A     February 24th, 1970.

 2        Q     What's your home address?

 3        A     681 VOA Cite C Road, Greenville, North

 4    Carolina 27834.

 5        Q     How long have you lived at that address?

 6        A     Approximately 14 years.

 7        Q     And who lives at that address with you?

 8        A     My wife, my son -- and my daughter's at

 9    Wake Forest but lives there in the summer.

10        Q     And you mentioned your wife.  How long

11    have you been married?

12        A     That's a great question.  I should answer

13    that quickly, right?  I got married in 1994, so

14    whatever the numerics on that are.

15        Q     And you've only been married once --

16        A     That's right.

17        Q     -- to your current wife?

18        A     Correct.

19        Q     As far as your education goes, did you

20    graduate from high school in about 1988?

21        A     Yes, sir.  About that.

22        Q     Where did you graduate from?

23        A     Clayton High School.

24        Q     And then you went to college?

25        A     Yes, sir.
```

1        Q     And where did you go?

2        A     East Carolina University.

3        Q     When did you graduate from East Carolina

4    University?

5        A     1992.

6        Q     What was your degree in?

7        A     B.S., B.A., business administration.

8        Q     Did you do any postgraduate work?

9        A     No, sir.

10       Q     Have you had any certifications or

11   training courses that you've undergone?

12       A     Not in any specificity, no.

13       Q     After you graduated from East Carolina

14   with a business degree, where did you go to work?

15       A     I went into distribution and then -- I

16   don't recall the exact years.  I spent about four

17   years in distribution.

18       Q     What company?

19       A     Cameron and Barkley.

20       Q     Cameron and Barkley?

21       A     Yeah.

22       Q     Where is that located?

23       A     They were located in Charleston.  They had

24   a branch in Greenville.  And then they sold out

25   probably three or four different times through those

Harry Smith                            June 2, 2017

1     years.

2          Q    So that was your first place of

3     employment, and you were there for about four years?

4          A    My very first place of employment was a --

5     was a company called Industrial Construction, which

6     was also distribution of products.  And I was there

7     probably three years.  I got recruited to go to

8     Cameron and Barkley and was there approximately

9     three or four years.  And then I went in business,

10    you know, really, for myself.

11         Q    All right.  Let me -- let me just go back.

12    With Industrial, the three years you were there,

13    what were you doing?

14         A    Sales.

15         Q    Sales of what?

16         A    MRO supplies, maintenance, repair,

17    operational supplies.

18         Q    And Cameron and Barkley, what were you

19    doing there?

20         A    I was a branch Manager, so I ran the

21    branch and performed sales functions as well.

22         Q    And what were you selling?

23         A    Same thing, yeah.

24         Q    Maintenance type supplies?

25         A    Uh-huh.  Yes, sir.

Harry Smith                              June 2, 2017

1          MR. GRAY:     And let's go off the record

2     just real quick.

3     (Off the record from 9:10 a.m. until 9:11 a.m.)

4          BY MR. GRAY:

5     Q    After Cameron and Barkley, you said you

6     went into business for yourself?

7     A    Right.  I had -- had my own company, doing

8     sales and marketing.  And that's -- I was also

9     sending to and representing Flanders.  So that's

10    where my friendship started with Flanders.

11    Q    Okay.  Well, let's -- let's back up just a

12    hair.  So you graduated in '92, and you worked for

13    Industrial and Cameron and Barkley for a combined

14    total of about seven to eight years?

15    A    Six, seven years, something like that,

16    yeah.

17    Q    So we're getting close to the end of the

18    century?

19    A    Yes, sir.

20    Q    And at that point you -- you went in to

21    work for yourself.  You went to work for yourself?

22    A    Yes, sir.

23    Q    And explain exactly what you were doing?

24    A    Doing the exact same thing, Ken, but doing

25    it on my own.  So, you know, I wanted to, you know,

Harry Smith                          June 2, 2017

1      work for myself.  So I started a company.  I started

2      developing manufacturing relationships where I

3      represented those companies in a sales and -- sales

4      function, selling their products.  And I had been

5      doing business -- one of my larger accounts,

6      actually, was Flanders with Industrial Construction

7      and Cameron and Barkley.  So -- and that is how --

8      well, that was one of my lines.  I sold air

9      filtration products for Flanders.

10          Q    Okay.  I want to --

11          A    Not as an employee.

12          Q    Right.  I want to take it step by step

13     here.  When you were with Industrial and Cameron and

14     Barkley, explain your relationship with Flanders.

15          A    Strictly a supplier.  So I mean I'd call

16     on those guys and sold them supplies.

17          Q    And you were selling them maintenance type

18     supplies?

19          A    Maintenance and OEM type products.

20          Q    What -- what is that?

21          A    OEM product would be a product that went

22     into their finished goods.  So you may -- you may

23     sell them, you know, electrical wire and conduit for

24     repair in a plant, which we represented.  You may

25     sell them a gear or a gear box that went into a

Harry Smith                          June 2, 2017

1    finished product.  So it would be both products.

2         Q     You were selling them products that would

3    go into their equipment?

4         A     Uh-huh.  Yes, sir.

5         Q     Were you -- were you selling them any

6    products that would go into the actual air

7    filtration product that they sold to their

8    customers?

9         A     Yes.  So you would have what we call high

10   purity products, which would be our metal-type

11   products.  So we might sell a gear box that went --

12   that was a permanent mount on that product.  But it

13   was just a piece of that product.  And then, you

14   know, they have the throw away, which is more your

15   retail products.  I didn't sell anything there --

16   that went into the final product.

17        Q     How long were you self-employed?

18        A     Approximately three years or so.

19        Q     During that time were you doing the same

20   type of -- did you have the same type of

21   relationship with Flanders?

22        A     I did.  But the exception then was I also

23   was representing them.  So I -- I got their line and

24   was selling Flanders' products as well.  So I had

25   the Flanders' that I was selling.  So, you know, I

Harry Smith                          June 2, 2017

1    also was -- and when you represent, you have

2    different manufacturers you represent, you know, as

3    either a manufacturer's rep or distributor.  And I

4    was able to get the Flanders' products to sell to

5    end users.

6              And I developed that relationship with

7    Pitt Memorial Hospital before it was Vidant.  So at

8    that time Robert Amerson, who was the former CEO and

9    Chairman, caught me in the hallway one day and said,

10   Hey, is there anyway you can help us get the Pitt

11   Memorial Hospital business?  Now, at this time

12   Flanders is not a large corporation, Ken.

13             And I said, I'd love to -- obviously,

14   right?  You know, because I knew it was an

15   opportunity.  And I was able to secure that piece of

16   business fairly quickly for Flanders Corporation.

17   You know, Pitt, now Vidant, uses a tremendous amount

18   of filtration, up to and including HEPA filtration.

19   So there's a large range of filtration, right.  And

20   so they would use the whole gamut.  And that is how

21   the relationship started.  I secured that piece of

22   business, and subsequently I was allowed to

23   represent their products going forward.

24        Q    So during this three-year period in which

25   you were self-employed you were selling products to

Harry Smith                          June 2, 2017

1    Flanders --

2         A    Uh-huh.  Yes, sir.

3         Q    -- for both their machinery and for their

4    end product?

5         A    Uh-huh.  Yes, sir.

6         Q    And you were also taking the end product

7    and selling it or distributing it to customers?

8         A    Yes, sir.

9         Q    Did you have an independent contractor

10   relationship with Flanders at that time?

11        A    I don't recall.  I don't think I had a

12   contract.  I think I just had, you know, a verbal

13   agreement that I could represent and sell in a given

14   geographic territory.  And back then the company

15   wasn't very complex -- I don't recall if I had a

16   specific contract, but I do not think I did.

17        Q    And during this period of time when you

18   were self-employed, you were working with other

19   companies as well?

20        A    Yes, sir.

21        Q    In terms of selling them products,

22   maintenance type products?

23        A    Yeah.  I was calling on a multitude of

24   companies -- yes, sir.

25        Q    Were you also selling those other

Harry Smith                              June 2, 2017

1      companies' products to customers?

2          A    Yes, sir.

3          Q    So what happened to change the

4      relationship between you becoming self-employed and

5      some -- you know, tell me the next step.

6          A    Robert sat me down one day -- and you

7      know, I was doing fairly well -- and said, I would

8      like for you to come to work for me.

9          Q    All right.  Robert who?

10         A    Robert Amerson was the CEO and Chairman of

11     Flanders.  No, I'm sorry.  He was the Chairman, not

12     the CEO.  Steve Clark was the CEO.  And Robert and I

13     threw it back and forth, and I said, you know, let

14     me think on it.  And, you know, he made some

15     appealing -- you know, because I was still young and

16     up and coming, right?  And he made some appealing

17     comments to me about leadership in the company,

18     opportunities.  And subsequently, you know, he and I

19     came to an agreement that I would actually come to

20     work for the company.  So at that time I became an

21     employee of Flanders Corporation.

22         Q    Do you recall the date?

23         A    No, sir.

24         Q    Just ballpark?

25         A    I really have no idea.  I mean I'd love to

Harry Smith                              June 2, 2017

1     give you better dates, but it just ran altogether.

2     But I mean I was CEO from -- you can back into it

3     from there.  I was CEO from -- call it May of 2007

4     through '14, I think, 2014.  Approximately the same

5     time, Ken, it would be the May time frame period or

6     pretty close.  And then prior to that, in a sequence

7     of events, you know, I was Chief Operating Officer

8     of the company.  I was --

9          Q     When were you COO?

10         A     Approximately a year before I was CEO.

11         Q     For just a one-year period?

12         A     Approximately.

13         Q     So we'll say from about May of 2006 till

14    about May of 2007?

15         A     Yes, sir, approximately.

16         Q     Okay.  Prior to that point in 2006, when

17    you became the COO, what was your position?

18         A     I held a number of different positions,

19    from sales to managing direct sales offices, to

20    operations in high purity.  So it was just a series

21    of different positions.  I moved into the company --

22    and I basically moved into the company where, you

23    know, we seem to have, you know, financial

24    constraints or financial challenges.  And I was

25    moved in those areas accordingly.

Harry Smith                              June 2, 2017

1          Q     Well, okay, but I want to back down.  We

2     started with CEO.  Then you -- before that you were

3     COO.

4          A     Uh-huh.

5          Q     What were you before you were --

6     immediately before you were COO?

7          A     Before that I was in charge of high purity

8     operations, high purity sales, and then all

9     commercial sales, except retail.

10         Q     About how long were you in that position?

11         A     I don't recall the exact time frame and

12    range.  But, you know, I would say a couple years,

13    you know.

14         Q     So that would put it around the 2004 time

15    period -- from about 2004 to 2006?

16         A     Approximately, yeah.

17         Q     Do you recall the position you were in

18    prior to being in charge of the high purity

19    operations?

20         A     I do.  But my original position, Ken, that

21    they brought me into is that I managed the direct

22    office.  So Flanders had approximately, probably ten

23    direct offices around the country.  And these are

24    actually distributors that we owned.  So we had --

25    the model at that time was, you know, we had direct

1    sales and distribution of sales.  So Steve Clark,

2    the CEO, was -- we had direct sales offices, which

3    we owned, which would be 5, 10, 15, 20,000 square

4    feet and a sales force that went out and sold

5    filters.  But they were on our payroll.  We owned

6    the inventory.

7              And so I ran -- the first thing they did

8    was put me in charge of those direct sales offices.

9    And the assignment was given to me because they were

10   financially challenged.  You know, they were having

11   trouble getting them going.  And -- but that is the

12   first assignment I got with the company.

13        Q    Do you recall approximately how long you

14   were in that position?

15        A    I don't.  I'd say 18 months to two years,

16   something like that.

17        Q    Is it fair to say you started with

18   Flanders somewhere around 2002?

19        A    Approximately.  That's probably fair.  I

20   don't recall exactly, but I think you're pretty

21   close.

22        Q    And to the best of your recollection, you

23   had four different types?

24        A    That's probably -- probably fair.

25        Q    The Manager of Direct Offices?

Harry Smith                          June 2, 2017

1          A       Uh-huh.

2          Q       Director of high purity operations, COO

3      and CEO?

4          A       Yes, sir.  I ran everything at some point

5      in time except retail.  I never had retail until I

6      became COO.  Then I had retail control as well.

7          Q       So within those four different roles that

8      you performed you, at one point or the other,

9      oversaw every facet of Flanders' business?

10         A       Yes, sir.

11         Q       Mr. Smith, I want to take you to the point

12     of right before you started with Flanders.  And you

13     had a relationship for a number of years, it appears

14     a decade relationship as -- you know, working in

15     some type of contractual relationship in terms of

16     providing them with maintenance type materials, and

17     then subsequently in addition to doing that, you

18     were also selling product for Flanders?

19         A       Uh-huh.  Yes, sir.

20         Q       What was your perception of Flanders?

21         A       Not a very well run company.  You know,

22     when I looked at it, I did see a lot of opportunity.

23     I didn't know much about the air filtration space,

24     but I called on a lot of different people.  So, you

25     know, I would call all the billion dollar

Harry Smith                              June 2, 2017

1    pharmaceutical companies, obviously a lot of

2    infrastructure very well ran.  And I would call

3    small companies, from Hackney and Sons in

4    Washington, that I would probably assimilate along

5    the same lines I would in Flanders at the time,

6    right, which is, you know, undercapitalized, slow

7    pay -- because I got paid slowly.  So, you know, I

8    was not -- I never got up in the morning time

9    saying, gee whiz, golly, this is the next best thing

10   since sliced bread.  So I didn't have a high

11   perception of the company.  I didn't have a low

12   perception of the company.  And I also probably

13   wasn't mature enough at that time, Ken, to

14   understand the dynamics of the capitalization and

15   finance like I do now.

16           So -- but I don't recall having some --

17   you know a great perception of it.  I mean my

18   perception at that time, based on use and

19   experience, was, you know, when I went into a big

20   pharmaceutical company, it enamored me.  And then

21   when I went to Little Washington, not so much.

22        Q    And Little Washington is where Flanders is

23   based?

24        A    Was headquartered at that time, yes, sir.

25        Q    Did you call on any other air filtration

Harry Smith                         June 2, 2017

1   companies prior to going to work for Flanders?

2       A    I attempted to.  I tried to do business

3   with Purolater, as I recall.  I don't recall anybody

4   else that I tried to -- I was really kind of

5   geographically -- you know, Eastern  North Carolina.

6   I had some products that I thought that I could have

7   sold in other markets, but I was not successful in

8   doing it.

9       Q    Were you aware of Flanders' competitors at

10  the time, before you went to work for Flanders?

11      A    I was aware of a few, but had no idea of

12  the range of competitors.  So I would tell you my

13  knowledge was limited as to the breadth and depth of

14  who could do what in the space.

15      Q    Once you began your employment with

16  Flanders, did that knowledge base change?

17      A    Dramatically.

18      Q    How so?

19      A    Well, you know, I think ingrained myself

20  in the business, you know, based on what, you know,

21  I was perceived and was told as an economic

22  opportunity for me.  And I quickly learned, you

23  know, the landscape, you know, and it's

24  multifaceted.  So, you know, you have retail, which

25  is obviously big box stores.  You have what we call

Harry Smith                        June 2, 2017

1    ARW, which is air conditioner, refrigeration and

2    wholesale, which would be like your Johnstone

3    Supplies, C.C. Dixons, which would be a local

4    distributor to sell fans, belts, freon, air filters.

5    So the mechanical contractors you would call here

6    today, he would go by there and pick up a can of

7    freon, he'd get a case of filters.  So that's a

8    space.  And then we have the filter sales and

9    service space, which would be Ken Gray owns Ken Gray

10   Filters Sales and Service.  You have the warehouse,

11   two trucks.  And you call on hospitals,

12   pharmaceuticals and plants locally.  And you would

13   buy our products and sell our products.  So that's

14   the third space.

15           And, you know, we had the high purity

16   space, which is HEPA filtration, clean room

17   filtration and nuclear filtration.  And then, you

18   know, we had a complete service division, which was

19   rooftop change outs, mostly big box stores, so forth

20   and so on.  And we also had a paint booth division.

21   So the paint booth division would sell paint booth

22   and roll type products to, you know, automobile

23   dealerships and so forth.

24           And so, you know, what I learned quickly

25   was it was a pretty complex model.  And so I really

Harry Smith                        June 2, 2017

1   ingrained myself into learning, who, what, when

2   where and how from a competitive landscape.  So I

3   would say, yeah, I got up to speed really, really

4   quickly on -- on all the divisions.

5        Q    Okay.  Let me go through --

6        A    And I'm sorry, retail as well.

7        Q    Yeah.  Retail, explain that.  And

8   basically explain what Flanders does.

9        A    Sure.  Yeah.  So Flanders Corporation, you

10  know, is a multi-faceted air filtration company.

11  What I got at Flanders Corporation is an evolution

12  of the model.  So when I got to Flanders Corporation

13  it was in financial challenge.  It's public record

14  was a NASDAQ traded company.  So what my thesis when

15  they offered me -- took the job, was that we had a

16  model problem.  Because, you know, we had the direct

17  offices I was telling you about, and then, you know,

18  we also sold to Ken Gray Filter Sales and Service.

19        So you would actually go and compete with

20  our direct offices every day.  So we'd have sales

21  guys on our payroll competing with you selling our

22  products.  And the same thing in the retail space.

23  Instead of you going to Lowe's, you could just go to

24  one of our direct offices and buy our filters.  So,

25  you know, what I said is we had a confused strategy.

Harry Smith                          June 2, 2017

1   And what we had at that time was a CEO that was

2   buying (indiscernible.)  So I mean, he was losing

3   market share in the normalized market because people

4   didn't trust us as a partner, because we were

5   competing with him.  So he was going out and buying

6   Ken Gray's Air Filter Service.

7           So, you know, you say, hey, I'll sell it.

8   I do 8 million in sales.  And then, you know, we buy

9   it and it looks like you've got $8 million in

10  revenue growth.  And so, you know, we had a very

11  challenged balance sheet.  We had a loss in customer

12  base and we had poor service because, you know, we

13  had financial challenges, raw material flows, so

14  forth and so on.

15          So when I got in the company, you know, I

16  said, I'm going to take it here.  So where I took it

17  to was strictly in the direction -- so I spun off

18  all the direct offices, sold them all off to Ken

19  Gray.  So, you know, I said, Ken, would you like to

20  have two more offices?  And I worked with our

21  existing filter sales and service space to -- to buy

22  those branches and incorporate the trust that we

23  weren't going to compete with you.

24          And then we put the -- we spun off the

25  complete service division, which was the rooftops,

Harry Smith                          June 2, 2017

1    you know, because we were competing as well there.

2    So we got out of that space.  We got out of the

3    paint booth space because it just wasn't a core

4    space, it was a cash burner.  We had a competing

5    high purity plant in Salt Lake City, Utah, which is

6    where the former CEO lived.  So we had a competing

7    plant to the high purity plant in Washington.  So

8    they actually had a sales force in Salt Lake City.

9             We had a sales force in Washington.

10   Didn't work out so good.  We competed for price.  So

11   you could call Salt Lake City and get a price for a

12   HEPA filter and you could call Washington for a

13   price for a HEPA filter.  And so I shut that plant

14   down.  And we had a detached corporate office, which

15   doesn't work for a company in this space.  So the

16   detached corporate office was in Florida, which the

17   ex-CEO had a place in as well.  And I closed it down

18   and I moved the corporate office to Washington,

19   North Carolina.

20            Two fronts there, one, job creation in

21   North Carolina, which was near and dear to me.

22   Didn't try to hide that.  And, two, I wanted to be

23   with my family.  I didn't want to be in Florida.

24   And so, you know, we took a detached office, the

25   detached corporate office and moved it to

1      Washington, North Carolina, which would be customer

2      service, accounting, IT and all those platforms.

3             In that process, the world said you can't

4      hire enough help in Washington, North Carolina.  We

5      had all the help we wanted, great folks, and it

6      worked really, really well.  That was when the

7      company started turning.  We took a tremendous

8      amount of overhead out and then, you know, we really

9      started driving service through efficiency and

10     trust.

11            The retail space is a very difficult.  In

12     and to itself, it's a tough space.  You know, you're

13     calling on Wal-Mart, Lowe's and Home Depot.  And

14     it's really a two-edged sword, you know.  I can also

15     tell you, if I go back into this, I don't know that

16     I'm going into that space.  I still have a lot of

17     friends there, but why did I have a lot of friends?

18     I couldn't run a company without them.

19            So, you know, we were approximately --

20     these are rough numbers.  I think when I got it, we

21     were probably 160, 165 million, you know.  When I

22     exited we were 325, something like that.

23     Q    All right.  Give me those numbers again.

24     A    When I got it, I'd say we were --

25     Q    And let me ask you -- let me just stop you

Case 4:16-cv-00289-FL   Document 30-1   Filed 07/14/17   Page 30 of 254

1     there.

2          A     Yeah.

3          Q     When you say, "when I got it."  Are you

4     talking about --

5          A     CEO.  When I got control of the company

6     and could put the company in the position that I

7     wanted to, right?  And, really, I had a carte

8     blanche opportunity, because the company was in

9     trouble.  So, you know, the Board basically said,

10    help.  And so, you know, I was able to enact my plan

11    without -- without a lot of -- I won't tell you it

12    was zero respect.

13              Now, as a part of the process, when I

14    became CEO, you know, myself and Robert Amerson

15    bought the ex-CEO out.  So we went to him and we

16    bought his stock out.  It was a $7 million

17    transaction.  I bought $3.5 million.  He bought $3.5

18    million.

19         Q     "He" being Robert Amerson?

20         A     Robert Amerson, correct.  This was the

21    time when you could go to the bank and borrow money

22    you shouldn't borrow.  And so I collateralized my

23    whole $3.5 million with the stock.  So I would say

24    that I was all in.  And then subsequently, you know,

25    as we got into the company, I realized the balance

Harry Smith                              June 2, 2017

1    sheet had a lot of problems.

2         Q    And let me go back though.

3         A    Sure.

4         Q    I just wanted to make sure I got those

5    numbers right.  You said when you took over as CEO

6    the company was worth?

7         A    I think the company revenue-wise -- I'm

8    pretty close to this -- was about 165 million.  When

9    I exited, we were on a 325 run rate, 325 million.

10        Q    So you doubled it?

11        A    Approximately.  Uh-huh, approximately.

12   And I spun off a lot of sales.  So I mean if you

13   took the direct offices -- I don't remember the

14   number.  But you got direct offices going to do 1.5,

15   3 or 4 million.  So I mean I spun off probably $25

16   million worth of sales that we -- we got rid of.  We

17   lost money on every office.  So it wasn't a cash

18   hit, but we dropped the revenues, you know.  And

19   so -- but I was in a position we were burning cash.

20   I had to stop the cash burning, right.

21             So what I really did from the initial

22   start was -- my whole game plan day one was to get

23   the company to break even, you know, we were burning

24   cash.  So I started spinning stuff off.  And also,

25   by the way, I didn't think it would fit and I also

Harry Smith                        June 2, 2017

1    didn't think that the model would work.  But, by the

2    way, I can't tell you that I had the expertise in

3    the space that I do now.  Some of that was really

4    educated guesses, because I knew we had to do

5    something, right?

6              I knew the direct offices were a problem,

7    because we had constant complaints from our customer

8    base and customers leaving because we were competing

9    with him.  That makes sense, right?  And so, you

10   know, I put the company through a series of moves,

11   and I would tell you the right-sized of the

12   organization, you know, closed the detached office,

13   closed Salt Lake City, spun off distribution

14   offices, got rid of the complete service division,

15   got out of the paint booth division, tried to re-

16   introduce the company and -- to the customer base.

17   And so I was heavily engaged with -- too engaged

18   with customers, vendors and employees.

19             But, you know, you're also -- you know, I

20   was all in, right.  So if the company fails, I mean

21   I didn't have that kind of capital at that point,

22   right.  You know, I had borrowed money -- risk and

23   reward at a young age.  I still haven't paid for it.

24   I risk mitigate at this point.  But, you know, as I

25   got more into it, I can tell you at this point in my

Harry Smith                              June 2, 2017

1    life I wouldn't have done it.  Because I know a lot
2    more about balance sheets, income statements -- and
3    I didn't know that back then.
4           I didn't have that skill set.  I had a
5    tremendous amount of energy.  I was a pretty smart
6    guy.  And I had learned the space pretty good.  And
7    you also had a Board of Directors that probably
8    couldn't have went out and recruited a real world
9    CEO at that time.  I can't tell you at that time
10   that I should have got the company, because I
11   honestly do not think I should have.  I don't think
12   I was prepared to be a NASDAQ CEO at 35 with a
13   company with challenges.  I mean I had never done an
14   earnings call.
15          So I'd say I got indoctrinated pretty
16   quick.  And it was a lot of -- a lot of trial by
17   fire, made a lot of mistakes.  And we just kept
18   working through it.  And, you know, the great
19   recession came along the same time and, you know, we
20   just continued to work through it.  But it was a
21   tough bunch of years.  I mean, you know, that's the
22   reason I sold the company.  I mean I was really
23   done.
24          And, you know, I also got in pretty bad
25   health during that period of time.  So I was work

Harry Smith                          June 2, 2017

1    100 to 120-hour weeks.  And at that same period in

2    the turnaround, I ended up with all the real estate.

3    So we'll explain how I ended up in the real estate

4    business.  We didn't have any capital.  So Bartow

5    burned to the ground.  That was a manufacturing

6    plant in Florida.  Key and critical plant because

7    Florida's hot and we sell a lot of filters there.

8    So we had an old plant and had a guy -- a man and

9    his wife, as I recall, burned the plant down.  Air

10   filters burned.  So burned the plant down.  I

11   immediately went back to Bank of America, who was --

12   we had our ABL, which was asset based lending, you

13   know.  We borrowed money off of receivables and

14   inventory and balance sheet.  And we were leveraged.

15   I mean every week I was paying, you know, payroll.

16   I got company with no cash.

17          So I went to the Bank of America and sat

18   down with Bob Rhodes and Bob Moore, two great guys

19   who I still think a lot of today.  And I said, I

20   need -- I need to rebuild Bartow.  And as I recall,

21   Bob Rhodes started laughing.  He said, here, come

22   on.  What's the next conversation?  I said, I've got

23   to -- I mean I'm done if I can't rebuild this plant.

24   I had the dirt because I owned the dirt.

25          And the said, we're not going to let

Harry Smith                            June 2, 2017

1    you -- no more debt for this company.  We're not

2    going to get more exposure.  We're not going to

3    allow the company to have anymore exposure.  I

4    didn't understand it then.  I understand it now.  I

5    mean it was back -- I was still -- when I was -- I

6    mean -- so I called Robert.  And, you know, Robert

7    had some net worth, right.  And I said, look, I've

8    got to rebuild this plant.  And he said, okay, well,

9    let's rebuild it.

10           So he and I went to BB&T, back when you

11   could borrow money you shouldn't be able to borrow.

12   And he and I bought the land from the company, fair

13   market appraisal, you know, arm's length

14   transaction, fully documented and vetted, gave the

15   company a 1.5, $2 million injection of cash, which

16   helped the company.  And so you're going to get a

17   turnaround at the time we turned this thing around

18   here in a second.  And then we borrowed, I think 7

19   to $9 million and built the plant ourselves.  So we

20   owned Bartow.  That's how the real estate function

21   started for me.

22      Q    And Flanders, prior to that, had owned

23   Bartow?

24      A    Correct.  So we bought the land, injected

25   the cash into Flanders, which we needed it, and then

Harry Smith                          June 2, 2017

1      we built the plant.

2           Q     And at that time Robert Amerson was --

3           A     Chairman of the Board.

4           Q     -- still Chairman of the Board?

5           A     Correct.  So we started there and then,

6      you know, if we needed a plant, we took it on our

7      personal balance sheet.  So, you know, it goes back

8      to when you're all in; I was all in.  And, you know,

9      we were still really -- I mean if you go back and

10     look at the financials -- because I was on NASDAQ

11     for many years.  I mean, you know, we were just

12     bumping along.

13             Bartow actually was one of our big

14     turners, because we had two different facilities, a

15     leased facility, old, very old facility, we rebuilt

16     this facility.  And what happened -- but people also

17     perceived that we rebirthed.  They said, wow, look

18     at this facility they built.  So, you know -- and we

19     told them that.  You know, we built a new state-of-

20     the-art facility.  You know, we're here to stay.

21     Because the rumors in the industry, rightfully so

22     for all of our competitors, were these guys are

23     going under.  I mean that was my -- that I dealt

24     with every day.

25             And it was very challenging in the retail

Harry Smith                            June 2, 2017

1    world, where they're very sophisticated.  So, you

2    know, they're very -- you know, they want a low

3    price, but they also want to know you're going to be

4    able to ship them.  And so I battled that all the

5    time.  That was one of our turning points.  And then

6    I ended up owning Bartow Oklahoma, a 500,000 square

7    foot in Oklahoma.  And what happened there was we

8    had two plants in Matamoros, which was maquiladoras

9    across from Brownsville, Texas.  So we had three

10   maquiladoras.

11          We had Tijuana, which had worked

12   incredibly well for us.  And we -- we had a plant in

13   Texas.  I mean I was winning the lottery.  And both

14   guys convicted.  So we ended up with two

15   maquiladoras in Matamoros, Mexico, with the premise

16   that Tijuana had worked like a dream.  These didn't

17   work.  So we had a distribution center in

18   Brownsville trying to take advantage of entry level,

19   you know, labor in Mexico.  I had an armed takeover.

20   I had all kinds of issues in Matamoros.  It was when

21   the drug stuff blew up in Brownsville, if you

22   remember that.

23          We couldn't get employees, a lot of

24   shootings.  We wouldn't even go over there.  So we

25   actually moved our assets out 2:00 o'clock in the

Harry Smith                              June 2, 2017

1      morning and we bought a 500,000 square foot plant in

2      Ardmore, Oklahoma.  Again, myself and Robert

3      purchased it.  I ended up owning Air Seal in Texas,

4      which was a division where we made air handlers.  We

5      exited that division, and I sold that facility early

6      on.  I ended up owning Hudson, New York.  So, you

7      know, we had to have a distribution point in New

8      York.  So I bought that facility.  And in that

9      facility --

10         Q    And when you say you bought it --

11         A    Yeah, I bought it.

12         Q    Now, did you personally?

13         A    Uh-huh, yeah.  Yeah, me personally.  And

14      on that facility, I allowed my management team to

15      participate.  I had five or six guys on my

16      management team that I gave a portion of that

17      facility to.  And so, you know, I was -- I was in to

18      the extreme.  Now, every time we would do this, we

19      would go to the bank and say, you know -- we still

20      hadn't got to the point that I think everybody felt

21      comfortable.

22              And as we got the facilities going, we

23      really battled it, fought it, and we had a lot of

24      help on the vendor base.  And, you know, the company

25      started turning.  And we started making some money

Harry Smith                          June 2, 2017

1    and started getting credibility.  You know, one of
2    our big turns was, you know, I personally landed the
3    Lowe's contract.  And it was a big turning point for
4    us because it was faith -- that one of the big box
5    stores had faith in Flanders Corporation.  And, you
6    know, we got a $37 million increase overnight.  So
7    through put efficiency in that business, right?
8            So we landed the Lowe's account and that
9    was a big turning point for us.  You know, revenue
10   jumped.  You know, we had a movement in EBITDA.  And
11   the company really started stabilizing.  The balance
12   sheet was stretched the entire time I had it, but
13   not as bad.  You know, you could manage the company
14   without coming in on Friday trying to figure out if
15   you were going to cover $2 million in payroll
16   checks.  And I did that for I don't know how many
17   years, every Friday, you know.
18           So I mean it was pretty stressful, as you
19   can imagine.  We were able to get that account and
20   get it going.  And at that point I had a
21   conversation with the Board about taking the company
22   private, no me, specifically.  We had no business
23   being in NASDAQ.  I mean, we just -- it was one of
24   those things where, you know, they went and raised
25   capital with a great, big famous story.  This

1     industry never returned those kinds of numbers, and

2     never will, the bear interest too low in the space.

3              And so I said, look, we need to get --

4     move the pink sheets and we need to sell the

5     company.  I want out.  I mean I was very up front

6     with the Board about that, that I wanted out.

7          Q    About what time are we talking about?

8          A    I think it was about two years before I

9     sold it to Insight.  So, you know, it took a period

10    of time for me to move out.  And, you know, I talked

11    to my -- my wife about it, my family about it.  And

12    we had made that decision.  And I had also said if

13    we don't do that, then it's probably time for me to

14    exit then.  And so the Board agreed and we went --

15    we started the process.

16             And we went from NASDAQ to pink sheets,

17    which is an intermediary.  And, again, I learned a

18    lot.  I mean I tell everybody I got a Ph.D. at a

19    young age.  And so we went to pink sheets, never got

20    sued, total transparency.  When I went to pink

21    sheets, you don't have to do Qs and Ks.  I still did

22    it for everybody, because I wanted to be completely

23    transparent.  And so we never got sued, and I

24    communicated with all the investors, spent a lot of

25    time in New York explaining where we were going, how

Harry Smith                              June 2, 2017

1      I was going to get everybody out, try to make

2      everybody whole.

3              And then we really had some pretty good

4      numbers on the Board.  You know, I think we were

5      20 -- we pro formaed about 23 million EBITDA, which

6      was a nice turnaround.  I think when I got it it was

7      negative 10 or 12 in cash.  So we went from negative

8      10 or 12 million EBITDA to positive 23.

9         Q    Okay.  You need to spell that acronym --

10        A    Sure. EBITDA --

11        Q    -- for the court reporter.

12        A    Yes.  EBITDA is earnings before income,

13     tax, depreciation and amortization.

14        Q    And give her the initials.

15        A    EBITDA.  So we went from -- when I got it,

16     it would be negative, significantly negative EBITDA

17     to positive EBITDA for that space.  And my

18     recommendation to the Board was it was time to exit.

19     And why did I say that?  We had a significant

20     portion of retail.  Retail's going to force you down

21     every single year.  So, you know, you don't go into

22     Home Depot, Lowe's and Wal-Mart to get a price

23     increase.  There are other people in the space.

24     It's a big number.  People want it.  They're

25     enamored with it.

Harry Smith                          June 2, 2017

1              And so every year, you know, if you're

2    doing -- we were doing 80 million or 90 million in

3    retail at that time, you know, they wanted 1-1/2, 2-

4    1/2, 3 points every year.  So we had to figure out

5    how to take it out, either raw materials feed --

6    it's just tremendous pressure because every year

7    you're trying to figure out how to do it quicker.

8    And the fact is that if you lose that piece of

9    business the whole model changes.  So you've got all

10   these plants that you built for a certain amount of

11   volume.  So the old acronym is, when they got you,

12   they got you.  So, you know, we had to figure it

13   out.  And at the same time, I had everything on the

14   line.  So it's very, very, very stressful.

15        Q    Okay.  I want to go back and unpack a few

16   of the things.

17        A    Sure.

18        Q    Just to be clear to people that are not

19   familiar with Flanders, and we're talking about air

20   filtration.  What you're talking about as far as

21   from a retail standpoint are the filters that go in

22   somebody's house --

23        A    Yes, sir.

24        Q    -- you know, for the HVAC system?

25        A    Correct.  Yes, sir.

Case 4:16-cv-00289-FL   Document 30-1   Filed 07/14/17   Page 43 of 254

1        Q      And then you also have commercial sales in

2    which you're producing bigger air filtration

3    systems?

4        A      Yes, sir.

5        Q      Some comparable to what you do on the

6    retail side as far as their heating and air system;

7    is that correct?

8        A      Yes, sir.

9        Q      But you also do the high purity, which is

10    an area in which you're trying to have a very pure

11    environment?

12        A      Yes, sir.

13        Q      Such as dealing with computer chips?

14        A      Yes, sir, the cleaner -- yes, high purity

15    is -- is a multi-faceted business too.  It was

16    approximately a $50 million piece of business out of

17    Washington, North Carolina.  And you do clean rooms.

18    It will be Intel and Motorola.  Then we had a 1,000

19    clean room, very, very efficient, did very well.  We

20    also did nuclear filtration.

21        Q      What is that?

22        A      So nuclear filtration is like Westinghouse

23    Nuclear, where we actually, you know, had nuclear

24    certified -- because they've got to go through a

25    rigorous testing process -- nuclear certified HEPA

Harry Smith                                June 2, 2017

1    filtration.  And there was only a few people in the

2    country that -- that were nuclear certified.  We

3    were one of them.  And the same process, you know,

4    we may containment houses, which would be where the

5    filters went in at.  So these would be massive metal

6    containment houses, which were called bag in, bag

7    outs.  And we were very successful in that product.

8    It was basically a product, Ken, where you would

9    take the HEPA filtration into a big, massive bank of

10   stainless houses.  Very caustic air would go into

11   them.  These filter banks would clean them.  Now

12   when you took the filter out, it went into a bag.

13   So there's a seal there.  The bag goes on it.  The

14   filter comes out and drops in the bag.  You cinch

15   the bag.  Nothing ever comes out.  And that's the

16   kind of caustic environment that we dealt with

17   there.  And it had significant margins in it.

18           One of the advantages we had there is we

19   had very little overhead, right?  So we competed

20   with people that had -- in my opinion had

21   superfluous overhead structure.  We had a pretty

22   lean overhead structure.  The disadvantage we had

23   was lack of capital to invest in the business.

24   So -- but that business -- and we also did

25   pharmaceuticals.  So, you know -- and hospitals.

Harry Smith                          June 2, 2017

1    So, you know, all your operating rooms had HEPA

2    filtration in them.  So if you're in the OR and you

3    look up and you see the square grid there, that's

4    going to be a 99.97 percent HEPA filter, which will

5    catch everything up to .03 microns.  And so, you

6    know, we did that space too.

7           So, really, Flanders Corporation did

8    everything from a 99 cent filter that would go in

9    your house, which we had fiberglass filter you buy

10   at Wal-Mart, a really great model, up to a multi-

11   million dollar filter.  So, you know, we covered the

12   entire spread, strictly manufacturing, got out of

13   distribution and all that and drove manufacturing,

14   which was development of products, marketing

15   literature, low cost manufacturing.  But we covered

16   the entire gamut on air filtration.

17       Q    And you said there close to the end that

18   you got out of the distribution portion?

19       A    Yes, sir.  We -- we-- Steve Clark

20   developed the model.  And it's been one of my

21   contentions that -- you know, and my offer to help

22   was genuine.  You cannot have a direct model and a

23   distribution model.  So I'm going to explain it to

24   you, where this is -- so today -- and I can use this

25   as a real world example.  Today American Air has

Harry Smith                          June 2, 2017

1     approximately 65 direct sales people in the center,

2     right?  And they work for American Air.  They get up

3     every day and they go call on hospitals,

4     pharmaceuticals, manufacturing plants and try to

5     sell Flanders American Air products.  Sixty-five

6     guys get up every day and go sell direct.

7          Flanders has distributors that get up

8     every day and go sell those to same customers

9     against the American Air sales guys.  So, you know,

10    what you got is they're taking the products that you

11    you would buy, Ken Gray -- Ken Gray Air Filtration,

12    and you go over to the hospital here and say, Look,

13    I want to -- they say, Ken, I want to get a price on

14    50 HEPA filters, Flanders HEPA filters.  So you

15    would give them a price for Ken Gray Air Filtration.

16          (Noise interruption.)

17          So you would say, Mr. Hospital -- say,

18    Ken, can you give us a price on 20 Flanders HEPA

19    filters?  You say, absolutely.  I've got them in the

20    warehouse.  You would give them a price.  The

21    American Air salesperson, who also is on the same

22    payroll as Flanders' manufacturing people, he goes

23    and cuts your numbers via exact same filter.  He's a

24    direct guy from the company.

25          That is the model they have today.

Harry Smith                           June 2, 2017

1    They're competing internally.  I got an account

2    called Grainger before I left.  I negotiated a

3    contract myself.  It's approximately a $60 million

4    contract.  Grainger's core business is hospitals.

5    American Air's core focus is hospitals.  So now

6    Grainger is a $60 million direct account to Flanders

7    is competing with American Air's people every day

8    for the same filters.  And it's -- and it's the

9    approach that I went away from.  And, you know, I'm

10   not 90 percent or 85 percent or 80 percent, I am 100

11   percent that if they do not change course in that

12   model, they're going to have catastrophic results.

13   I think if you would look at the actual performance

14   of the company today, you would find that I'm

15   correct.

16          And so I'm not trying to perceive --

17   they're doing great.  That's phenomenal.  I'm happy.

18   I go back home.  So they have a direct model and a

19   distribution model in the same environment, and

20   they're going to continue to lose significant market

21   share.  Let me further that on two accords.

22   Grainger and Home Depot are the two largest accounts

23   that they have, along with ACE.  So if you took

24   Grainger, Home Depot, ACE and Wal-Mart, those four

25   accounts -- Home Depot's 100.  Grainger's 55 or 60.

1     ACE should be 15 to 20.  Wal-Mart's 12.

2          Q    And when you're saying these numbers,

3     they're in the millions?

4          A    Revenues.  Yes, sir, revenues.  So those

5     four accounts, if you look at the 335 run rate that

6     I had, they're critical.  Now, none of those

7     accounts lacked a single source, because they don't

8     want to have all their eggs in one basket.  It's

9     called leverage.  So when I went in, they would say,

10    well, Ken, Kevin will cut your price.  We can go

11    with Kevin.  And by the way, he's doing great.  Look

12    at this part of the country; he's doing great.  So

13    that's how they did it.

14         Q    Let me make -- let me unpack that.

15         A    Sure.

16         Q    I think what you're saying is they would

17    play one rep against another?

18         A    Absolutely.  No question.

19         Q    Okay.

20         A    And so at the same time we couldn't afford

21    to lose the volume.  So it's a very strenuous

22    position.  So you're sitting there on one hand, you

23    need a price increase.  On the other hand, if you

24    lose a $50 million piece of business, you can't make

25    the plants work.

Harry Smith                           June 2, 2017

1       Q    And you have mentioned the Grainger

2    account, and you said that was how much?

3       A    It should be 55 or 60 million.

4       Q    And you also said that you landed the

5    Lowe's account, 37 million?

6       A    Okay.  So to back up on Lowe's, what

7    happened on Lowe's, I did personally land the Lowe's

8    account, $37 million.  I also personally negotiated

9    the Grainger account by myself, along with Charlie

10   K. but I led the effort there.  And I'll tell you

11   why.  At the same time I continued to get a really

12   good relationship with Home Depot in Atlanta.  I

13   mean they've been a long-term customer.  The company

14   started to turn.  And I kept saying, guys, I can

15   beat 3M.  I've got a lower overhead structure.  I

16   don't have a brand name.  And I didn't have the time

17   to develop one.

18           So myself, along with the Home Depot

19   executives developed Honeywell and Rehm, which is

20   what they sell now.  So Home Depot came to me --

21   they actually put me on their foundation Board and

22   said, here.  If we give you Honeywell and Rehm,

23   what's your pricing structure?  And I said -- I gave

24   my pricing structure.  And I said, I need to make

25   this, total transparency.  I said, I -- I got to

Harry Smith                         June 2, 2017

1    make this.

2           And I gave them approximately a $28

3    million cost reduction from 3M with a name brand,

4    because of their superfluous overhead structure.

5    And I was able to negotiate the Home Depot contract

6    nationwide.  So I got -- and so on a further point,

7    because some of this is really critical that you

8    need to know.  They don't single source.  So, you

9    know, I had to really work the accounts.  I was in

10   Atlanta a lot getting confidence, working with

11   senior management, you know, talk to Frank Blake,

12   the CEO and working -- so I said, you can trust me.

13   I will -- I can do this.

14           And I was able to gain that trust.  And

15   they fired 3M and hired Flanders nationwide with the

16   Honeywell Rehm ticker.  And at the same time, they

17   negotiated the -- the rates.  Now, when we announced

18   that, I got fired from Lowe's two days later, as we

19   expected.  So, you know, when I went to Depot I

20   said, look, if I do this, Lowe's is going to fire

21   me.  So I said, I'm doing 37 million with them.

22   But, by the way, if you guys will do this, I'm good.

23   Because I actually have a better margin structure

24   here than I have here.

25        Q    And when you say here, you would have had

Harry Smith                          June 2, 2017

1        a better margin structure at Home Depot --

2                A      Yes, sir.

3                Q      -- than you did at Lowe's?

4                A      Yes, sir.  So I was willing to trade the

5        Home Depot partnership, which I felt really strong

6        about a partnership there.  I mean, you know, I

7        was -- I would tell you I was an insider there.  I'm

8        still really close with those guys.  I don't -- you

9        know, I talk to them.  We text.  We don't talk air

10       filtration.  But I became pretty close with that

11       organization, you know.  And they embodied a lot of

12       trust in me.  And I was totally transparent.

13               So, you know, when Harry Smith negotiated,

14       I would say, Ken, this is my cost structure.  I mean

15       this is what it cost me to have 4,000 employees in

16       the plant.  I've got to make something.  And by the

17       way, if somebody can do it cheaper, I don't know

18       how.  So I mean I didn't never -- I never tried --

19       and I never tried to hide my balance sheet.  So when

20       I was in trouble I did this.  I said, I've got

21       challenges.  This is my plan.  And that's how I got

22       the Lowe's contract.  Lowe's felt like I was very

23       forthright with them.

24               We never failed Lowe's.  Lowe's called me

25       up said, hey -- I said, I'll be there tomorrow.  So

Harry Smith                                June 2, 2017

1       I went to Mooresville, sat down.  They said, This

2       don't work for us.  I said, I fully understand.

3       Love you guys.  You know, we will service you

4       through an exit.  Lowe's went to 3M.  So you had the

5       two big guns.  We had Home Depot; 3M had Lowe's.

6       And we really lined up against each other.

7               So when you talk about an air filter --

8       you know, what I kept telling everybody is the media

9       is the media.  3M's just getting the 28 million,

10      because they're 3M.  I mean we had the same media,

11      right.

12      Q    Now, what do you -- when you say media?

13      A    That is the -- that's the stuff inside the

14      filter where the air hits.  So that would be media,

15      right.  So, you know, if this is your air filter

16      frame, that's the media.

17      Q    All right.  For the court reporter, what

18      you're referring to as the media would be the

19      fiberglass?

20      A    Or the -- it's fiberglass or what do we

21      call -- I mean it looks like paper.

22      Q    Yeah.

23      A    Well, there's two different medias.

24      There's fiberglass.  Because we did a fiberglass

25      operation, which we'll talked about.  And then

Harry Smith                          June 2, 2017

```
 1    there's pleat media, which is the white stuff you
 2    see.  And so the one differentiation we had, so I
 3    could tie the Pronamics together real quick for you.
 4    It's going to come -- it's really fluid.  Is -- so
 5    and we can go back to it, but this is a good time to
 6    tie in.
 7              MR. CEGLOWSKI:     You want to take a
 8    break?
 9              MR. GRAY:     Yeah.  Let's take a break.
10    (Off the record from 9:58 a.m. until 10:06 a.m.)
11              BY MR. GRAY:
12        Q    Mr. Smith, let me ask you this in regard
13    to what you've just testified to in regard to these
14    contracts that you developed based on, you know,
15    your personal relationship.  Did all of these occur
16    while you were the CEO?
17        A    Yes.  And let me qualify the word
18    contract.  They are not contracts.  So they would be
19    evergreen, which is a difficult part of the
20    negotiation process.  I wish we had contracts, so
21    you could go to sleep at night.  Those accounts are
22    evergreen contracts, which means they can fire you
23    at will without notice.  So part of that is a
24    strategy, obviously, to keep you front and center.
25              So I personally negotiated the Home Depot
```

Harry Smith                          June 2, 2017

1    contract and the Grainger contract myself, along

2    with Charlie Kwiatkowski at Grainger and Travis

3    Stephenson at Home Depot.  But I led the efforts on

4    both of those accounts from the CEO desk.

5         Q    You were the main player in that regard?

6         A    Absolutely.

7         Q    Now -- and let's focus on the industry.

8    Because it is a very small universe of participants;

9    is that correct?

10        A    It's evolving.  There's some new players

11   coming into the space.  But, you know, if you take a

12   look, Flanders has different competitors in

13   different spaces.  But you could tie them altogether

14   in a handful of companies, and I won't go by space.

15   But -- well, I will go by space.  So retail, you've

16   got 3M.  This is your biggest competitor.  And then

17   we have a company called Protect Plus, which is a

18   venture capital -- you know, what you want to call a

19   disruption type model company.  Purolater to some

20   degree.  American Air completely exited retail and

21   put it in writing.  So those were our competitors in

22   retail.

23             In ARW, you know, we completed with, you

24   know, Purolater, Glass Loss, Protect Plus in the

25   most part, and a company called Filtration Group.

Harry Smith                         June 2, 2017

1    Filter sales and service would have been those --

2    those same players.  And we competed at that point

3    with American Air's direct sales force.  With

4    American Air and direct sales force we had a

5    distribution -- se trusted you to go sell.  We just

6    sold you the filers. And high purity, our main

7    competitor there was Camfil Farr, very well run, a

8    very well capitalized company, and they were our

9    main competitor in that space.

10        Q    Now, going back to when you started with

11   Flanders, was it the market leader in any of these

12   categories?

13        A    Unequivocally, no, in no way, shape, form,

14   or fashion.

15        Q    At the point that you began as CEO, was it

16   the market leader in any of those categories?

17        A    No.

18        Q    During your tenure as CEO, did it become

19   the market leader in any of those categories?

20        A    Absolutely.

21        Q    Which ones?

22        A    We -- you know, we went -- we became the

23   largest air filter manufacturer in the country.  So,

24   you know, we went from where people were counting us

25   out, we were done, to the largest manufacturer in

Harry Smith                          June 2, 2017

1    the country and growing double digits handily.  So

2    we led retail.  I will tell you we had the

3    predominant position in retail.  And I had developed

4    a marketing and brand strategy in retail that would

5    have continued to have driven success predicated on

6    the Home Depot relationship and our relationship

7    with Wal-Mart and our relationship with ACE.  So we

8    had a significant amount of their market share.

9           We led the ARW portion of the business,

10   which would be air conditioning, refrigeration and

11   wholesale.  So we became the predominant player in

12   that space.  We were not the predominant player in

13   the filter sales and service space.  It was a very

14   tough space.  We didn't -- we did okay there, but it

15   was --

16        Q    In that space did you improve?

17        A    We dramatically improved.

18        Q    During your tenure as CEO?

19        A    During my tenure, but we were not the

20   leader in that space.  In high purity I would tell

21   you we were the leader domestically, not

22   internationally.  But in the United States, you

23   know, I felt like we had a predominant market share.

24   We attempted to open in Europe, and I was

25   unsuccessful.  I was unable to make it go.

Case 4:16-cv-00289-FL   Document 30-1   Filed 07/14/17   Page 57 of 254

1        Q       In high purity?

2        A       Yes, sir.  I put a couple people over

3    there and we started talking about manufacturing

4    plants, people, place and things.  It's a totally

5    different structure in how they operate.  I did not

6    have, one, enough time; two, enough capital.  So

7    I -- I -- I gave it about a year trying to figure it

8    out.  Part of my strategy there was to exit.

9    Because if we were going to sell the company, we

10   were also selling opportunities.  And I wanted to

11   show that market is an opportunity.  I could never

12   get traction and I retracted.  So as I exited, we

13   were very much the predominant player in three

14   spaces, in my opinion.

15       Q       And you mentioned the largest manufacturer

16   of air filtration in the country; is that correct?

17       A       Yes, that's correct.

18       Q       How did that compare to the world?

19       A       I don't know what the world space is.

20   That's a great question.  I mean I've heard numbers.

21   I don't know if I recall anything.  But, you know,

22   we were at a run rate of 325 or 335 when I exited.

23   I don't know of anybody else that would have been

24   that size.  I'm not sure how big Camfil was.  I

25   don't think Camfil was that size.  But Camfil is

Harry Smith                          June 2, 2017

1    primarily high purity.  So they didn't operate in

2    any of the retail space, which is a big numbers, low

3    margins.  But to my knowledge, I don't know of

4    anybody else in the world that was that size in air

5    filtration.

6         Q    And what do you attribute the success of

7    Flanders going from not being the leader in any of

8    those areas to it being the leader in at least three

9    of those areas that you talked about?

10        A    I was able to recruit some really great

11   people.  I gave them a story, gave them where we

12   were going, got them on the plan.  We ran a very

13   fast-paced company.  I was a very strong leader.

14   And in that you're going to have lovers and haters,

15   because I would fire you and did a lot.  But I --

16   I -- I attracted the best of the best in the

17   industry.  I had zero turnover.  Nobody left me.  I

18   could hire anybody I wanted to.  So I assembled an

19   A-Team.  And we ran a really fun, upbeat, fast

20   company.  I was over engaged in the company.  It was

21   a mistake of mine.  At the age I was and you put

22   what you put in, you get over engaged.

23        Q    And when you say it was a mistake, you're

24   talking about from a health standpoint?

25        A    It was.  I mean the problem I had was, you

Harry Smith                          June 2, 2017

1    know, when I tried to exit I couldn't exit -- and

2    we'll talk about that -- because they brought me

3    back.  And it's one reason I wanted to exit, because

4    I kept saying, guys, I don't want to get hung up

5    when this thing sells again, right.  And I had that

6    pressure on me that, we need you to sell.  At some

7    point you gotta go.  And we'll talk about it when we

8    get to that point on the dynamics of why I left.

9            But I -- you know, I -- I -- I was all in

10   and I had a team that was all in.  And I led -- I

11   was heavily involved in sales.  I was heavily

12   involved in the procurement of the vendor base,

13   driving cost out, you know, worked with vendors.  I

14   was very involved with customers -- I mean

15   employees.  You know, I made sure I visited plants,

16   talked to people, walked.

17           And so I would tell you from that

18   standpoint I was over engaged.  Because at the point

19   when it came -- I got the company where I wanted to.

20   But then when I was trying to figure out how to get

21   out, it got tough.

22       Q    Were you the primary individual who led to

23   the success of Flanders becoming a market leader?

24       A    You know, without making an egotistical

25   statement, there's no doubt.  And I think Insight

Harry Smith                          June 2, 2017

1    will tell you the same thing, and so would my Board

2    of Directors.  And I think the customers, vendors

3    and employees would tell you that.

4        Q    Were you the one at Flanders with the

5    primary customer relationship with the most

6    important customers?

7        A    Absolutely.

8        Q    And I think you mentioned those

9    previously, but that's Home Depot --

10       A    Yes.  And I'll name what I would -- and

11   there's a lot of -- everybody's key and critical.

12   But, you know, when I got up in the morning time, I

13   looked at it as though you can't -- we can't lose

14   these.  So these are the can't-lose-accounts.  So it

15   would be Home Depot.  It would have been Grainger.

16   It would have been ACE.  It would have been Wal-

17   Mart.  It would have been Johnstone supply on the

18   ARW side.  It would have been C.C. Dixon.  It would

19   have been the Ware Group.  So there was eight or ten

20   people that I personally interacted with to make

21   sure that if anything was going on, I knew about it;

22   service level, quality, complaint, and then just

23   personal relationships, building trust from the CEO

24   desk.

25       Q    And of those eight to ten entities that

Harry Smith                          June 2, 2017

1    you just named, what percentage of the business do

2    you think that accounted for?

3        A    I think if you're 335, I think that's 200.

4    It's the number I put in the e-mail to Phil.  I mean

5    I think if I went in the space that I -- I mean I'm

6    not -- in total transparency, I think I could

7    absolutely move those customers.  I'm not denying

8    that.  I think I would have a percent success in

9    moving those customers.

10       Q    In other words, just to be clear, I think

11   what you just are -- testified to was that if you

12   went into competition with Flanders right now, you'd

13   be able to get virtually all of that eight to ten --

14   those eight to ten entities, which you equate to

15   about $200 million?

16       A    I feel that way.  And so, you know, I'm

17   not going to -- obviously, I'm not going to mislead

18   you.  I mean I feel that way.  And, you know, that's

19   predicated on a couple of different fronts.  So, you

20   know, why did I exit?  One, I was incredibly tired.

21   Two, I wanted to take the chips off the table.  I

22   mean, you know, mitigate risk.  And, three, I had

23   gotten everything I thought I could get out of it

24   without really hunkering down for another five

25   years, right.  So I thought margins were going to be

Harry Smith                          June 2, 2017

1    depressed, you know, on the retail side.  I thought

2    there was potential to lose market share from a

3    destruction player.

4           My biggest concern was the scale and

5    magnitude of the model with entry level labor.  And

6    so when I looked at the model, you know, we were

7    4,000 employees, a great big number, 85 percent at

8    your entry level labor.  So we had built a model on

9    entry level labor, that I also was seeing a shortage

10   of.  So we started, you know, having trouble filling

11   plants, getting positions that -- you know, it

12   started concerning me.  Because you can't run a

13   model without entry level labor.

14          Now, we started developing automation,

15   which we developed in-house.  Okay, slow down -- we

16   started developing automation that we developed

17   internally, and it was a booming success.  But it

18   still wasn't enough that you had to have significant

19   entry level labor.  So when I looked at the model,

20   we had too many plants and, you know, not enough

21   entry level labor.  And I felt like, you know, we

22   needed a massive amount of capital to fully automate

23   the plants.  So I just said, look, it's time for me

24   to mitigate my risks and exit.  And, you know, I

25   was -- I was pretty open about that.  And I also

Harry Smith                              June 2, 2017

1    thought the right player could grow the business

2    with the right capital structure.

3          And so I encouraged Insight that it was

4    time to exit.  And on one point I'm going to go

5    back, because this is a critical point on two

6    phases.  This kind of ties Pronamics in.  And I will

7    tie it together in three minutes.  So one of the

8    issues -- or five minutes, Ken.  One of the issues

9    we had with Home Depot was 3M was manufacturing

10   their own media.  So they had proprietary media.  So

11   one of the reasons we were able to get Home Depot

12   was we had found a company in South Carolina called

13   ECN Industries.  And the guy's name was Rick

14   Chapman.  And he was operating in a small, eight or

15   10,000 square foot building.  And we stumbled upon

16   Rick, and Rick actually had developed the number one

17   performing media in air filtration, one guy, a

18   brainiac.  Couldn't carry on a conversation, knew

19   everything about air filtration media.

20         We took that as part of our package to

21   Home Depot and is one of the reasons we were able to

22   displace 3M.  Because we had a media that actually

23   beat 3Ms proprietary media.  So went back to Insight

24   and said, we've got to protect this product.  And so

25   Insight said, you know, we agree.  We think that we

Harry Smith                         June 2, 2017

1    should be in the media business as 3M is.  We don't

2    want to deploy anymore capital, because we want to

3    exit.  Will you help us?

4              I had an incredible relationship with Home

5    Depot.  I made a mistake.  I put my capital in,

6    bought ECN with the Board's support.  And we became

7    Pronamics.  That's how Pronamics was formed, is we

8    bought ECN, which had the proprietary media to

9    service Home Depot.  So we had -- that is how

10   Pronamics came about.

11        Q    All right.  Let me stop you there.

12        A    Sure.

13        Q    When you say, "we bought ECN," who is we?

14        A    So it would have been myself, Kevin Boyd,

15   and John Paul Corey.  So I had 65 percent ownership.

16   Kevin had 25 and John Paul had 15.  And John Paul

17   was learning from Rick and learning the operation,

18   because Rick had some age on him.  And, you know,

19   Kevin was helping us build equipment to enhance what

20   Rick had.  Rick was under capitalized, had one piece

21   of equipment.  We needed more.

22        Q    So when you -- the three of you bought ECN

23   Industries, at that point you renamed it Pronamics?

24        A    Correct.  Correct.  We renamed it.  Went

25   to Home Depot.  And then we developed a plan

Harry Smith                              June 2, 2017

1     alongside Home Depot, Insight and ourselves to buy

2     two pieces of equipment to supply Home Depot.

3     Because we were having service issues.  Rick

4     couldn't run enough media, and then he had a down

5     issue, I believe, one time and we -- we -- we

6     collapsed Home Depot in the summertime.  Now, this

7     was in total transparency with Home Depot, but at

8     that point, Home Depot had given me a hundred

9     percent of the business.

10          So we sat down, we developed the equipment

11     we needed, which was two pieces of equipment we

12     bought out of Italy.  And, again, I capitalized

13     that, so it was my money.  And we started Pronamics.

14     And as a part of Pronamics, we had -- this is how

15     the fiberglass operation started.  We had a

16     relationship with a company called Superior Fibers.

17          When I became CEO, the former CEO had

18     gotten into the media business and had bought two

19     pieces of equipment and opened the Clarkton, North

20     Carolina, that made MERV 6, 7 and 8, which is your

21     very entry level media.  And when we were exiting

22     anything that was not core, I spun that business off

23     to our fiberglass supplier, Superior Fibers.  We

24     bought all our fiberglass air filtration media from

25     them.  And so we helped them get in that media

Harry Smith                        June 2, 2017

1    business to help round the model up, and we exited.

2             How we ended up in the fiberglass media

3    business was Superior Fibers shut down one of their

4    main facilities and attempted to move it to Mexico.

5    And it caused a catastrophic supply chain shortage.

6    The plant was a colossal failure and they closed it.

7    But we had a massive void in raw material that was

8    key and critical to Flanders.  So, again, we sat

9    down as a Board with Insight and I said, we have

10   to -- you know, what do we do here?  We decided that

11   we would start manufacturing our own fiberglass

12   media.  And, again --

13        Q    Okay.  Wait a second now.  I'm confused on

14   the timing of this.  Is this before Insight had

15   acquired --

16        A    This is Insight ownership.  Insight owned

17   it.

18        Q    Insight owned Flanders at the time?

19        A    Uh-huh.

20        Q    Okay.

21        A    And myself.

22             MR. CEGLOWSKI: That's a yes or no?

23             THE WITNESS:  Yes.

24             BY MR. GRAY:

25        Q    All right, so -- okay.  Let's go back

Harry Smith                              June 2, 2017

1    then, okay, because I want to make sure we're clear

2    on the timing of things and -- before we get to

3    that.  Another thing you mentioned earlier was that

4    when you started with Flanders it was financially

5    challenged?

6         A    Very much so.

7         Q    And even after you took over as CEO it was

8    financially challenged?

9         A    For years.

10        Q    At what point would you say that it was no

11   longer financially challenged?

12        A    I think -- I had a challenged balance

13   sheet the entire time I ran the company.  I never

14   had a balance sheet where we weren't -- we weren't

15   tight, but we -- we didn't have the -- for three or

16   four years I battled to make payroll.  So I'd say

17   that's tight.  And I didn't have bank support.

18             When I turned the corner is when I got the

19   company positive EBITDA and I was able to go out to

20   the market and price our ABL for interest.  That's

21   the asset based lending which you run a company on.

22   And PNC stepped in and gave me a much better deal

23   than Bank of America, who had been with me.  They

24   supported me, but they didn't support me, right.  So

25   we would keep the company running but, you know,

Harry Smith                              June 2, 2017

1       nothing else.

2              And we were able to move to PNC, which had

3       a much better ABL structure, much less restriction

4       on financial covenants.  And I will tell you that

5       that was the point that things really settled down.

6       You know, we didn't worry about making payroll.  We

7       were a lot more current with the vendor base.  I

8       will tell you we never fully paid the vendor base on

9       time, you know, when I was the CEO.  So if you had a

10      30-day term, we probably paid you 45.  And -- but

11      that went from -- we had 30-day terms and we paid

12      you at 120, which is when I got it.  And so that was

13      a lot of communication with the vendor base.

14             But we still didn't have millions in

15      capital, so we were building the company.  So we

16      were creating EBITDA, investing in equipment to try

17      to grow revenues.  Because I also knew I couldn't

18      exit where I was at, because the $3 and half million

19      I got up front, the company wasn't worth it.  I mean

20      I made an uneducated buy there.

21         Q    Now, I want to focus on when you became

22      CEO, did the previous CEO resign, retire, or was he

23      terminated?

24         A    He was terminated.

25         Q    What was his name?

1          A     Steve Clark.

2          Q     Did you immediately -- did the Board put

3     you in immediately as CEO?

4          A     I began as COO.

5          Q     COO?

6          A     Uh-huh.  And I think I was COO

7     approximately six months and became CEO.

8          Q     Was there a CEO at the time?

9          A     Robert came back in from Chairman and took

10     a CEO role.  But I will also tell you from the day

11     one I was COO, I was acting CEO.  So it was a title,

12     but I really was acting CEO.  And that -- that was

13     premised on the Board that, you know, that there

14     needed to be some period of time where, you know, I

15     wasn't known and then became known to the investor

16     base.  They got confident and I got the official

17     title.

18          Q     And again, Robert is Robert Amerson?

19          A     Robert Amerson, correct.

20          Q     You earlier testified that you and Robert

21     Amerson together came up with -- borrowed $7 million

22     to pay Mr. Clark upon his exit; is that correct?

23          A     That's correct.

24          Q     How did that number materialize?

25          A     When we were publicly traded.  So, you

Harry Smith                          June 2, 2017

1      know, we took the term valuation on the stock market
2      and bought him out at what the market was.  I will
3      also tell you that, you know, again, different level
4      of education through your career, I would not have
5      done that again.  You know, I did not have the
6      expertise to read a balance sheet, to understand
7      what the real company earnings were and what the
8      relieve valuation should have been.
9             I will tell you the real valuation was
10     half of what I paid.  Six months, I figured that
11     out.  But, you know, the valuation when I got the
12     company was half of what I paid for it, because I
13     had to clean up a lot of stuff on the balance sheet,
14     you know, and -- so, you know, he had pushed
15     earnings, you know, in my opinion when he shouldn't
16     have.  And so the other problem we had was this.  We
17     were not a highly traded stock, so the stock would
18     just hang.  There was no volume in it.  So it was
19     hanging at, I think, $4.  But, you know, it probably
20     should have been hanging at two.  But so --
21          Q    Well, let me ask you this.
22          A    Yeah.
23          Q    Mr. Clark had a certain number of shares;
24     is that correct?
25          A    Uh-huh.  Yes, sir.

Harry Smith                        June 2, 2017

1      Q     And when you bought him out with the $7

2   million payment, it was buying that precise number

3   of shares that he owned outstanding?

4      A     Yes.

5      Q     And you had to put a price on it?

6      A     We put the market price on it.

7      Q     Which was what anybody could have gone and

8   bought it for that day --

9      A     That's correct.

10      Q     -- on the NASDAQ?

11      A     No discount.  We bought him out at where

12   the market was at.

13      Q     Were you obligated to buy him out?

14      A     No.

15      Q     Now, you've talked a good bit about your

16   relationship with the important customers of

17   Flanders, and I believe you've also testified that

18   you still have those relationships?

19      A     That's correct.

20      Q     How about the vendors of Flanders?  Do

21   you -- did you have much Interaction with the

22   vendors?

23      A     Very close relationship, tremendous

24   interaction.

25      Q     Who were the vendors of Flanders when

Harry Smith                         June 2, 2017

1       you -- at the time you were last CEO?

2           A    Well, we had a multitude of vendors, but

3       we had a core of small vendors.  So my strategy was

4       very similar to Home Depot, Lowe's and Wal-Mart,

5       which I would load the vendors up and they would

6       need me to operate.  And so I would force into their

7       overhead structure, right?  So I learned that trick

8       early on.

9               So my core vendors on the Precision Air

10      side would have been Taylor Chemical, Jack -- Jack

11      Temple, Walter @ Wire Lyre, (indiscernible) Atlantic

12      Packaging.  And then I had two different cardBoard

13      manufacturing companies because of capacity.  And

14      then I had two media suppliers on the Precision Air

15      side.  And then the only supplier in the country for

16      fiberglass was Superior Fiber.  They were the only

17      ones that we could buy fiberglass from.  So, we

18      were -- we were locked in there.

19              But I had -- and then what I did, those

20      vendors also helped me turn the company around.  So

21      I sat down with those vendors, and as I grew the

22      company I would ask for terms.  So I would press

23      into their balance sheet as I grew.  And so, in

24      effect, I had another ABL.  So I would sit down with

25      you and say, Ken, I'm getting ready to go to 20

        Harry Smith                          June 2, 2017

1    million, can you extend me another $5 million credit

2    and give me some terms until I get cash turning,

3    because I had to hire people, buy equipment.  You

4    know, give us some time.  And every one of those

5    vendors worked with me in the growth of the company.

6          In return, they got a tremendous amount of

7    volume.  I canvassed the market constantly for

8    prices.  So we would go out and bid, bid, bid, bid.

9    And then I would sit down with Ken and say, Ken, you

10   know, I got to have you here.  And then we would do

11   the same thing the big box guys did to us.  I'd take

12   three points and tell you three points under.

13          You know, I did due diligence on certain

14   companies during my term as CEO.  That was one of

15   the first things I looked at.  And would tell you

16   that every time I looked at one I was eight to ten

17   points under on raw material pricing.  I think it's

18   accumulated on several things.  I think the vendor

19   base had a tremendous amount of respect and I knew

20   that I was loyal, faithful and had had their best

21   interests.  I think they knew I was difficult but

22   fair.  And I think they knew that I would always

23   come to them, and I did.  And so I was very involved

24   with the customer base, because a five point slide

25   in raw materials is significant in that business.

Harry Smith                          June 2, 2017

1        Q     Wait.  Now, you just said customer base.

2        A     I mean vendor base.

3        Q     Vendor base?

4        A     Yes.  The vendor base is significant

5    there, because a five, three, four point slide on

6    raw materials is a major impact for us.  So I was

7    trying to drive one point in EBITDA.  So every I

8    could take out of the raw material side went right

9    to the bottom line.  And so I was very involved

10   there, over involved.

11       Q     Were you the primary individual at

12   Flanders who had the strongest relationship with

13   those vendors?

14       A     Absolutely.

15       Q     And do you still have relationships with

16   those vendors?

17       A     Absolutely.

18       Q     Did you have access to Flanders'

19   proprietary information?

20       A     Absolutely.

21       Q     Did you have access to its financial

22   needs?

23       A     Absolutely.

24       Q     Its customers' needs?

25       A     Absolutely.  On proprietary information,

Harry Smith                            June 2, 2017

1    there really is none.  So, you know, there's

2    somebody in every single space and -- you know, so

3    there's -- the only thing we had proprietary was the

4    ECN media that we bought.  And we bought that

5    because Home Depot asked us to.  They said, we want

6    you to protect that for us.  But outside of that --

7    and, you know, somebody catches that, right.  So you

8    go back to dust collecting, pressure drop, and in

9    six to nine months somebody's there typically, so.

10        Q    Do you have any intellectual property?

11        A    There's no intellectual property, in my

12   opinion, in Flanders in any way, shape, form, or

13   fashion that the market don't have.

14        Q    How about trade secrets?

15        A    There's no trade secrets in any way, shape

16   or fashion to my knowledge that the market doesn't

17   have and multiple players within the market.

18        Q    Were you involved in every aspect of the

19   business as CEO?

20        A    Absolutely, over involved.

21        Q    And what would you say occurred from the

22   time you took over as CEO till the time that you

23   exited as CEO in regard to Flanders' reputation in

24   the industry?

25        A    I think -- I think it had a complete, you

Harry Smith                          June 2, 2017

1    know, evolution.  You know, we went from when I took

2    over and the constant word was they're going out of

3    business, they're bankrupt, they're not going to

4    make it, you know, they can't perform.  We could not

5    attract an entire team in the -- an entire critical

6    staff.  When I -- when I exited, I feel confident

7    with were the largest air filter manufacturer in the

8    country.  We had rebuilt the retail brand, the our

9    brand.  We had opened new plants, put in new

10   equipment, state-of-the-art equipment that we

11   designed internally.  We had -- at that point we

12   hired key and critical people from every aspect of

13   the industry.  We had no turnover within key and

14   critical faculty staff.  And, you know, we were

15   enjoying, you know, a very nice position as, there's

16   no doubt, the leader of the market.

17           So I think it was a complete reversal of

18   the corporation.  And, again, I think it was 180,

19   360, whatever the number is, but I think it was

20   night and day.

21      Q    And would you say that at the time you

22   exited as CEO, Flanders was a powerhouse in the

23   industry?

24      A    Absolutely, absolutely, yes.  When I

25   exited -- so on the exit, we were very challenged.

Harry Smith                          June 2, 2017

1    Keep in mind, when Insight bought the company, the
2    quadruple leveraged it.  So, you know, where I
3    thought I was leveraged, they took it times four.
4    So I think I had -- these are rough numbers.  I
5    think I had 35 million in ABL, and I think they took
6    it to close to 200 million.  So I had -- all of a
7    sudden I went back to tremendous pressure on
8    financial needs.  Because I was having to pay debt
9    structures, right.  So I was paying mezzanine debt
10   and a tremendous amount of leverage debt.
11        Q    What's mezzanine debt?
12        A    Mezzanine debt would be high interest
13   debt, where you can't get traditional debt because
14   you're leveraged.  And they hit me up with 18
15   percent -- I think was the number in leverage debt.
16        Q    I do want to go back to earlier.  When you
17   were talking about the operations that were in Texas
18   and maybe south of the border there, you used a term
19   that I was not familiar with.
20        A    Maquiladora.
21        Q    That, yes.
22        A    Maquiladora is just a Mexican based
23   operation that ships product into the United States.
24   So we had one in Tijuana, still in Tijuana.  That's
25   become very challenged too, because there's so many

Harry Smith                         June 2, 2017

1    manufacturers going to Mexico, the entry level labor

2    is not there.

3        Q    Okay.

4        A    We exited because of the violence that was

5    in there.

6        Q    And as far as the time that -- from when

7    you took over as CEO till the time in which you

8    exited, can you describe Flanders' footprint and how

9    it progressed?

10       A    You know, when I got Flanders, we were in

11   Washington, Smithfield, Florida, Salt Lake City,

12   Mexico.  When I exited Flanders, we were -- and

13   Clarkton, North Carolina.  They had bought the media

14   facility in Clarkton.

15       Q    So let's say those again, Washington --

16       A    Yeah, Washington --

17       Q    North Carolina?

18       A    Yes.  Smithfield.

19       Q    Clarkton?

20       A    Uh-huh.

21       Q    North Carolina?

22       A    Uh-huh.  You had Dallas, Texas.

23       Q    Dallas.

24       A    You had Salt Lake City, Utah, and you had

25   Illinois.

Harry Smith                          June 2, 2017

1          Q      Where in Illinois?

2          A      Oh boy --

3          Q      That's fine.

4          A      Momence, M-O-M-E-N-C-E -- and Tijuana,

5    Mexico.  We also had approximately --

6          Q      You also mentioned Florida awhile ago?

7          A      Yeah.  We're in Florida.

8          Q      Where in --

9          A      Bartow, Florida.

10         Q      Bartow, okay.

11         A      We also had a corporate office in Saint

12   Petersburg, Florida.

13         Q      But I think your testimony was that some

14   of these locations did not do well and needed to be

15   out of the company?

16         A      Correct.  And we had approximately ten

17   direct offices that were spread all over the

18   country.  So that would have been ten more roof

19   lines.

20         Q      Okay.  And so with that ten offices,

21   that's how it looked, the footprint looked when you

22   took over as CEO?

23         A      Correct.

24         Q      Now, talk about at the time you exited.

25         A      So when I exited, we had Washington,

Harry Smith                              June 2, 2017

1    Bartow, Hudson, New York.  Oh, we also had a plant

2    in Pennsylvania when I -- when I took over.  It

3    originally was in Pennsylvania.  But we had

4    Washington; Smithfield; Hudson, New York; Bartow,

5    Florida; Ardmore, Oklahoma; Tijuana, so a national

6    footprint.

7         Q    And so you probably -- you had less actual

8    facilities?

9         A    Yes, sir.

10        Q    But you were much more profitable as a

11   result?

12        A    Way more efficient.  So we went to big

13   plants less, moved raw material, people less.   And

14   then, you know, the trick in this business is not to

15   run one shift, run three shifts, same plant.  So

16   then you've got the freight dynamic.  So, you know,

17   what does it cost of a truckload of filters and

18   should you have a plant or should you ship a

19   truckload of filters?  So we figured that out as we

20   went along.

21             So I had a really neat model that is built

22   on volume.  You know, I had a national footprint,

23   which you must have if you're going to play in the

24   retail and the Grainger space.  Because they want

25   one -- you know, you've got to ship to all their

Harry Smith                          June 2, 2017

1    distribution centers nationwide.  So that was one of

2    my plays.  One of the problems is if you lose that

3    piece of business, you cannot feed the plant.  So it

4    is an ultimate Catch 22 in what we had talked about

5    earlier, in not losing market shares.

6         Q    And back to the market share piece, you

7    gave me that list, you said of eight to ten very

8    important customers?

9         A    There's four primaries there.

10        Q    Lowe's would have been on that list,

11   but -- because you had a good relationship with

12   Lowe's, correct?

13        A    Incredible relationship.

14        Q    But you decided that it was even better --

15   it was better for the company to have Home Depot.

16   And you couldn't have both of them, so you made the

17   deal?

18        A    I made the -- made the -- made the

19   business decision, and it was a correct one, to part

20   with Home Depot nationwide.  The brought us

21   Honeywell Rehm, which gave us national branding for

22   the first time ever.  And we actually negotiated an

23   open, transparent return.  And, you know, we went

24   to -- we probably had three points in profit on Home

25   Depot until we moved to ten in total transparency.

Harry Smith                           June 2, 2017

1    And that year we were supplier of the year for Home

2    Depot and vendor of the year for Home Depot.

3         Q    And let's unpack that.

4         A    Yeah.

5         Q    Because when you say supplier of the year

6    and vendor of the year, you're not talking about

7    just in the air filtration.  You're talking about

8    every single vendor that Home Depot uses?

9         A    Well, it would be by department.  So we

10    were the D26 plumbing.  And I said there's five big

11    key departments.  So you've got lumber.  We were

12    vendor of the year, supplier of the year for D26

13    plumbing first time in the history of the company.

14    So you're talking about a company that went from

15    bankruptcy to being supplier of the year, big

16    recognition, lots of rewards.  And I got put on

17    their foundation site.

18         Q    Okay.  Now, and you just mentioned

19    bankruptcy.  Actually, Flanders, has it ever been

20    bankrupt?

21         A    No.  But I mean I will tell you that today

22    if you were to call me up -- and, you know, I get

23    offers all the time to run companies now.  That if

24    you gave me Flanders today, with the skill set I

25    have today versus the skill set I had then as an

Harry Smith                          June 2, 2017

1    unprepared CEO, my recommendation today would be to

2    put the company into bankruptcy.  And that is what

3    Bank of America recommended to me as a young,

4    inexperienced CEO.

5           They said, Harry, you need to put this in

6    bankruptcy.  You can't fix this.  I said, guys, I'm

7    going to give it a shot.  But keep in mind the

8    driving premise of that is I had borrowed $3.5

9    million.  So, you know, it's not that -- that was my

10   driving premise for not putting it in bankruptcy.  I

11   mean, you know, at that point I'm just starting and

12   I'm going, well, honey, we've lost the house.  So

13   today if you brought me in, with the skill set I

14   have today, I'd say, Ken, that's the very best thing

15   we can do.  Your balance sheet's shot.

16          You know, you've got model problems.

17   Let's reorganize, shrink the company and then start

18   regrowing, total transparency.  I would not put the

19   company through the moves that I put it through.

20   And I don't think many people would.  I mean it

21   really impacted my health and -- and -- but I was

22   somewhat trapped.  And so, thus, also the desire to

23   exit when I exited.

24      Q    You were trapped because you had put in

25   your own money, right?

Harry Smith                          June 2, 2017

1        A    I couldn't get out, right.  There was not

2    a buyer for my stock, nor a return.   So, you know,

3    the valuation of the company wasn't there.

4        Q    But ultimately you built the valuation

5    because of your own efforts?

6        A    I built it and, you know -- now from an

7    exit standpoint, you know, we sold the company at

8    225, something like that.  I sold the real estate

9    prior to that.  So when Robert actually exited the

10   company and I become Chairman, approximately the

11   last year to 18 months I was Chairman as well.  So I

12   was CEO and Chairman.

13       Q    That would have been --

14       A    The end of '05, something like that.  It's

15   all public record, but I became CEO and Chairman and

16   Robert exited the Board.

17       Q    That was about the last year and a half or

18   so --

19       A    Yeah.

20       Q    -- before you exited?

21       A    Correct.

22       Q    So that --

23       A    Before I sold to Insight.

24       Q    So that would have been in maybe the 2013

25   time period?

Harry Smith                        June 2, 2017

1        A     Yeah.  It's '13, something like that.  I

2    became -- I became CEO and Chairman.  And in that

3    process, I bought him out of the real estate.  So I

4    took him out of the facilities that he and I owned

5    together.  So I bought all that real estate from

6    him.  And he was going in another direction, so he

7    had gotten into the development business, hadn't

8    been active in the business for three or four years,

9    but he had the Chairman title.

10       Q     And I haven't asked you about this yet.

11   But you were -- when did you get on the Board?  Was

12   that when you --

13       A     On day one, yes.  When I became CEO, I

14   became a Board member, yeah, day one.

15       Q     Day one of being CEO?

16       A     COO.

17       Q     Oh, COO?

18       A     Right.  I was a Board member then.

19       Q     Okay.  So when you went from being in

20   charge of high purity operations to COO, that's when

21   you became a Board member as well?

22       A     Yes.

23       Q     Okay.  Now let's -- let me ask you,

24   because you mentioned this earlier -- about taking

25   Flanders private.  When did that occur?

Harry Smith                          June 2, 2017

1        A    I don't remember the specific dates and

2    times, Ken, but it was probably approximately a year

3    before I sold it to Insight.  I took it to what they

4    call pink sheets, which is kind of an intermediary

5    to going private.

6        Q    And so this would have been after you were

7    Chairman?

8        A    Yes, sir.

9        Q    Okay.  So it might have been --

10       A    No, no, I was Chairman probably half the

11   time we were on pink sheets.  Robert was still Chair

12   when I went to pink sheets.

13       Q    So this could have been the 2012, early

14   2013 time period?

15       A    It's all public record, but that's

16   probably right.

17       Q    Now, will you tell me about Insight.

18       A    Sure.

19       Q    What is Insight?

20       A    Insight Equity is a middle market private

21   equity company out of Texas.  You know, so when I

22   went to pink sheets, I had two options.  I could

23   take the company private myself, and I had the

24   option to do that.  Or I could sell it.  And I did

25   not want to take the company private for the things

Harry Smith                         June 2, 2017

1    I had told you before.  My concern was with the

2    model.  And so we put a book together and hired an M

3    and A firm and went out and met with 25 or 30

4    different potential buyers.

5            And Insight was the high bidder.  And we

6    went back and forth with them and were able to get a

7    transaction done, and all the shareholders were

8    happy.  So we, you know, moved the company to

9    ownership structure of Insight and Harry.

10        Q    Okay.  Now, let me ask you this.  You said

11   all of the shareholders were happy.  Would these be

12   shareholders of the private entity at this point?

13        A    Right.  So when we went from NASDAQ to

14   pink sheets, your shares still move.  So you know,

15   we had mutual funds and we had embodiment of

16   shareholders.  And so we were able to negotiate a

17   price that everybody said, okay, we're -- you know,

18   we're happy and, you know, we're able to move it

19   through that next phase, which is somewhat untypical

20   that you don't incur any significant losses in that

21   process.

22        Q    And so when Insight came in, were there

23   additional shares issued?

24        A    No.  Insight took out the entire

25   shareholder pool, and they owned everything except

Harry Smith                        June 2, 2017

1    what I owned.

2         Q    So there were two owners of Flanders at

3    that time?

4         A    That's right.

5         Q    It was Insight Equity Holdings --

6         A    Uh-huh.

7         Q    -- and Harry Smith?

8         A    Correct.  Insight's original request was

9    that I remain completely in.  I said I'm -- my goal

10   here is to mitigate risk and, you know, I want to do

11   some other things.  And so I'll leave a portion in

12   but, you know, I'm going to take a portion work.  If

13   that doesn't work and that doesn't work.  I had

14   already sold all our real estates.  I had gotten off

15   of that risk.

16        Q    Okay.  Let's -- then let's back up.  The

17   real estate that you owned that you sold, what was

18   that?

19        A    That was the plants that we had talked

20   about earlier that I sold.

21        Q    And did you sell them all to one buyer?

22        A    Sold every one of them to W.P. Carey out

23   of New York, a REAT.  So I went to the Board --

24        Q    Can you spell Carey?

25        A    It's C-A-R-E-Y.

1          Q     And it's a REAT?

2          A     It's a REAT.  And the individual I dealt

3     with was a guy name Gino Sabatini, who is still

4     there.

5          Q     And the REIT bought a hundred percent of

6     the real property that you had owned --

7          A     For the company.

8          Q     -- for the company?

9          A     Right.  And, you know, when you're

10    public, you know, all this is full disclosure.  So

11    we had to disclose, you know, everything from lease,

12    rents, market.  Then we had to do market valuation

13    and everything has to be arm's length, you know.

14    But it turned out to be a really great deal for me,

15    but it could have turned out to be a really bad

16    deal.  So I mean it was a Catch 22 until I got the

17    company turned.  And as soon as I got the company on

18    a stable platform, I went to exit mode, which also

19    means I wanted off the real estate.

20              And so, I think Christian was a big

21    adviser for me then, Ken, Christian Porter.  And so

22    I went to the Board and said, look, I'm over exposed

23    here.  It's time for me to mitigate risk.  You know,

24    the company's doing well.  And so we took the -- we

25    ratified the leases and took it to market and I --

1    and I mitigated that risk with W.P. Carey.  And

2    really from a balance standpoint, it's really much

3    more balanced to have the insider transactions like

4    that.  I did it because I was forced to have to

5    rebuild it.  So I exited, and it turned out to be --

6    to be a solid exit for me.

7         Q    Now, was this done in your name or did you

8    have an LLC?

9         A    I had an LLC.

10        Q    And what was the name of that LLC?

11        A    It was National Warehouse Leasing, which

12   still operates today.  So during that time period

13   when I started -- the company started performing

14   and, you know, my wealth start growing, you know, I

15   moved into the multi-family business in a big way,

16   student housing.

17        Q    So that's what National Warehousing

18   Leasing is doing today?

19        A    Correct.  It's very -- you know, I'm

20   actually a pretty big player in the student housing

21   market.

22        Q    But none of that's related to what you

23   were doing at Flanders?

24        A    That jump started me.  I created National

25   on the first plant I bought.

```
 1        Q     And you bought every plant personally
 2   through National Warehouse Leasing?
 3        A     That's correct.
 4        Q     Who was the -- you said it was an LLC?
 5        A     Uh-huh.  Yes, sir.
 6        Q     Were you the only member?
 7        A     Only member.
 8        Q     At the time you sold to W.P. Carey, how
 9   much liability did you have?  What was the amount
10   owed?
11        A     Approximately -- this is approximate.  I
12   mean I'm going to say 30-plus million.
13        Q     How much did you sell it for?
14        A     I don't -- I don't think that's relevant.
15   I will tell you I made a significant gain.
16        Q     You earlier mentioned Steve Clark getting
17   bought out for $7 million.  How did he get those
18   shares?
19        A     I don't know.  You know, he took the
20   company public, so he met Robert and he was with a
21   customer.  And Robert was trying to figure out how
22   to get the family that had found it, Flanders in
23   Washington, out.  And Steve was more of a whiz Wall
24   Street type of guy, actually a very brilliant guy
25   finance-wise, but not so  much operations-wise.  So
```

Harry Smith                          June 2, 2017

1    Steve was the guy that everything he was going to do

2    was going to work and he went all in.  And he didn't

3    really measure and moderate his decisions, but a

4    very smart guy.

5            He talked Robert into the fact that he

6    could take the company public, raise a lot of money,

7    buy up some people and exit.  They took the company

8    public, raised 30 or 60 million in their first

9    offering, bought Precision Air, bought Air Seal.

10   They bought a commodity of air filtration companies,

11   put it together, and it never performed.  So it's

12   the classic example of raising capital and

13   overpaying.  So, you know, he raised capital and

14   overpaid to employ capital.

15       Q    I guess my question was do you know if he

16   purchased stock or was he granted stock?

17       A    He was granted stock, yeah.  I don't -- to

18   my knowledge, I don't know of Steve ever buying a

19   share.

20       Q    Okay.  And then at any time during your

21   employment did you ever buy any shares?

22       A    Not that I recall.  I was gifted one

23   million shares by the Board.

24       Q    But you don't recall buying any?

25       A    I don't recall buying any.  I was gifted a

Harry Smith                              June 2, 2017

1   million shares and I also had options that, if I

2   recall, were probably 250,000 shares.  But I was

3   gifted one million at zero consideration.

4       Q    All right.  Well, let's go back.  You said

5   you had options on 250, but you didn't exercise

6   those?

7       A    I did exercise those.

8       Q    Okay.

9       A    Right.

10      Q    All right.

11      A    Yes.

12      Q    When were you gifted the one million

13  shares?

14      A    I'd say two years into my CEO leadership

15  role, Ken.  And how that went down is we had a Board

16  meeting, and I had, in my opinion, significantly

17  overpaid for the shares I bought.  I think I had to

18  back that in detail to prove that it was not worth

19  3.5 million when I bought them.

20      Q    You're talking about when you bought Clark

21  shares?

22      A    Clark shares, right.  And I basically went

23  in and said, guys, you know, I took on significant

24  risk here.  You know, I was not knowledgeable.  I am

25  now.  This is what I really think it was worth.  I

Harry Smith                          June 2, 2017

1    think they agreed.  And I said, This is what I want

2    in consideration of me putting my family at risk, me

3    at risk and my health at risk.  And I said, I'm

4    asking for a million shares.

5         Q    Okay.  So let's go back.  Because I guess

6    you did buy some shares when you bought Clark out?

7         A    I did buy six shares, correct.

8         Q    Okay.

9         A    So Robert and I bought those 50-50.  And

10   that's off of the records, I think, yeah.

11        Q    Do you recall how many shares that was --

12   that amounted to?

13        A    That was about -- I think it was about $4

14   a share, something like that.  So whatever it comes

15   to, 750, 800,000, something, a million shares.

16        Q    So close to -- upwards of three-quarters

17   to a million shares?

18        A    Approximately.

19        Q    And then you were gift another million?

20        A    Million.  And then I had options of, I

21   think, 250,000.  But it's all public record.  I

22   think when we exited I was the second largest

23   shareholder in the company.  And Robert and I

24   collectively controlled about 50 percent of the

25   company.

Harry Smith                          June 2, 2017

1       Q     And then was Robert bought out by Insight?

2       A     Correct.  Robert came to me, Ken, and

3   said, I'm ready to go.  It's time.  If you want to

4   buy me out, you can buy me out.  But I'm ready to go

5   ahead and exit.  And at that time he had got into

6   the development basis and was pretty challenged in

7   that great recession.  And I really never

8   contemplated buying him out.  I said, I'd be remiss

9   in telling you.  I  never really had any interest in

10  buying the company.  And I was very forthright when

11  I met with the Board.  I would also tell you that I

12  had a Board that would have supported that.

13          And they were saying, Harry, you know,

14  think about this.  But the problem at that time was

15  I was over engaged, which is somewhat my persona.

16  But I also knew that I had to have some balance.

17  And I also wanted to mitigate my risk.  And so I had

18  built enough wealth then that I said, okay, it's

19  time.

20      Q     Because by that time you had sold the real

21  estate and --

22      A     And I had also gotten into the multi-

23  family business and I had hit it right on time.  So,

24  you know, the first two complexes I bought, you

25  know, were in bankruptcy, great recession.  And, you

Harry Smith                          June 2, 2017

1    know, I paid five and ended up selling 17 and 18.

2    So I mean I had built some wealth there.

3         Q    But Insight's the one that ended up buying

4    Robert Amerson out?

5         A    And myself, except what I kept in,

6    correct.  Insight took everybody out but me.

7         Q    And they took out part of you as well?

8         A    Correct.

9         Q    Okay.  How much did Insight take or pay

10   you?

11        A    I don't recall the transaction amount.  We

12   sold at 4.25 a share, approximately, something like

13   that, 4.28, if I remember correctly.  And I left

14   660,000 shares in, which was equivalent to the

15   current value of what we sold for.  That became a

16   dollar a share, so whatever that number was.  I

17   don't recall.  And then I took that portion and paid

18   off my original 3.5 million.  And then the bulk of

19   my gain was the million shares that I was gifted in

20   my options.

21            There was no gain on the shares I bought

22   from Steve Clark.  In fact, I actually, if I

23   remember correctly, lost money because of the

24   interest I paid on the $3.5 million.  So my gain

25   became the million shares that I was gifted and the

Harry Smith                         June 2, 2017

1      250 shares that I sold, as well as, you know, I had

2      a significant income period there from -- from rent

3      and W-2.

4                So I was making approximately a million to

5      1,250,000 a year, you know, to run the company,

6      compensation and bonuses.  And then, you know, I had

7      the rent on top of that.  So I mean my income, you

8      know, at that time, including the multi-family, I

9      was probably making $3.5 million a year.

10          Q     The multi-family, though, is not related?

11          A     Not related.  I mean that was --

12          Q     So if you took that out --

13          A     Yeah, probably $2 million a year.

14          Q     Two million dollars from your

15     compensation, the -- and the amount that you were

16     renting to the company?

17          A     Uh-huh.  That's correct.  Yeah, that's

18     correct.  And then -- so, yeah, I had built some

19     significant wealth there.  And I had built enough

20     wealth that, you know, I didn't want to continue to

21     push in.  I wanted to push out.  And so -- and was

22     pretty tired and wanted to do some other things.

23     And I was very upfront with Insight about all that.

24     I said, guys, this is where I'm at.  I'm not going

25     to be a long-term player for you.

Harry Smith                          June 2, 2017

1            This is my recommendation that you buy

2       this company.  Let me rev revenues up, really

3       increase sales, drive EBITDA as hard as we can, and

4       you guys should exit.  And I'll exit with you, but I

5       want to go ahead and slide backwards.  I don't want

6       to be the guy on the front of the exit.  That was

7       our plan when they bought the company.

8            Q    Okay.  And basically when a private

9       equity firm buys a company, it doesn't desire to run

10      it for a very long period of time?

11           A    No.  I mean their goal was -- and I made

12      a commitment to stay with them.  Now, listen, I

13      learned a lot about private equity on leverage.  You

14      know, because when I sold them the company, the

15      conversation that I had is, guys, if grow it, I'm

16      going to need working capital because we're

17      leveraged.  So if I grow revenue, you've got to give

18      me money for inventory, to hire people and to buy

19      equipment.  But it would be a direct injection into

20      the business.  And they said, You grow revenue and

21      we'll give you working capital.

22           MR. GRAY:    Let's go off the record.  I

23      need to take another break.

24      (Off the record from 10:59 a.m. until 11:08 a.m.)

25           Q.  So, Mr. Smith, we were getting into

Harry Smith                          June 2, 2017

1    talking about Insight.  So, could you tell us how

2    that came into being?

3         A.    Sure.  We took the company to market and I

4    think we showed it to 25 to 30 different buyers,

5    would have been strategic buyers and also would have

6    been financial buyers, Insight being a financial

7    buyer.  Insight was the high bid.  We took it and we

8    actually out of showing it to 30 qualified buyers we

9    actually had two offers total in the corporation.

10   So, not a lot of interest.

11        Q.    Insight was the high bid and the Board

12   accepted Insight's bid?

13        A.    Correct.

14        Q.    What role did Insight want you to have?

15        A.    Chief Executive Officer and I was a member

16   of the Board as well.

17        Q.    And was it still Flanders Corporation?

18        A.    Correct, Flanders Corp.

19        Q.    Do you recall when this sale occurred?

20        A.    It's public record I -- if I recall was

21   August 2015 or something -- no, '14, in that time

22   period.  '13, '14, I'm terrible on that stuff, but I

23   mean it's public record.

24        Q.    Did you execute a separation agreement at

25   that time?

Harry Smith                              June 2, 2017

1        A.   I executed a long term incentive

2   compensation plan, and I don't actually recall all

3   that I executed.  Obviously it was a tremendous

4   amount of documents at that time.  The one document

5   I do remember was the long term incentive

6   compensation plan that they offered me.

7        Q.   Was your role changing in any way?

8        A.   No.  I was no longer Chairman of the Board

9   but I was still CEO and a member of the Board.

10        Q.   Were you just regular member or were you

11   Vice Chair?

12        A.   No, I was just a regular member of the

13   Board.

14        Q.   Okay.  And you believe that was the summer

15   of 2014?

16        A.   Somewhere in that time period.

17        Q.   How did things progress from that point

18   forward?

19        A.   I would think it probably progressed as

20   typical fashion, a middle market company that gets

21   over leveraged.  So, what was unique in this process

22   was when I sold to Insight, they told me that they

23   did not take distributions, that I never had to

24   worry about giving a distribution to Insight.

25             So, they did put a lot of leverage on it

Harry Smith                        June 2, 2017

1    including mezzanine debt, which I understood when we

2    closed.  Approximately 90 days into the close I was

3    contacted by the CEO and Chairman of Insight and he

4    asked me for a $7,000,000 distribution.

5        Q.   And just to be clear for the record,

6    earlier we were talking about distribution and that

7    was we were talking about selling product --

8        A.   Product.

9        Q.   -- to a customer.  Now when you're talking

10   about distribution, you're talking more in terms of

11   a dividend?

12       A.   Correct.  So, he contacted me and it was

13   early on, 90 to 120 days, if I remember correctly, I

14   think that's approximately, and asked me to come up

15   with a $7,000,000 distribution to Insight.

16       Q.   Who was this person?

17       A.   It would have been Ted Beneski, the CEO of

18   Insight and the founder of Insight.  I was taken

19   back.  My CFO John Oakley who had been with the

20   through the entire process was taken back.  We kind

21   of came back and holed up and there was absolutely

22   no way I could do it.  The balance sheet was

23   incredibly stressed.  I would have had to gone back

24   to early days.  And so, I basically went back and

25   said absolutely impossible.  And then I think there

Harry Smith                           June 2, 2017

1    was a little bit of a friction based on that.  But

2    I'm pretty good with balance sheets and income

3    statements, there was just absolutely no way I could

4    figure out how to do that.

5         Q.   And was he also the Chair of the Flanders

6    Board?

7         A.   Correct.

8         Q.   Okay.  So, he was Chair of both.

9         A.   Correct.

10        Q.   And so you told him you couldn't do it?

11        A.   Couldn't do it.

12        Q.   And what was the response?

13        A.   Brad Buser, who was the lead person from

14   Insight who led the buy of Flanders understood.  I

15   mean he called me and, you know, I was a little bit

16   perplexed at the change in landscape very quickly.

17   And he said no, I understand, don't worry about it.

18             I think it created just the feel some

19   dynamics between Ted and I.  I think Ted felt like I

20   never really vetted to figure out if I could get the

21   7,000,000 but I'd lived with the balance sheet for a

22   long time.  I knew it wasn't there.  It created a

23   big issue with my CFO and subsequently I lost him.

24   And that was the premise of me losing John, who was

25   very important to the company.

1          Q.    And the CFO you're referring to is John

2    Oakley?

3          A.    Correct.  Correct.

4          Q.    Now, explain why because if you say we

5    can't do it, then --

6          A.    John basically came in and he had done

7    fairly well in the sale of the company.  I don't

8    know exactly what his gain was but probably, you

9    know, a couple million dollars approximately.  And

10   he just said this isn't going to work.  I don't want

11   to go back down this road, and I need to go.

12              And I think that set the path for some of

13   the challenges because John was a very -- he'd

14   managed the balance sheet with me a long.  But he

15   exited, that was the premise of the exit.  I'm going

16   to say that was the complete exit but that started

17   the -- him having a very difficult relationship with

18   Insight.

19         Q.    And just to be clear, how much did you

20   make on the sale?

21         A.    On the sale of the company?  On the

22   original stock I bought I lost money.  So, my

23   original investment of three and a half million I

24   lost.  The shares that I was awarded, you know, I

25   made whatever we sold the company for.  And then I

Harry Smith                          June 2, 2017

1    kept $660,000 in at par value of the sale.  So, it'd

2    been what we got at the sale price and the valuation

3    on that I think they had it at $1 share so they

4    redid the valuation.  But I kept $660,000 in

5    approximately.  So, the 660 was what I left in based

6    on the price that they sold at -- they bought us at.

7        Q.   Did you mention earlier that you thought

8    the price per share was 28?

9        A.   No, it was -- it was probably 4.28 or

10   something like that.  You know, we sold for

11   approximately 200,000,000, 225,000,000 but that

12   includes debt, you know, everything that goes along

13   with it.

14       Q.   But $428 per share?

15       A.   No, no, no, $4.28.

16       Q.   Okay, yeah.  So, basically you could

17   multiply --

18       A.   It's all public record.

19       Q.   Right, 4.28 times a million and that would

20   be what you received?

21       A.   Correct, right.  Well, when I had my final

22   exit, I had no gain.  So, I actually had wanted to

23   leave my shares in and they wanted me to go ahead

24   and completely get out of the ownership structure.

25   So, they forced me out.  I knew the value of the

Harry Smith                         June 2, 2017

1    company was much higher at that time because we had

2    grown $100 million.

3              And Insight basically said you know what,

4    if you want to exit, that's fine, then you can't be

5    an owner.  And part of the exit they forced the sale

6    of my 660,000 shares at significantly below market.

7    So, you know, I left a significant amount of money

8    on the table from my shares.  So, if you would

9    calculate the value I had grown the company to, you

10   know, the overall transaction I lost money.  So, you

11   know, I grew the company $100 million from the time

12   Insight bought it till they exited and so your

13   valuation jumps significantly.

14             And so, I actually said Brad, my share is

15   worth a lot more than this and they would only give

16   me par value on the exit.  And so, it was kind of,

17   you know, some pretension there, and I actually

18   exited at a significant loss, you know, when I sold

19   my 660,000 because I didn't get any gain on it at

20   all based on two and a half, three years of immense

21   amount of work and moving the valuation of the

22   company.

23             So, you know, if you look at company

24   valuations, you know, we grew $100 million in my

25   last tenure there before I exited.  I got no -- I

Harry Smith                              June 2, 2017

1    got no return on that at all.  I was vested in my

2    long term incentive compensation plan.  So, if you

3    go back and look at the paperwork, I had a

4    significant long term incentive compensation plan

5    that was extremely generous because they wanted to

6    retain me.  And so, I was vested.  Even if I exited

7    and walked out the door, I was contractually vested

8    in the gain of the company.

9           When I exited, I voluntarily gave up the

10   long term incentive compensation plan with the

11   written request and verbal request that that went to

12   my employees.  The value of that I think was

13   probably $5,000,000,000 that I -- that I -- when I

14   left, my request was that it went to the employees

15   of Flanders Corporation.  I had done really well and

16   it was a pretty emotional exit.  And but I

17   voluntarily gave up the LTIC.  Victor Vescovo called

18   me and said this is the first time in history I've

19   ever seen anything like that.  But I voluntarily

20   gave that up and the request was it went to Flanders

21   Corporation.

22          And I don't know that they honored that

23   but I made that request to Victor and Brad that my

24   LTIC would be awarded upon the sale of the company

25   and at that time I mean Victor even said Harry, do

1    you know what this is worth and I said I do.  So, I

2    was trying to exit with the best, you know, premise

3    in mind.  The history on that, as you know, you

4    know, I went to the Board, we brought Peter Jones

5    in.  Peter was not a great hire and Insight agreed

6    with me.  The CFO actually called for his

7    termination.  I stepped in and mitigated that.  The

8    biggest mistake I made was when I returned.

9         Q.   Okay.  We need to get this time.  So, the

10   sale occurred, you were still CEO.

11        A.   Uh-huh.  Yes.

12        Q.   And at what point did Peter Jones come

13   into the picture?

14        A.   Great.  So, some history there I don't

15   remember the exact dynamic, probably 18 months in.

16   So, how did Peter Jones come into the picture.  You

17   know, I had invested in Pronamics at Insight's

18   request and we had developed a plant in Wilson that

19   I completely capitalized that made two different

20   media.  So, it made MERV six, seven, and eight media

21   and it made the electrostatic media for Home Depot.

22            So, we were self sufficient in media and

23   in internal consumption arm's length everybody knew,

24   you know we were below market and controlling the

25   technology.  What happened to bring Peter Jones in,

Harry Smith                          June 2, 2017

1    there's a company called Blackstone, and Blackstone

2    had a $15,000,000 mezz strip with us at 18

3    percent -- it may have been 20,000,000 but they had

4    a mezz strip.  And Blackstone owned the company

5    called PGI Industries and PGI Industries made MERV

6    six, seven, and eight media.

7              So, we were moving the buy to Pronamics

8    with Insight's support.  And they were trying to

9    sell PGI Industries.  And Brad Coleman, who was the

10   lead guy at Blackstone who I met with, we went up,

11   we had put the company in a tremendous growth

12   curve -- $100 million in probably six months.

13             We took on Home Depot nationwide, took on

14   Grainger, 4,000 new part numbers overnight.  I think

15   we hired four to 500 people.  We have to buy five,

16   six, $7 million of equipment to service it with.

17   So, big dynamic change to the company, right?

18             I flew to Texas.  I said guys -- with the

19   CFO, who was Scott Brown, I said guys, this is the

20   dynamic change I talked to you about.  You know, the

21   company's going to through a curve, we're going to

22   get insufficient, we've got 4,000 new part numbers,

23   we've got to hire new people.  So, we're going to go

24   through a curve with EBITDA, you know, we're going

25   to come out here and we were here.  But we're going

Harry Smith                          June 2, 2017

1    to dip and I need capital.

2          So, we started the dip and it was pretty a

3    pretty stressful time when you went from 225 to 335.

4    Those are pretty close variables.  I got no working

5    capital.  So, they gave me $5 million at a bullet at

6    high interest.

7          So, Brad Coleman really started getting

8    over involved and at the same he started putting

9    pressure on us to PGI, who they owned as a portfolio

10   company.  And we had the conversations internally

11   with Insight and Brad Coleman was just continuing to

12   step in.  He was calling me direct.  I thought it

13   was, you know, very inappropriate.  We had a much

14   lower price than PGI was giving us internally.

15         Long story short I got sideways with Brad

16   Coleman and Coleman threatened Insight to pull it.

17   Brad Coleman--

18       Q.   And when you say pull it, you mean pull

19   the loan --

20       A.   Right.

21       Q.   -- and call -- and make a call?

22       A.   Right.  Victor Vescovo and the Board at

23   the Bartow plant internally and Victor said, Harry,

24   we've lost our soul to the bank.  Right?  And I said

25   okay and he said, you know, Brad is -- we can't

Harry Smith                        June 2, 2017

1    afford to lose Blackstone in our bigger

2    organization.  We need you to step back and go to

3    the Board and let us bring in a guy that you work

4    with because you and Brad, you know, are butting

5    heads.  I said that's fine, I don't have any problem

6    with that.

7           And so, we actually -- that's how Peter

8    Jones came in.  We had a great meeting in Bartow.  I

9    said I'll go to the Board, which really worked for

10   me.  So, I went to the Board, we brought Peter in.

11   Peter had been unemployed approximately seven to

12   eight years.  He was -- from a dynamic standpoint it

13   was a big mistake.  Insight will tell you that

14   today.  Brad and Victor will both tell you he was a

15   full British accent going to Home Depot just doesn't

16   work, right?

17          So, I was at the Board and pretty happy

18   and really was this is myself.  Brad Coleman stepped

19   in and started a full blown attack on Pronamics to

20   get PGI back the media business.  So, I had invested

21   in Pronamics for Insight at Insight's request

22   everything like we had said and we were going to use

23   the Pronamics piece in the sale.  So, when we were

24   looking at selling the company, we were going to

25   roll Pronamics in so they vertical supply on the raw

Harry Smith                        June 2, 2017

1    materials side.

2         Q.    Okay.  Let me stop you there.  The plan at

3    that moment was that obviously since this was a

4    private equity firm they want to flip this thing,

5    they want to get it --

6         A.    Correct.

7         Q.    -- get in a position where it could sell

8    it for a profit and the plan was that you were going

9    to be the CEO until that occurred?

10        A.    Uh-huh.  Yes.

11        Q.    And that Pronamics, which you and the

12   other two guys still owned, was going to be part of

13   that deal as well as Flanders?

14        A.    Correct.  So, we were going to be vertical

15   in the raw materials side with technology.  So,

16   there was only one other superior -- there was only

17   one other fiberglass supplier in the country and

18   they had a catastrophic events.  So, we were

19   controlling the supply chain with fiberglass, too,

20   and we had all our internal consumption and we had

21   put together a robust research and development team

22   on the media side.

23             So, we opened a plant in Wilson and that's

24   where the media was made, and we have a plant in

25   Washington where the fiberglass was made.  All

Harry Smith                          June 2, 2017

1      ground zero build ups.  So, I go to the Board and

2      Brad Coleman immediately starts putting pressure --

3      because the procurement guys I would come into the

4      plant and the procurement guys would say hey, Harry,

5      can we talk to you.  And I'd go in there and they

6      said hey, we just had to call this Brad Coleman guy

7      from PGI, he's trying -- from Blackstone, he wants

8      us to buy from PGI, we don't know what to do.

9              I said well, you need to buy from the

10     lowest cost producer.  If that's not Pronamics, you

11     shouldn't do it I mean because -- but I also knew he

12     couldn't get there, we didn't have no overhead.

13     Long story short Insight called me and said we've

14     got to do something here, we can't lose the

15     Blackstone relationship.  But Brad Coleman from

16     Blackstone forced my exit to the Board.  Now, what

17     Victor Vescovo said is look, we're going to play

18     this game, we want to put you back in the CEO role

19     when we go to sale because at that point we're close

20     enough that we can -- you and Brad can work it out

21     if he thinks he's going to get a return.

22             My comment was let's get there and see how

23     that works.  I was great with Peter, didn't have a

24     problem with Peter at all.  Peter came in

25     immediately.  Travis Stephenson can attest to this

Harry Smith                          June 2, 2017

1    one, about 30 days in he calls me in and goes

2    Insight's made a massive mistake buying this

3    company.  I said, really.

4           He said, they've made a massive mistake, I

5    want to scare the shit out of him - excuse me, what

6    he told me - and get them out.  They said I'm going

7    to talk them in to taking a loss.  I said, Peter,

8    that's a mistake.  I said, you know, we're scaling.

9    So, Peter had never run a company probably with more

10   than 100 employees.  I said, Peter, I think that's

11   incorrect from a valuation standpoint.  You know, I

12   saw it where it was going.

13          He was struggling, the CFO Scott Brown

14   actually called Insight and the Board and called for

15   his termination.  His exact words was he can't do

16   this, he can't lead us, he's in over his head.  I

17   stepped in, calmed all that down, went to Costa Rica

18   fishing.  Victor and Brad called me.  I was over

19   there and we had a three-hour phone call where they

20   put a tremendous amount of pressure on me to come

21   back as the Managing Director of Flanders.  I pushed

22   against it.  I fought against.  And long story

23   short, I went back as a Managing Director with Peter

24   reporting to me.

25          Q.  Now, explain that dynamic because at that

Harry Smith                              June 2, 2017

1        point is Peter the CE --

2            A.    Peter was the CEO and I was just a Board

3        member.

4            Q.    But you were called a Managing Director?

5            A.    They called me back as the Managing

6        Director.  We still had this dynamic with Brad

7        Coleman at Blackstone.  So, right -- and

8            Q.    So, you couldn't officially be --

9            A.    You know, look, I could have sued

10       Blackstone coming and going and I had all the facts

11       down in detail.  Because as soon as Brad Coleman

12       forced Flanders to move the media business back to

13       PGI they sold the business.  So, I mean they were

14       trying to run revenues up on Flanders and Brad

15       Coleman was using their ownership structure and its

16       overall strength in that industry to pressure

17       Flanders to do.

18              It was pretty grotesque and Insight was

19       really worried about it because they, you know --

20       and I said guys, let's just keep working.  Right.

21       But I came back as a Managing Director, basically

22       took over.  Peter the first -- the first day back in

23       Peter came to me and said would you buy the company

24       back if I talked Ted into taking a $50 million loss.

25       And I said no.  He said can talk him into short

Harry Smith                      June 2, 2017

1   selling this company back to you, we've made a

2   mistake.

3           At the same time Insight had a company

4   called EMES, that's its public trader ticker, okay.

5   It was a sand play and it was trading at

6   approximately $140 a share.  In that same

7   conversation Peter Jones looked at me and said I'm

8   on the Board over there, and this thing's an

9   operational disaster, and Insight's looking for a

10  win anywhere they can get it.  This thing, you know,

11  we're going to get in trouble because of the

12  valuation of this stock.  And I was like Peter, I

13  ain't got nothing to do with that.  I said I want to

14  help Insight exit.

15          So, that kind of continued to -- it was

16  just constant every day.  At the same time when I

17  came back, you know, I became under a tremendous

18  attack from a small group of employees that did not

19  want me to reenter the space, right?  So, you know,

20  I came back, I was pretty strong leader.  I was

21  looking, you know, where I could drive.  I cut

22  benefits pretty quickly trying to drive EBITDA.  And

23  I came under a pretty vicious attack.

24          Case in point was the Beaufort Observer,

25  you know, wrote a scathing piece on me that had all

Harry Smith                         June 2, 2017

1    kinds of context written into it.  I didn't respond

2    to it at all and they actually contacted me, called

3    me said, are you going to respond to this.  I said,

4    no, I understand but it's all incorrect.  He said,

5    can I come to talk to you and I said, sure.

6           He came sat down, we gave him the fact,

7    Brad gave him all the Board minutes everything we'd

8    done on Pronamics everything, investment, what was

9    going on with Peter.  We put all the facts out

10   there, he wrote a full redaction and apology.  He

11   also in that thing said there's four or five people

12   that are Flanders that are writing all this stuff.

13   And I said, I understand.

14          At the same time, you know, I had hacked

15   email issues that, you know, because I was going in

16   my personal email.  So, there was a personal attack

17   within the company in a small group.  But it put a

18   lot of pressure on me, you know, at home and

19   everything else.  Now, I understood it and I told

20   Insight I understood it.  And, you know, I actually

21   sent some emails to Insight asking specific people

22   to stop writing because we knew who they were.  I

23   didn't fire them, but we knew who they were.

24          And so, you know, I endeared a very

25   personal attack when I came back as managing

Harry Smith                          June 2, 2017

1    director from a small group of people both internal
2    and external.  And so, I was dealing with all of
3    that at the same time.  And that's culminated the
4    final exit was Peter Jones asking to buy the company
5    back.  The other thing that happened when I came
6    back as managing director was Insight asked me to
7    sign the bank line.  So, the bank came in with Scott
8    Brown and I, we were trying to renew a current bank
9    line that we had.  And the bank said we're not going
10   to renew it because you're too leveraged.  We will
11   renew it if Harry signs a personal guarantee.
12          I mean, I had tons of cash, big balance
13   sheet.  Insight got me on the phone and said we need
14   you to sign this personal guarantee.  I said, guys,
15   I'm a minority shareholder and this -- you got
16   this -- so that was the dynamic.  They were trying
17   to force me to sign a personal guarantee with the
18   bank which is one of the reasons that I sold the
19   company.
20          So, I just said, that's it, it's time.
21   You know, I've got to go.  And I had sold the media
22   plant to SWM, a publicly traded company and sold the
23   glass plant to Flanders and exited.  So, you know,
24   went to the Board, brought me back as managing
25   director.  I don't remember the compensation.  It

Harry Smith                          June 2, 2017

1    was a crazy number they paid me to come back.  You

2    can go dig it up, they've got it I'm sure.  They

3    paid me an enormous amount of money to come back and

4    threw everything I wanted at me.  I mean I could --

5    whatever I wanted they said yeah.

6            And so, I stepped back in running it, the

7    dynamics were just incredible.  There was two

8    different camps.  So, you had the camp that Peter

9    developed when he came in because he had his own

10   guys.  So, you know, my guys were over here and all

11   the sudden we went from one organization that was,

12   you know, a North Carolina based driven company to,

13   you know, we had this camp that didn't want Harry

14   back, right?

15           So, we had hired Nevin Caldwell, who'd

16   been unemployed for a significant of time as a chief

17   operating officer.  We had hired Ron Shriver who had

18   been unemployed for a significant period of time,

19   you know.  So, we had this group of people that had

20   gotten into a significant position of power.  We're

21   looking at an LTIC and you had that dynamic.

22           I gave it the best run I could.  I had

23   already sold Pronamics, that transaction was done.

24   Insight, Flanders Corporation bought the glass

25   plant, I'd sold that.  I came back and I gave it

Harry Smith                          June 2, 2017

1    everything I could and it just wouldn't work.  So,

2    you know, that precipitated the exit.  And when I

3    exited, you know, I think I left -- if you would

4    count the valuation of what the shares that I short

5    sold for and my long incentive compensation plan, I

6    think you could quantify seven to $8 million that I

7    gave up to be able to exit the company without

8    creating any angst.

9            And I exited very quietly.  I continued to

10   work with Insight with customers.  I went to Home

11   Depot I think twice on my own accord, my own ticket,

12   and continued to say, you know, stay with these

13   guys, work with them.  Insight called me once a

14   week.  Peter Jones, you know, came to my son's

15   football game to get advice.  One of the things that

16   concerned Insight when I had finally decided I was

17   going to exit because at some point you got to go --

18   Home Depot actually flew in and met with me, Brad,

19   and he told Brad if he exits, we've lost trust, I

20   don't think you'll see a single source.  And my

21   advice to Insight was to exit.

22           My advice also when American Air was

23   looking at my Insight was to make sure full

24   disclosure on the fragility of the retail piece of

25   business.  Because I perceived it to be fragile and

Harry Smith                              June 2, 2017

1    I thought that they should be aware of that.  So,

2    but I continued to help Insight and Peter, you know,

3    for a significant period of time with customers,

4    vendors.  And, you know, and I think you could

5    easily quantify that I gave up seven to $8 million

6    when I exited.

7              And I knew that.  I mean I knew what my

8    long term incentive compensation was worth.  I knew

9    my shares were worth a significant amount more.  And

10   I had done really well and I didn't want to exit

11   with that approach.  And I think Insight will tell

12   you, you know, it was one of the most gracious

13   things they've ever seen.  My hope is it went to the

14   employees.  That was the request.

15       Q.   When you began working for Flanders, did

16   you get an employment agreement?

17       A.   I had an employee agreement as the CEO

18   with compensation, et cetera, yes.

19       Q.   So, prior to becoming CEO do you recall

20   ever having a written employment agreement?

21       A.   I cannot recall.

22       Q.   Do you believe that you had an employment

23   agreement as soon as you took over the CEO position?

24       A.   I did.  I had a contractual agreement with

25   the Board.

Harry Smith                         June 2, 2017

1          Q.   Do you know where that would be?  Do you

2     have a copy of that personally?

3          A.   I can -- I can -- I can redact a copy.

4     I'm sure Christian has got a copy, I'd be glad to

5     provide it.

6               MR. GRAY:     Kevin, can we get a copy of

7     that?

8               MR. CEGLOWSKI: Uh-huh.

9               BY MR. GRAY:

10         Q.   Do you know how many employment contracts

11    you had with Flanders?

12         A.   No idea.

13         Q.   Mr. Smith, I'm going to hand you what I've

14    marked as Exhibit 1.  Do you recognize that

15    document?

16               (Deposition Exhibit Number 1

17                was marked for the record.)

18         A.   I don't know if I per se recognize it but,

19    you know, as -- as -- as such.  I obviously am aware

20    of it but I don't recognize it readily.

21         Q.   If you'll turn to the next to the last

22    page, page nine, is that your signature on that

23    page?

24         A.   Absolutely.

25         Q.   And this document appears to be executed

Harry Smith                            June 2, 2017

1     on or about May 16th, 2012; is that correct?

2          A.   Correct.

3          Q.   And the person that signed on behalf of

4     Flanders was John Oakley who was signing as

5     President and CFO.

6          A.   And he was an officer.

7          Q.   But you were his boss?

8          A.   Correct.  This would have been a Board

9     supported document and a public document.

10         Q.   This was a document that was prepared in

11    anticipation of the company ultimately being sold;

12    is that correct?

13         A.   I don't -- I don't recall that per se.

14    But that could very well be correct.

15         Q.   If you'll look on the first page under the

16    paragraph entitled employment, do you see where it

17    indicates that was an employment agreement entered

18    between Flanders and you that was dated March 18th,

19    2012?

20         A.   In the first paragraph?

21         Q.   The paragraph entitled employment.

22         A.   Oh, okay, yeah.  Absolutely I see that.

23         Q.   And do you know if that particular

24    employment agreement was your first employment

25    agreement or --

Harry Smith                              June 2, 2017

1          A.   I don't recall.

2          Q.   Do you believe you may have a copy of that

3     agreement?

4          A.   I -- I would think that Christian would

5     have a copy of that agreement.  I also would think

6     that there is copies in the files.  I mean we left

7     everything intact, so.

8               MR. GRAY:     Could you give us a copy of

9     that as well, Kevin?

10              MR. CEGLOWSKI: Yes.

11              MR. GRAY:     And any other employment

12    agreement that was executed prior to this Exhibit 1.

13              BY MR. GRAY:

14         Q.   On the second page, Mr. Smith, do you see

15    that there is non-competition and non-solicitation

16    provision?

17         A.   I do.

18         Q.   Do you have any problem with that

19    particular provision?

20         A.   Not that I'm aware of.  You know, my view

21    on non-competes, you know, I never utilized non-

22    competes in my entire history or career.  I never

23    intended to compete with Flanders.  So, you know, my

24    intent was to build and develop and grow a company

25    that provided a tremendous amount of jobs in North

Harry Smith                          June 2, 2017

1    Carolina primarily and to watch it grow and

2    flourish.

3            So, you know, from that perspective I

4    never had a problem signing one.  I never utilized

5    them.  You know, I always thought if you build a

6    harmonious organization, people don't leave.  But I

7    don't see why I would have a reason with this at

8    all.  Obviously I signed it.

9        Q.   And do you have any reason to believe that

10   the provision in paragraph number five entitled Non-

11   competition and Non-solicitation is unreasonable?

12           MR. CEGLOWSKI: Objection, calls for a

13   legal conclusion.

14           BY MR. GRAY:

15       Q.   You can answer.

16       A.   I have no idea, I mean, from a legal

17   standpoint.  But I mean I -- I didn't have a problem

18   with it.  And, you know, I -- I would not have

19   gotten really legal advice at this point, you know.

20   I utilized Christian toward the end, but I wouldn't

21   have gotten any legal advice at this point.

22       Q.   And when you're referring to Christian,

23   you're referring to --

24       A.   Porter.

25       Q.   -- Christian Porter of Colombo Kitchin in

Harry Smith                              June 2, 2017

1       Greenville?

2            A.   Yes, sir.

3            Q.   So, it's your belief that you signed this

4       document without consulting legal counsel?

5            A.   Absolutely.

6            Q.   But as far as you were concerned you

7       didn't have a -- you did not have a problem with

8       this particular --

9            A.   No.

10           Q.   -- non-competition and non-solicitation

11      provision?

12           A.   No, none at all.

13           Q.   Mr. Smith, you've just been handed what

14      I've marked as Exhibit 2, do you recognize that

15      agreement?

16                     (Deposition Exhibit Number 2

17                      was marked for the record.)

18           A.   I do recognize the agreement.

19           Q.   And on the last page, page eight, did you

20      sign that agreement?

21           A.   I did.

22           Q.   What is the date that you signed it?

23           A.   July 1st, 2014.

24           Q.   And on the first page it indicates that

25      your employment with Flanders, and it specifically

Harry Smith                              June 2, 2017

1    refers to the document we looked at earlier, Exhibit

2    1, which was your employment agreement, it indicates

3    that that is ending as of July 1, 2014; is that

4    correct?

5            A.    That would be correct.

6            Q.    Can you explain how this document came

7    about?

8            A.    This is the document where I moved to the

9    Board I'm assuming.

10           Q.    I want to give you some time, take a look

11   at it.

12           A.    Yeah, this is a document where what I had

13   explained earlier about meeting with Insight in

14   Florida and them asking me to move to the Board and

15   working with bringing in Peter Jones, who was a

16   director at EMES.  And to quote Ted Beneski that day

17   he said Harry, he'll do to get us through.  I said

18   absolutely let's bring him in.  I understood there

19   was a massive dynamic between Blackstone and Brad

20   Coleman and myself.

21                I also understood that Insight needed

22   Blackstone as a further partner from a private

23   equity standpoint.  I did not understand the PGI

24   dynamic at Blackstone yet but I quickly understood

25   it.  And so, you know, I agreed to move to the Board

Harry Smith                          June 2, 2017

1    and continue to support the company in a Board

2    position and it was a very healthy and positive

3    transition to the Board of Directors.

4         Q.   And I think as you mentioned, the Board of

5    Directors that's on page two, paragraph number five?

6         A.   Correct.

7         Q.   And it indicates that you would begin

8    serving as the Vice Chairman of the Board; is that

9    correct?

10        A.   Correct.

11        Q.   And it sets out what your compensation

12   would be as the Vice Chair of the Board?

13        A.   Correct.

14        Q.   Was that an increase from what you were

15   receiving as a -- being just a general of the Board?

16        A.   Well, I mean I went from CEO to this

17   position.  So, I mean I took a dramatic cut in

18   compensation to -- to move to this position.  I

19   actually when we got this agreement I told them I

20   was fine with zero compensation to go to the Board

21   and they wanted to continue to compensate me.  So,

22   that was their decision.

23        Q.   They provided you with severance benefits

24   in paragraph two?

25        A.   Uh-huh.

1         Q.   Is that correct?

2         A.   Yeah, whatever this agreement says is

3    correct.

4         Q.   And they gave you a bonus for 2014 or

5    agreed to pay a bonus for 2014 even though you would

6    not be eligible for one since your employment was

7    ending; is that correct?

8         A.   That's correct.  I got a prorata share of

9    the annualized year is what it says.  As I remember,

10   that's what happened.

11        Q.   And you've been talking about LTIC, which

12   is long term incentive compensation?

13        A.   Yes, sir.

14        Q.   And in paragraph number four on page two

15   they increased your vested percentage from 20 to 30

16   percent; is that correct?

17        A.   That's correct, and that is the piece that

18   I voluntarily -- at my request asked to go back to

19   the company when I exited.  The final exit I

20   requested that my LTIC, which I was 100 percent

21   vested for and legally mine, that I think at the

22   exit to Daikin would have been probably $8 million

23   or seven, you can quantify.  I voluntarily gave that

24   back to the employees of Flanders Corporation in my

25   exit.

Case 4:16-cv-00289-FL   Document 30-1   Filed 07/14/17   Page 129 of 254

1         Q.    In paragraph six it sets out payments that
2    were owed to the company by Pronamic and Oak Ridge
3    and gave a time frame for that to be paid?
4         A.    Uh-huh.  Uh-huh.
5         Q.    Is that correct?
6         A.    Yes, sir.
7         Q.    And we haven't talked -- we've talked
8    about Pronamic, we haven't talked about Oak Ridge.
9         A.    Yeah.
10         Q.    Just tell me real quick.
11         A.    Sure.  Yeah, Oak Ridge -- Insight came to
12    us early on and, you know, we had an internal
13    machine shop with -- where we machined all our own
14    parts internally.  And one of their first requests
15    is that we exit the machine shop business and
16    procure the parts.  And so, Kevin Boyd, who had ran
17    the machine shop and was a key and integral part
18    player, called me and said, look, these are 20-year
19    guys, 25-year guys, is there anything we can do.
20              And he said -- I said, you know, let me
21    talk to Brad.  I called Brad and I said, look, you
22    know, we hate to send these people home, they're
23    eastern North Carolina, and they've been with us
24    and, you know, part of this deal was, you know,
25    we're going to grow, not hurt.  And I said, you

Harry Smith                            June 2, 2017

 1    know, what can we do.  He called me back and said,
 2    look, you know, if you guys would like to buy the
 3    assets and hire those employers, we would work out
 4    an agreement where you guys could open a business.
 5         We would still procure those parts at a
 6    competitive price which means you'd get more bids,
 7    but that would be an opportunity, that's the only
 8    thing we can do.  And he said, by the way, that'd be
 9    a big win for us because we don't know if we could
10    sell the equipment, which was fair.  We went and got
11    an arm's length valuation on all the equipment and
12    we entered into an agreement to buy the equipment
13    and we also entered into an agreement with the
14    company with Insight managing that process on where
15    we got first right of refusal on machine work within
16    the company.
17         And as a part of that process Kevin had
18    developed an automation program, two different types
19    of products called Pac and C-Pac, which took out a
20    lot of the labor, and he had developed it in-house.
21    And they also driven by Brad Buser and Eliot Kerlin
22    wanted Oak Ridge to build I think six of those
23    machines.  So, that is what started Oak Ridge.  You
24    know, I went in with Kevin 50/50 and it was Kevin's
25    venture.

Harry Smith                          June 2, 2017

1           Kevin now owns it 100 percent.  So, we

2    went and bought a building, put him in it, hired all

3    the employees, nobody lost their job, and we put

4    them in business.  I covered all the capital losses.

5    We had a capital loss the first two or three years

6    where we lost, you know, money and all that's of

7    record as well.  I covered the losses until Kevin

8    got stabilized and then I gave Kevin the business at

9    no consideration.

10           So, Oak Ridge is still performing today.

11    You know, one of the points of contention that we

12    had talked about before was immediately when we

13    doing -- Oak Ridge was doing a significant amount of

14    business with Flanders and Insight was also

15    contacted Kevin and said we want you to do business

16    with our other companies.  You've done a really good

17    job, you've built every single piece of equipment in

18    the company.

19           As soon as Daikin took over the POs

20    stopped and communication to Flanders was we've been

21    given -- and need not to do business with you.  So,

22    Kevin didn't understand it.  Kevin tried to contact

23    Howard Campbell, who as I understand it was

24    terminated by Phil Whitaker, that's what we were

25    told.  And, you know, the word to the corporation is

Harry Smith                          June 2, 2017

1    we're not allowed to buy from you.

2            Kevin reached out, sent multiple emails,

3    said can I help, I want to help.  It was not

4    antagonistical, he had a great relationship with

5    Insight working in the plants all the time.  And he

6    lost a significant amount of business day one that

7    Daikin took over and we never understood.

8            And then we started getting feedback.

9    Kevin had also built the glass plant, which was

10   directly across the street from Oak Ridge, I mean

11   they're across the street from each other.  He

12   designed it, built it, bought equipment and

13   immediately as well because, you know, that was part

14   of it.  Insight said we want -- that business

15   stopped as well.

16           And as well, you know, there was comments

17   coming out right, wrong, or indifferent that were

18   pretty derogatory.  But there was -- never should

19   have -- I mean Kevin never did anything in any way,

20   shape, form, or fashion to be retaliated like that.

21   And I mean it -- the business stopped immediately.

22   And this was a process where we saved jobs in

23   eastern North Carolina, made a significant

24   investment in the east, and bought an empty

25   building.

Harry Smith                              June 2, 2017

1              And look, that business is flourishing

2    today and providing a lot of jobs in the east.  And

3    I've got to tell you when -- when Phil Whitaker who

4    said that he'd made a decision not to do that, and

5    Kevin sent multiple emails said just let me help you

6    and he could have helped him dramatically, he really

7    harmed eastern North Carolina and I injected a lot

8    of capital to cover Oak Ridge as Kevin developed

9    other customers.  So, that is how Oak Ridge was

10   formed and it's flourishing and doing really well

11   today.

12       Q.   There's also a provision in here about the

13   company would assist you in selling Pronamic?

14       A.   That's correct, uh-huh.  So, I had

15   basically at that point said, you know, guys, I was

16   happy to make this investment that you all agreed.

17   I've made a mistake, you know, I put a lot of

18   capital at work here and at this point I was dealing

19   with the Brad Coleman PGI issue.  And I said, you

20   know, I'm -- I'm going to exit and they said, well,

21   we don't want to lose the glass plant because they

22   needed that fiberglass.

23              So, they did not assist me in any way,

24   shape, form, or fashion.  I sold the media plant to

25   SWM DelStar and exited the Wilson plant in one

Harry Smith                          June 2, 2017

1    transaction.  And Brad said, we want to buy the

2    fiberglass plant. And I said, that's fine because,

3    you know, they didn't want to lose control of it

4    because when I built the fiberglass plant, Superior

5    Fiber, the only qualified vendor that made media

6    that we could buy from, had moved their biggest

7    plant to Mexico.

8            And as I had just started getting --

9    because I had said, they're going to fail, won't

10   work because of humidity conditions, they shut that

11   plant down.  So, you know, Insight immediately came

12   and said, my God, you were right, you know, and it

13   became a big part of I think what Daikin wanted as

14   well was that fiberglass plant.  It was a big

15   bearing interest for us but they bought it and we're

16   happy to produce the records.  I lost money on the

17   transaction.  So --

18       Q.   There was also a provision about exclusive

19   aircraft dry lease?

20       A.   Yeah, I mean I had the jet that I had

21   leased to the company that I owed personally.  And

22   at that point in time I was trying to unwind

23   everything and they were trying to unwind

24   everything, so.

25       Q.   And then in paragraph 11 it goes back and

Harry Smith                          June 2, 2017

1    reiterates going back to Exhibit 1, the non-
2    competition and non-solicitation, and says that it
3    will remain in effect for a period of two years
4    after the separation date; is that correct?
5          A.    That is correct.
6          Q.    Now, did you have a lawyer review this
7    document?
8          A.    I think at that time, Ken, I probably had
9    Christian involved somewhat.  But there was still
10   a lot of trust.  I mean there was some angst there
11   but -- and on the dry lease, and I think the
12   documents will show that, I actually voluntarily
13   paid back $260,000 that I didn't have to because I
14   was going to keep the plane and they had just made a
15   big capital investment in one of the engines and I
16   voluntarily paid that back, too.
17              So, I was trying to go above and beyond.
18   But, you know, you've got to keep in mind at that
19   time, you know, I had no intent, desire to go back
20   in the air filtration business.  My desire through
21   this whole process was to watch Flanders flourish.
22         And even though there was some contention
23   between myself and Insight, it wasn't unhealthy, you
24   know.  Those guys knew it all the time.  You know,
25   the company had been good.  I was trying to do

Harry Smith                          June 2, 2017

1    everything I could, while at the same time being

2    under a pretty big assault internally from a small

3    group.

4            And, again, Beaufort Observer, you know,

5    redacted the entire document.  And -- and to exit.

6    So I had no desire to go into air filtration

7    business in any way, shape, form, or fashion, you

8    know, until I was personally attacked, defamed, you

9    know, with the customer base, the vendor base and

10   personal attacks taken against two companies I own

11   and actions were taken that were never explained to

12   us.

13           So, that is why we're sitting here today.

14   So, from this perspective I didn't have a problem

15   with that.  I never intended to get back into air

16   infiltration base.  And by the way can't tell you

17   I'm still going to go back.  So, you know, my goal

18   today based on the email I sent you was I would love

19   to see them flourish.  I've offered that for free.

20   By the way, I did happen carry them to Home Depot.

21   So, you don't go read emails from email, you go see

22   them, right?  If Home Depot finds out that they went

23   through their emails, that account's gone tomorrow.

24   And by the way, public record I can go tell them.

25           I haven't done that because that's not the

Harry Smith                        June 2, 2017

1     kind of action I want to take, right?  So, when the

2     CEO says I went and read Home Depot and your emails,

3     right, and I did a Home Depot search of your emails,

4     then -- then, you know, my advice to Phil would be

5     Phil, let's go see them, let's not do that, let's

6     fix the relationship.  So, you know, that is how we

7     ended up here today was -- was, you know, is how

8     they went about the relationship of me.  And by the

9     way, when they sold the company, I reached out early

10    on and offered to help.

11              MR. GRAY:    Let's go off the record.

12    (Off the record at 11:55 a.m. until 11:59 a.m.)

13

14              BY MR. GRAY:

15         Q.   Mr. Smith, so at the time you executed

16    this document on July 1, 2014 you were aware that

17    there -- you know, you were obligated to comply with

18    the provisions of the non-competition and non-

19    solicitation agreement --

20         A.   Yes, sir.

21         Q.   -- that was initially set forth in Exhibit

22    1?

23         A.   Yes, sir.

24         Q.   And reiterated in Exhibit 2?

25         A.   Yes, sir.

1          Q.    And you did not have a problem with that

2     particular provision?

3          A.    Absolutely not.

4                MR. GRAY:     Let's go off the record

5     just for a moment.

6     (Off the record from 12:00 p.m. until 12:00 p.m.)

7                BY MR. GRAY:

8          Q.    Mr. Smith, I'm handing you what I've

9     marked as Exhibit 3, do you recognize that document?

10                    (Deposition Exhibit Number 3

11                      was marked for the record.)

12         A.    I do.

13         Q.    And did you sign that document on the

14    third page?

15         A.    I did.

16         Q.    And when did you sign it?

17         A.    March 12th, 2015.

18         Q.    Okay.  Do you recall what brought about

19    this particular document?

20         A.    I do not.

21         Q.    Do you know what the document was trying

22    to accomplish?

23         A.    I do not.

24         Q.    Does it appear that it's amending the

25    confidential separation agreement, which we

Harry Smith                          June 2, 2017

1      previously marked as Exhibit 2?

2          A.   Yeah, this is when they were increasing my

3      LTIC.  And the intent here is -- this is when they

4      were getting me back to run the company, right?  So,

5      they -- they gave me a significant increase in the

6      long term incentive compensation plan to come back

7      and take over.  So, this is when I went from CEO to

8      the Board and then I actually came back as managing

9      director of the company.  So, this would be the

10     process where they -- they increased my LTIC in an

11     attempt to financially compensate me for coming

12     back.

13         Q.   How long were you Managing Director?

14         A.   I don't recall.  You know, it went pretty

15     quick in the fact that, you know, we -- we had a

16     transaction where I sold the media plant to SWM,

17     they bought the glass plant and the Pronamics

18     transaction was done.  They talked me into coming

19     back as the Managing Director.  I was pretty happy

20     on the Board and would have been there through the

21     entirety just as a Board member.  When I came back,

22     you know, it was -- it was pretty tough.  I can tell

23     you to battle they asked me to sign a personal

24     guarantee, all the stuff we went through.  And then,

25     you know, it just didn't work.  So, I exited at some

Harry Smith                              June 2, 2017

1   time period after that, 30 to 45 days.

2       Q.   Let me ask you this.  During the time

3   period when you had resigned as part of the

4   confidential separation agreement at that point you

5   became Vice Chair of the Board.

6       A.   Uh-huh.

7       Q.   And before the time in which you were

8   Managing Director, okay, have we got that time

9   period in your mind?

10      A.   Uh-huh.  Yes.

11      Q.   And I want to know just briefly what your

12  role was on the everyday basis.  Were you going to

13  the plant or were you just truly acting as a Board

14  member?

15      A.   I really was a Board member.  I helped

16  Peter.  He called me daily.  I still talked to

17  customers for them.  So, I managed the key

18  relationships for them, just phone calls.  I was

19  still there so I think that was a big comfort factor

20  for --

21      Q.   How often were you going to the plant?

22      A.   I came in probably two days a week, three

23  days a week I think.

24      Q.   And then at the point you became the

25  Managing Director, I assume your involvement was

Harry Smith                           June 2, 2017

1     more.

2            A.   Six days a week.

3            Q.   Right.

4            A.   So, we had a significant increase in raw

5     materials when I exited.  I came back and took that

6     on.  I came back on and tried to calm and quell the

7     customer base because the competitors were

8     attacking, right?  We had -- we lost a couple key

9     employees under Peter.

10           Q.   So, the bottom line is you were full time

11    and --

12           A.   Absolutely, back in it to win it.

13           Q.   And in the second -- on the second page it

14    amends the Board of Directors from Exhibit 2 and

15    appears to give you additional payment

16    opportunities.

17           A.   Yes, they -- they -- I mean it's pretty

18    evident they threw a bunch of LTIC at me and a bunch

19    of money to get me to come back and run the company.

20    This was the mistake.

21           Q.   And when you say this, you were referring

22    to Exhibit 3 and the concept behind it --

23           A.   Coming back.

24           Q.   -- coming back.

25           A.   You know, it just never works, right?  And

Harry Smith                          June 2, 2017

1    look, I came under a big assault, you know, as you

2    would think because I was coming back in to undo

3    what Peter had done pretty quickly with people,

4    place, and things.  So, and that's what they had

5    asked me to do.

6              MR. GRAY:     Let's go off the record.

7    (Off the record from 12:02 p.m. until 12:12 p.m.)

8              BY MR. GRAY:

9        Q.   Mr. Smith, I'm going to show you what I've

10   marked as Exhibit 4, have you seen that document

11   before?

12              (Deposition Exhibit Number 4

13                was marked for the record.)

14       A.   I have.

15       Q.   And what is it?

16       A.   It's the Asset Purchase Agreement between

17   Pronamics and Flanders Solutions and Blue Goose,

18   which was the building.

19       Q.   Did you have an ownership interest in Blue

20   Goose?

21       A.   Fifty percent as I recall.  Blue Goose was

22   a start up facility in Beaufort County approximately

23   50,000 square feet that had been empty I think six,

24   eight, or ten years and we occupied it, bought it

25   from the county.

Harry Smith                            June 2, 2017

1          Q.   Was this situation basically that Flanders

2     was buying Pronamics and the property that was owned

3     by Blue Goose?

4          A.   Yes.

5          Q.   Is it fair to say that you were

6     extensively represented by counsel, legal counsel,

7     in regard to this document?

8          A.   I don't know about extensively but I was

9     represented by legal counsel, and that counsel would

10    have been -- Ward and Smith represented me on the

11    media plant sale and Christian Porter represented me

12    on this sale because it was really internal, not a

13    lot of negotiation.  So, I didn't need as much help

14    on the glass plant as I did the media plant when it

15    come to legal.

16         Q.   The media plant, which you said Ward and

17    Smith assisted you with, that's not part of this --

18         A.   No.

19         Q.   -- agreement?

20         A.   No, but it was part of Pronamics.  So, two

21    different sales.  We sold the media business to SWM

22    DelStar and --

23         Q.   And that's the transaction that Ward and

24    Smith was involved in?

25         A.   Yes, sir.

1          Q.    But, again, that has nothing to do with

2    Exhibit 4?

3          A.    No, not at all.

4          Q.    Beginning on page 20 and continuing on 22

5    and into -- or continuing on 21 and into 22 are

6    there restrictive covenants in this agreement?

7          A.    Yes.

8          Q.    Including non-competition and non-

9    solicitation of customers and suppliers?

10         A.    Yes, sir, the glass plant, correct.

11         Q.    And non-solicitation of employees?

12         A.    Correct.

13         Q.    Did you have any problem with this

14   particular non-competition agreement and non-

15   solicitation agreement?

16         A.    No.  On this, you know, this was a

17   situation again where Pronamics actually had a

18   tremendous amount of leverage on Flanders because

19   they were the only suppliers at the time.  So, and

20   we held prices and I think that was a big concern,

21   because actually I had the fluidness of being able

22   to do that.  And so, we held prices and again did

23   the right thing.

24              So, you know, we took the asset value of

25   the company and full disclosure and tried to do what

Harry Smith                        June 2, 2017

1    was the right thing for Flanders Corporation.  And I

2    had no problem with it in any way, shape, form, or

3    fashion and again had no intent or desire to

4    compete.   This transaction here was predicated in

5    the benefit of the corporation and Insight and also

6    ended up being a tremendous part of their gain.  A

7    very difficult manufacturing process.

8         Q.   I think you just testified though that in

9    regard to this transaction Pronamics, which you were

10   an owner of, had significant leverage against the

11   company?

12        A.   Well, at that time, you know, we were the

13   only raw material supplier on glass.  The reason we

14   started it, you know, we had a catastrophic supply

15   chain issue with Superior, who was our single source

16   supplier for fiberglass which was a significant

17   portion of Flanders' sales and still is today.  And

18   so, that is how we started the operation.  And we

19   started with just four drums and Superior continued

20   to fail, we continued to ramp up.

21        Q.   But the question is you had a good bit of

22   leverage?

23        A.   Absolutely.

24        Q.   And this document was negotiated?

25        A.   It wasn't any negotiation here.  I mean I

1    basically sat down with Insight and showed them what

2    my investment was and happy to produce records.  And

3    there was no gain in any way, shape, form, or

4    fashion on the building or on a significant

5    manufacturing start up.  So, our intent here was to

6    the right thing.  We could have actually backed up

7    and -- and leveraged prices probably 20, 30, 40

8    percent and they'd had no choice.  But we operated

9    with utmost ethics and integrity.

10          Q.   And I think what you just testified to

11   when you said you could have leveraged prices even

12   more --

13          A.   Yes.

14          Q.   -- in other words, you could have driven

15   even a harder deal or a better deal for yourself.

16          A.   Yes.  I mean, you know, at this point I

17   mean, you know, probably from a capitalistic

18   standpoint it would have been better for me to just

19   walk in and resign.  You know, I had built an asset

20   that was in very high demand and the only other

21   source was having significant troubles, had lost

22   their Mexico operation and had supply chain issues.

23   And we had a significant amount of demand so we had

24   customers calling us.

25               And so, you know, I could have exited at

Harry Smith                          June 2, 2017

1    this point and just, you know, owned this asset and
2    what we had thought would be -- you know, we
3    anticipated being a significant performer.  But what
4    we did was Insight wanted to control of the glass
5    plant, did not want us to sell it to another party.
6    And so, we did not go out -- we had people that
7    wanted to buy the asset and we did not sit down with
8    them.  We basically did it at par value; building,
9    plant, and equipment exactly what we had in it.
10        Q.   Do you recall if Mr. Porter was involved
11   in any of the negotiations?
12        A.   I think Christian was involved in the
13   legalese of the contract.  But I mean there was
14   no -- no negotiation, I didn't negotiate.  I mean we
15   sat down and they basically took the asset.  You
16   know, we basically gave it to them in the benefit of
17   the company.
18             It's my opinion and I think -- I think
19   it's proven out I think I left -- I don't know what
20   the value was based on the complicated build out of
21   this.  But I will tell you when I did that, I think
22   I gave up probably eight, ten, 12, $15 million in
23   what this asset's actually worth in the market.
24   And we knew that then.  I actually had that
25   conversation with Brad.  I said, you know, we want

Harry Smith                          June 2, 2017

1    to do the right and we led with the right foot.

2    But, you know, I will tell you that the valuation of

3    that facility, the complicated manufacturing

4    process, we left a significant amount of money on

5    the table.

6         Q.   I'm going to show you what I've marked as

7    Exhibit 5, have you ever seen that?

8                   (Deposition Exhibit Number 5

9                    was marked for the record.)

10        A.   I don't recall it.

11        Q.   Does it appear that you are copied on the

12   email beginning at the middle of the page from

13   Christian Porter?

14        A.   Uh-huh.

15        Q.   Yes or no?

16        A.   Yes.

17        Q.   And does the email from Mr. Porter

18   indicate that he has spoken with you?

19        A.   Yes.

20        Q.   Does he indicate that there should be no

21   problem with Mr. Corey signing a non-compete

22   agreement related to fiberglass?

23        A.   Correct.

24        Q.   And does it also indicate that you and

25   Kevin have no issue with a non-compete?

Harry Smith                              June 2, 2017

1          A.   Correct.

2          Q.   And then it goes on later to talk about

3     the Promissory Note and the request that Flanders

4     guarantee the Note?

5          A.   Yeah, and I don't recall what this was

6     even about.  All of what you said is correct, but I

7     don't recall the dynamics of it.

8          Q.   And does it also indicate that he's

9     working on a red line and will be back to them

10    tomorrow?

11         A.   Correct.

12         Q.   And it appears that -- do you know who it

13    was sent to?

14         A.   It appears to be sent to Ryan McGary,

15    which is a AAF legal counsel.

16         Q.   And also to Greg Schmitt?

17         A.   Uh-huh.  I don't know who Greg was.

18         Q.   Do you know who Tyler Cotton?

19         A.   I have no idea.  And this may be where

20    Pronamics was doing business with American Air, but

21    I really don't recall what the dynamics of this was.

22         Q.   Could Greg Schmitt be the lawyer for --

23         A.   I don't -- I don't recall.

24         Q.   Okay.  But would this --

25         A.   Christian would have been our attorney.

1          Q.   Would this have helped -- does this help

2    refresh you recollection as to any back and forth or

3    any discussion about the terms of the document

4    that's in front of you, Exhibit 4?

5          A.   No.

6               MR. CEGLOWSKI: Don't testify anything you

7    and Christian discussed.

8               THE WITNESS:   Okay.  Not -- not that I am

9    aware of.  I don't know what this ties to nor do I

10   remember.

11              BY MR. GRAY:

12         Q.   In regard to the non-compete that's in

13   Exhibit 4 that we looked at earlier do you have any

14   reason to challenge that non-compete?

15         A.   No.

16         Q.   Do you have any reason to believe that any

17   part of the non-compete or the non-solicitation is

18   over broad?

19              MR. CEGLOWSKI: Objection, calls for a

20   legal conclusion.  You can answer the question.

21              THE WITNESS:   You know, my conversations

22   on the non-competes repeatedly were to Brad Buser,

23   who was my interaction between Insight.  This was

24   the conversation I had with him numerous times on

25   non-competes.  You know, up to and including five-

     Harry Smith                        June 2, 2017

1    year non-competes was Brad, I have no desire to

2    compete.  As long as I'm treated with respect and

3    dignity and the company continues to move forward,

4    you'll never see me in this space again.

5         I also had the conversation with Brad on

6    several occasions that North Carolina doesn't

7    recognize a five-year non-compete and he and I

8    actually joked about it, right?  Brad also I think

9    was under some pressure to try to get a signature at

10   my level and my degree of expertise in the space,

11   you know, in that process.

12        So, but, you know, those were the

13   conversations I had in generality, you know, I did

14   not have a problem in any way, shape, form, or

15   fashion, Ken.  I never intended to compete.  That

16   was not my goal, never was my goal.  So, and, you

17   know, it was -- it was fairly jovial in that

18   context.

19        Q.   I'm handing you what's marked as Exhibit

20   6, do you recognize that as a November 11, 2016

21   letter to Phil Whitaker from your attorney?

22              (Deposition Exhibit Number 6

23               was marked for the record.)

24        A.   I do.

25        Q.   And in the second paragraph does it refer

Harry Smith                          June 2, 2017

1      to this February 20th, 2015 asset purchase agreement

2      which we marked as Exhibit 4?

3           A.   It does.

4           Q.   And does it indicate that you agreed to

5      certain restrictive covenants in conjunction with

6      the sale of the glass plant, Pronamic?

7           A.   Yes, sir.

8           Q.   And does it indicate that you also do not

9      challenge the enforceability of those covenants and

10     intend to comply with them?

11          A.   Yes, sir.

12          Q.   So, is it fair to say in regard to the

13     non-compete and the non-solicitation provisions in

14     there you don't have any --

15          A.   I have no desire to go back in that space.

16     So, from that standpoint, you know, how -- do I view

17     the non-competes congruently, I just have no desire

18     to go back in that space.  I will tell you that that

19     non-compete, in my opinion, resembles the same non-

20     compete on the air filtration side.  Right.  Two

21     totally separate documents not involved in the

22     transaction of business with no consideration or the

23     overall scope.

24               So, if I desired to go back in the glass

25     plant, I would be challenging that as well.  I have

Harry Smith                          June 2, 2017

1       no desire to go back in that space.  So, you know,

2       right now, you know, my only position is to protect

3       my employees, vendors, and customers.  It's not what

4       I want to do.  What I want to do is see American Air

5       Flanders be successful.

6              So, you know, if -- if wanted to get back

7       in the fiberglass business, I would challenging that

8       congruently.  That's just not a decision I want to

9       make; therefore, I have no problem with it.  I got

10      zero consideration on the glass plant as well.  I

11      think I left eight to $10 million on the table when

12      I handed the asset back.  The reason I handed the

13      asset back was so the company could flourish.  It's

14      also one of the drivers I think of American Air's

15      decision to buy Flanders to protect that, you know,

16      that state-of-the-art manufacturing fiberglass

17      plant.

18             And I think Insight made an enormous gain

19      on the capital I put in, the time, energy, and

20      effort that we took to build it and I got zero gain

21      on that.  In fact, I think if we were to take the

22      numbers and really back them in, I probably lost

23      money.  I can't attest to that today but I think if

24      you look at the capital I put in versus how we did

25      it -- and at that time I was trying to do everything

Harry Smith                          June 2, 2017

1    I could --

2         Q.   Let me make sure I'm clear on this now.

3    In regard to this asset purchase agreement are you

4    saying you believe you may have lost money?

5         A.   I think that if you really drilled all the

6    way down to the pennies -- you know, the goal here

7    was just to give it them exactly what I had in it so

8    we would hand them the asset.  But, you know, it

9    would not surprise me if you went back to the money

10   I had put in the building and whatever, that there

11   was some dollars that I didn't recoup because, you

12   know, there was a lot of dollars floating.  I was

13   guaranteeing all of it, right?

14        Q.   But you didn't have to.  Let's assume that

15   you did lose money on it, you didn't have to, did

16   you?

17        A.   No, I didn't.  I mean I think it's the

18   point that I just didn't drill all the way down to

19   the pennies, Ken.  My intent with the glass plant

20   was to do the right thing.  Keep in mind that

21   Superior had had a catastrophic failure, Flanders

22   had to have the glass plant.  So, they had to have

23   this, you know, to maintain the company that it was.

24   It's one of the most key raw materials suppliers.

25   What I was trying to do here was do the right thing.

Harry Smith                          June 2, 2017

1    So, I -- I mean it's my belief I could have said
2    I'll take ten million for it and I would have got it
3    because they needed it.
4              And by the way, this thing was built for
5    Flanders.  It was a -- this is a huge strategic
6    piece of equipment.  It's -- this is a big, big
7    deal.  I built it with all my money, all my time,
8    energy, and effort and it is a state-of-the-art
9    fiberglass manufacturing operation.  And I will tell
10   you if go back and look at Daikin's due diligence
11   it's a key and critical reason they wrote the check
12   they did was to get this asset.  I gave the asset in
13   trying to do the right thing as I did with the LTIC
14   in trying to do the right thing.  I had done really
15   well at Flanders.  My goal at this point was
16   absolutely to operate beyond reproach.
17        Q.   You earlier testified that you had the
18   leverage in this particular transaction?
19        A.   Absolutely believe I did.
20        Q.   And as you just testified I believe you
21   said that you could have asked for $10 million more
22   than you did?
23        A.   I absolutely believe that's correct.  I
24   also, you know, could -- I mean this was the source
25   that I could have went up 50 percent.  You know, we

Harry Smith                    June 2, 2017

1    never did -- and it goes back too to Kevin being

2    attacked because Kevin was with me in this.  And so,

3    he said let's do the right thing.  And so, I will

4    tell you that, you know, we operated beyond

5    reproach.  And look, the other part of that is, you

6    know, I wanted Insight to be successful.  I wanted

7    Flanders to be successful.  At this point me taking

8    this kind of action is tough to justify, right?

9         I mean I'd already, you know, and so I was

10   trying to do everything I could to help the company,

11   the employees, and Insight be successful.  And I

12   think you'll find out in Daikin's due diligence they

13   wanted this and they wrote a check for it.  And we

14   knew what it was worth.  I mean we built it

15   internally with Oak Ridge with all those machine

16   shop guys we talked about and it is state-of-the-

17   art.  And it's the only fiberglass plant that's been

18   built in the country I think in 30 years.

19        So, it's a big -- big deal because they

20   have -- the control raw material sources critical to

21   the company.  And we were happy to do it.  I mean I

22   -- you know, I think I could have made a significant

23   gain -- and just let them have it.  But I -- that's

24   not what we wanted to do.  And I don't want to go

25   back in the fiberglass business.  I mean, you know,

Harry Smith                                June 2, 2017

1    I don't want to hurt Flanders, you know.  I have no

2    desire to do that in any way, shape, form, or

3    fashion.  I'm happy not to get back in the field.

4          Q.   And you've explained why whatever you got

5    out of this is what you got out of it.

6          A.   There's no gain and we're happy to produce

7    the records.  There's no gain here.

8          Q.   That was 100 percent your decision?

9          A.   Absolutely.  It's the same decision I use

10   when I gave up the LTIC.  I mean look at the

11   contracts.  I was 100 percent vested.  I knew there

12   was significant value there.  You know, I was really

13   trying to lead at that point, you know.   And look,

14   in full disclosure very emotional exit for me.  I

15   mean I had a company I built, a bunch of people that

16   I had gotten really attached to, customers, vendors,

17   employees.  And so, this was a dynamic change in my

18   life.  At the same time I was coming under immense

19   attacks within the company on a small group but, you

20   know, look, right, wrong, or indifferent that stuff

21   will bang you up, right?

22          And so, you know, I was -- at this point I

23   was trying to do everything I could and that's also

24   why I have such a great relationship with Insight

25   today.  Insight recognizes the value of what I did.

Harry Smith                          June 2, 2017

1    And I will also tell you Insight recognizes the

2    mistakes they made.  But, you know, we -- we led

3    right here and did the right thing.  And I don't

4    know what the number is but I -- I think it's eight,

5    ten, 12, $15 million we probably left on the table

6    from a valuation standpoint.  They can't run the

7    company without this today.

8        Q.   And when you said they can't run the

9    company without that today, you're talking about --

10       A.   Raw material supply fiberglass.

11       Q.   -- the document that was sold to Flanders

12   in Exhibit 4?

13       A.   Right, the asset.  Yeah, the plant.

14       Q.   I'm handing you Exhibit 7, can you tell me

15   what the purpose of that document is?

16               (Deposition Exhibit Number 7

17                was marked for the record.)

18       A.   I don't remember the purpose.  I mean it

19   appears to be, you know, where -- is this where they

20   were paying off the loan.

21       Q.   You signed it on the third page?

22       A.   I did.

23       Q.   And it does appear to be a statement of

24   repayment and termination of the business loan

25   agreement?

Harry Smith                            June 2, 2017

1          A.    Correct.

2          Q.    And this business loan would have been the

3    loan that you took out for Pronamics?

4          A.    Yes, sir.

5          Q.    And this would have been paid off as a

6    result of the asset purchase agreement?

7          A.    Yes, sir.  And we're happy to get you all

8    the accounting records on our -- our total

9    investment and then could compare that just so you

10   can put those in the records to show what we

11   invested in it.

12         Q.    I'm handing you what I have marked as

13   Exhibit 8, do you recognize this as the Closing

14   Certificate dated March 13, 2015 for the sale of

15   Pronamics?

16                    (Deposition Exhibit Number 8

17                     was marked for the record.)

18         A.    Yes, sir.

19         Q.    Do you know why it's done at that time as

20   opposed to the February --

21         A.    I don't -- I don't know if this is after

22   we cleaned up the debt.

23         Q.    -- 20th, 2015?

24         A.    If it was after debt was cleaned up.  I

25   don't know why the disparity in the dates would be.

Harry Smith                              June 2, 2017

1    Christian may could tell you that but I -- I have no

2    idea there.  My assumption is this is probably when

3    they had had all the -- you know, they had taken the

4    building so forth and so on.  And you know we made a

5    significant improvement in the building and we gave

6    them that as well.  But I don't know the disparity

7    in the dates.

8        Q.    I'm handing you what's been marked as

9    Exhibit 9, do you recognize this as Seller

10   Disclosure Schedules?

11                  (Deposition Exhibit Number 9

12                   was marked for the record.)

13       A.    Yes, sir.

14       Q.    And does that relate to the sale of

15   Pronamics?

16       A.    It would be, yes.

17       Q.    Is there a date on that?

18       A.    I'll see if there's a date.  Says -- well,

19   see, these are -- these are employees as of a

20   certain date.  So, I think they took it out of the

21   system.  I don't know what date this was actually

22   executed.  I'm assuming it matched up with that but

23   I don't know.

24       Q.    And when you said you were assuming it

25   matches up with that, you were referring to Exhibit

1      8?

2              A.    Yes, sir.

3              Q.    Mr. Smith, I'm now going to hand you what

4      I've marked as Exhibit 10.  Do you recognize this as

5      a Promissory Note dated March 13, 2015?

6                        (Deposition Exhibit Number 10

7                         was marked for the record.)

8              A.    I do.

9              Q.    And what was the purpose of that document?

10             A.    As I remember this was the -- this was the

11     buy-out amount as I recall where they agreed to buy

12     the business.  I don't recall the specifics but I

13     think that's the context of it, Ken.  Yeah, this is

14     where I -- I -- I -- they agreed to -- this is where

15     they bought the business and we had a Promissory

16     Note for $3 million, approximately.

17             Q.    I'm now going to hand you Exhibit 11,

18     which appears to be a Manager's Certificate for

19     Pronamics dated March 13th.  Do you recognize that

20     document?

21                        (Deposition Exhibit Number 11

22                         was marked for the record.)

23             A.    I don't recognize it but --

24             Q.    Is it your signature on the second page

25     and third page?

Harry Smith                              June 2, 2017

```
 1          A.   It is.

 2          Q.   I've marked as Exhibit 12 a Manager's

 3     Certificate dated March 13, 2015 for Blue Goose,

 4     LLC.

 5                    (Deposition Exhibit Number 12

 6                     was marked for the record.)

 7          A.   Uh-huh, the building.  That would be

 8     correct.

 9          Q.   And that was also part of the --

10          A.   Yes, sir.

11          Q.   -- Pronamics sale?

12          A.   Blue Goose is a building that occupied the

13     fiberglass manufacturing plant.

14          Q.   I hand you Exhibit 13, a letter agreement

15     between Pronamic and its various sellers, Blue Goose

16     and Flanders, is that right?

17                    (Deposition Exhibit Number 13

18                     was marked for the record.)

19          A.   That's correct.

20          Q.   And it's dated March 13, 2015 as well?

21          A.   Yes, sir.

22          Q.   And did you sign that document?

23          A.   I did.

24          Q.   I'm now handing you Exhibit 14, does this

25     also appear to be a letter agreement relating to
```

Harry Smith                              June 2, 2017

1      incentive payments?

2                    (Deposition Exhibit Number 14

3                     was marked for the record.)

4           A.   Yes.

5           Q.   And did you sign that document on March

6      13, 2015 as well?

7           A.   I did.

8           Q.   I'm handing you a Lease Termination

9      Agreement also dated March 13, 2015, do you

10     recognize that document?

11                   (Deposition Exhibit Number 15

12                    was marked for the record.)

13          A.   I don't recognize it but I understand what

14     it is and I executed it accordingly.

15          Q.   Would that be where you were as a part of

16     the transaction and, again, the transaction is the

17     asset purchase agreement in Exhibit 4, is that where

18     you would no longer be leasing the property and

19     receiving rent?

20          A.   Correct.  So, it would have been an

21     internal LLC that we -- that Pronamics wrote the

22     rent check to us.

23          Q.   I'm handing you what I've marked as

24     Exhibit 16, do you recognize that as a City Economic

25     Incentives Grant Agreement for project Blue Goose

Harry Smith                         June 2, 2017

1    that's dated March 22nd, 2013?

2                    (Deposition Exhibit Number 16

3                      was marked for the record.)

4        A.    I don't recognize it but I understand what

5    it is and I did execute it.

6        Q.    And just very briefly what was the purpose

7    of that?

8        A.    Economic incentives is where, you know,

9    create jobs and the county and state work with you

10   accordingly.  And in this case, you know, we had a

11   criteria to create 54 full time positions of a five

12   period of time.  I think we were 100-plus pretty

13   quick.  So, we obviously met that.

14       Q.    I'm showing you what I've marked as

15   Exhibit 17, does it appear to be a March 13, 2015

16   Closing Certificate for Flanders Solutions, LLC?

17                   (Deposition Exhibit Number 17

18                     was marked for the record.)

19       A.    It does.

20       Q.    And is that also related to the Pronamics

21   transaction?

22       A.    It would be, yes, sir.

23       Q.    As Exhibit 18 I've handed you a document

24   entitled First Amendment to Purchase Agreement dated

25   March 13, 2015.  Do you know why there was an

Harry Smith                              June 2, 2017

1      amendment to the purchase agreement at this time?

2                    (Deposition Exhibit Number 18

3                     was marked for the record.)

4          A.   I don't recall.

5          Q.   Did you sign it?

6          A.   I'm sure I did.  I did.

7          Q.   Does it refer to certain assets that are

8      excluded?

9          A.   Yeah, this -- I mean I guess it's the

10     ownership at ECN, which was the media plant separate

11     that we had sold to SWM that was in the Pronamics

12     umbrella.  And this just I guess is where they

13     amended -- they had taken out and revised it.  I

14     don't remember the details on it, Ken.

15         Q.   Okay.  As Exhibit 19 I'm handing you a

16     document entitled Certification of Non-Foreign

17     Status and Real Estate Reporting Information.  Did

18     you execute this document on or about March 12th,

19     2015?

20                    (Deposition Exhibit Number 19

21                     was marked for the record.)

22         A.   I did.

23         Q.   As Exhibit 20 I'm handing you a document

24     entitled Certification of Non-Foreign Status for

25     Pronamic Industries.  Did you execute this document

Harry Smith                          June 2, 2017

1    on or about March 13, 2015?

2              (Deposition Exhibit Number 20

3               was marked for the record.)

4    A.   I did.

5    Q.   As Exhibit 21 I'm handing you a Bill of

6    Sale that appears to be dated March 13, 2015.  Is

7    that your signature on the second page?

8              (Deposition Exhibit Number 21

9               was marked for the record.)

10   A.   Yes.

11   Q.   I'm handing you what I've marked as

12   Exhibit 22.  It appears to be a Loan Agreement dated

13   March 22nd, 2013.  Do you recognize this document?

14             (Deposition Exhibit Number 22

15              was marked for the record.)

16   A.   I do not.  I think it's for the purchase

17   of the building, but I don't recognize the document.

18   Q.   Does it appear to be an agreement between

19   Pronamic Industries, the County of Beaufort --

20   A.   Yes.

21   Q.   -- and Blue Goose?

22   A.   Yeah.  I would have known of the document

23   for sure.

24   Q.   And does it appear to be executed by Kevin

25   Boyd, CEO --

Harry Smith                          June 2, 2017

1          A.    Correct.

2          Q.    -- of Pronamics?

3          A.    Correct.   Yes, and I would have signed it

4     if had been asked to.  I don't remember the

5     specifics of it but I was obviously aware of it.

6          Q.    Mr. Smith, I'm going to hand you Exhibit

7     23, which appears to be an Assignment and Assumption

8     Agreement that's executed between Pronamics and

9     Flanders.  Did you sign that document?

10                    (Deposition Exhibit Number 23

11                     was marked for the record.)

12         A.    Yes, sir.

13         Q.    And do you recognize it?

14         A.    I don't recognize it but I did sign it and

15    I would have been fully aware of it.  This is

16    basically where we, you know, let them just assume

17    what debt we had when with no gain through the

18    process.

19         Q.    In other words, Flanders acquired the debt

20    that Pronamics still owed --

21         A.    Yes, sir.

22         Q.    -- to the lender?

23         A.    Yeah.  Whatever the basis was we just gave

24    them exactly that with no gain.

25         Q.    And there was certainly some benefit to

Harry Smith                          June 2, 2017

1    doing that for you, correct?

2         A.    No, I took an enormous loss on that, yeah.

3    So, you know, if you look at the valuation of the

4    building would have been, we bought a concrete shell

5    and then massive upfits.  So, we brought tremendous

6    value to the building.  And on top of that, you

7    know, we built a state-of-the-art manufacturing

8    process that is in my opinion the number one

9    fiberglass manufacturing operation in the world and

10   we gave it at par value.  I think I lost eight, ten

11   to $12 million in the process of trying to -- to

12   move this asset to Flanders and Insight to put

13   Flanders in a position to continue to win.

14            But, you know, we made a strategic

15   decision to do the right thing here.  At that time

16   they were -- we had the supply chain in control.

17   And record will show we did not mark up the material

18   and we could have.  And we also agreed when -- and

19   Insight asked us could they buy the asset, we had

20   multiple people wanting to talk to us about it.  But

21   we knew if we sold it outside of Insight, that that

22   would put Flanders in a very bad position.  So --

23        Q.    But for Exhibit 23 though, you would have

24   still owed money to the bank?

25        A.    Yeah, but we wouldn't -- the asset was

Harry Smith                           June 2, 2017

1    worth much more than this, right?  So, if you took a

2    look at the asset value of the building and

3    equipment, the building was worth much more than

4    this and the asset was much -- worth more than this.

5            I would call you to go probably take a

6    look at Daikin's due diligence and understand what

7    they put on valuation for here.  I think I may have

8    left as much as 20 or $30 million on the table in

9    this process.  But I know I at least left eight or

10   ten million.  So, the building and the plant that we

11   basically gave for consideration, which is what we

12   owed, was worth significantly more.  And Flanders

13   had to have the asset.  It wasn't a matter of them

14   wanting it, they had to have it.  And so, you know,

15   we try to lead back there and -- and as a result

16   Insight made a massive return on this.

17       Q.   I guess the point I'm trying to get to

18   though is but for this document, Exhibit 23, if you

19   had not assigned the debt to Flanders and Flanders

20   had not agreed to assume that debt, then that would

21   have ben debt that would have been owed by the

22   owners of Pronamics.

23       A.   Well, we wouldn't have done the

24   transaction.  Right.  So, I mean, you know, if you

25   take a look at the transaction, you know, we had an

Harry Smith                           June 2, 2017

1    asset they had to have.  We also had an asset that

2    multiple people were trying to buy from us.  We

3    never sat down and talked with anybody else.  We sat

4    down and said look, this is our basis, we know you

5    need it.  You know, Peter Jones even sat down with

6    me and said listen, we know you can up 20, 30, 40

7    percent, you know, what's your plans here because,

8    you know, their EBITDA would have dropped.

9           So, you know, we could have picked up I

10   don't remember the numbers, Ken, but probably 250 to

11   300,000 a month in margin just by moving a price

12   increase.  They had to have it, right?  The plants

13   were built for it, the customers had demand for it.

14   We never moved prices and when they said we want the

15   asset, we sold it to them for exactly what we had in

16   it.  I think if you add the numbers, I probably lost

17   some money.  It wouldn't have been significant but

18   we did not make a gain on this we could have.

19        Q.   Right.  You could have.

20        A.   We could have had a significant gain.  We

21   could have sold this asset outside of Flanders and

22   it would have crushed Flanders because at this time

23   Superior had a catastrophic failure in Mexico.

24   There was a massive shortage and Flanders needed

25   this guaranteed supply chain.  The customer base one

Harry Smith                         June 2, 2017

1   of the biggest things that moved Flanders forward

2   was the customer base knew that we had control of

3   our own fiberglass supply chain.  And Insight

4   recognized that quickly.

5        Q.   You could have sold it to an outside

6   party --

7        A.   Could have sold it Ken, and Ken, you could

8   have just said hey guys, this is the price.

9        Q.   And you could have sold it to Flanders for

10  more?

11       A.   I absolutely could have.  Yeah, I feel

12  very strongly about that.  And I think Insight would

13  agree with you on that.

14       Q.   I'm going to show you what I've marked as

15  Exhibit 24.  Do you recognize this document?

16            (Deposition Exhibit Number 24

17             was marked for the record.)

18       A.   I don't recognize the document but I'm --

19  I'm aware of what it is.

20       Q.   What is it?

21       A.   It's the Agreement of Purchase and Sale

22  for the building, I think, which would have been the

23  Blue Goose.  Building that we bought in Beaufort

24  County.  And the reason we named it Blue Goose was

25  because the building was painted blue and everybody

Harry Smith                          June 2, 2017

```
 1     in Beaufort County was calling it the Blue Goose,

 2     that the County had laid a bad egg.

 3          Q.   I hand you Exhibit 25, which appears to be

 4     a Subordination Agreement.  Is this a document you

 5     would have seen as part of the Pronamics

 6     transaction?

 7                    (Deposition Exhibit Number 25

 8                     was marked for the record.)

 9          A.   I don't recall the document but I feel

10     confident absolutely that it would be.

11          Q.   I'm handing you Exhibit 26, do you

12     recognize this document?

13                    (Deposition Exhibit Number 26

14                     was marked for the record.)

15          A.   I'm familiar with the document.  I mean I

16     don't recognize it per se but I'm very familiar with

17     it.

18          Q.   Did you sign the document?

19          A.   I did.

20          Q.   And when did you sign it?

21          A.   Would have been March 20th.

22          Q.   So, this would have been about a week

23     after a lot of these other documents that we just

24     reviewed were signed?

25          A.   Uh-huh.  Uh-huh.  Correct.
```

Harry Smith                          June 2, 2017

1          Q.   What brought about this document?

2          A.   It was a, you know, the intent was that I

3     was going to do everything I could to stay and work

4     through the company and help them be successful.

5     Insight, you know, wanted the glass plant and

6     precipitated that and we got that transaction done.

7     And it was a series of events that week that created

8     a lot of angst.  One was the request to sign a

9     personal guarantee by the bank, which brought me

10    some real angst.  Two was Peter Jones again

11    escalated to the offer to me to buy the company back

12    at a discount and a significant discount.

13          He actually said, you know, what if we --

14    as I recall, what if we -- it was 25 or 50 million

15    would you be interested in buying the company back

16    which I still think we made a mistake.  So, we had

17    that conversation.  We still had personal things

18    going on, you know, within the company.  Again, a

19    small group but, you know, a tremendous amount of

20    the stress.  You know, that week we had a meeting,

21    you know, where we actually were lined up on two

22    different sides of the table.  It bothered me a lot.

23          You know, we had my guys on one side and

24    Peter's team that he had put together on that side.

25    It was just a tremendous amount of angst.  And so,

Harry Smith                              June 2, 2017

1    there was a -- there was a series of events that I

2    just said this is not going to work.  And so, Brad

3    came down and, you know, he and I talked, a fairly

4    emotional meeting.  And their concern, of course,

5    was customers, vendors, employees and, you know, I

6    made the commitment that I would continue on.

7            I said, you know, I'll be right here, I'll

8    advise you, I won't leave your side.  I need to

9    exit, it's not healthy for me, it's not healthy for

10   my family, it's not healthy for the company.  The

11   dynamics are bad, the atmosphere is bad.  I'm not

12   going to sign a bank guarantee, you know.  So, you

13   know, you got to figure that out.

14           And, you know, and -- and I'm willing to

15   do this, you know, in every effort possible to make

16   sure that you guys win in a big way.  And so, we

17   went back and forth and they continued for about a

18   24-hour period to try to convince me to stay in

19   play.  At that time there was a lot of angst between

20   the CFO, Scott Brown, and Peter Jones.  He had just

21   in that same period called for Peter's termination,

22   which is unprecedented.  I stepped in the middle of

23   that and worked through that.

24           My guys are starting to get just, you

25   know, it was Peter, there was me, there was Insight,

Harry Smith                              June 2, 2017

1    there was Blackstone.  It was just a really bad

2    dynamic.  And so, you know, I sat down with Brad and

3    said look, you know, I'd like to exit.  I actually

4    wanted to keep my 660 in because I felt like that

5    was fair.  I wanted my LTIC to go to the employees.

6    And so I said I'd, you know, like to voluntarily

7    give up my LTIC.  I knew what it was worth.  In

8    fact, I think I told Brad I think it's worth six to

9    $8 million.  I think the transaction proves it's

10   worth more than that.

11         But -- and I said but I'd like to keep my

12   investment because I've worked very hard to the

13   company here.  I think I'm due that return.  Insight

14   came back and basically said, Harry, if you want to

15   exit, we want to get you completely out.  You know,

16   we'll be the single owner and, you know, we'll give

17   you the 660 and that's it.  I think they took

18   advantage of me there.

19         But in the effort to try to do the right

20   thing, you know, I agreed to that.  I had the

21   conversation with Brad that I didn't think it was

22   fair.  And so, I think at that time, you know, I

23   just rose above it all.  And, you know, I really

24   exited gratuitously and I continued to help them a

25   lot.  So, I went to see Home Depot I think twice on

Harry Smith                          June 2, 2017

1    my own accord, my own expenses.  Didn't turn in

2    expense.  I talked to Peter.  In fact, he came to

3    one of my son's football games, the entire football

4    game.  I watched football.  I gave him advice.

5           I continued to talk to the customer base,

6    the vendor base, employees who called me and I'd say

7    you're going to be great, keep forward, everything's

8    good.  Brad would call me often, I would give him

9    advice.  So, it was not -- I mean there was tension

10   there as you can imagine to some degree.  But I

11   think both parties handled it really well.  I've

12   still got a very good relationship with Victor and

13   Brad.  And, you know, Brad subsequently exited

14   Insight at the sale of Flanders and he's doing his

15   own thing now.

16          And my intent the entire time was to see

17   the company flourish and prosper and by the way as

18   well as my guys, Travis and Kevin.  I mean they

19   really wanted Flanders, who we spent a big portion

20   of our life, to do well.  And so, that is -- that

21   is -- and, you know, what you've got is you've got

22   two totally separate transactions.  I mean Brad --

23   Brad will contest that and so will Victor.  They

24   bought the assets they wanted to.  Had nothing to do

25   with the sell of business in any way, shape, form,

Harry Smith                                June 2, 2017

1    or fashion.

2         It was a series of events there from

3    wanting me to sign a bank guarantee, you know, to a

4    tremendous amount of angst.  And the current sitting

5    CEO trying to sell me the asset back and that was

6    going all up and down the hallways.  So, everybody

7    was saying well, Harry's going to buy it back and

8    Insight don't want it and, you know, I was getting

9    that phone call.  It was a very bad dynamic, Ken.

10   And, you know, we really had two different sides of

11   the tables.  We had my guys and their guys.

12        And so, it was, you know -- you know,

13   that's -- that's how it went down.  And -- and look,

14   I was pretty hard on Peter because of, you know,

15   what I thought was a failure in leadership.  And,

16   you know, I'm a pretty direct guy on stuff like

17   that.  I wanted the company to perform.  This is a

18   guy that was telling everybody, you know, it was a

19   mistake, shouldn't have done it.  You know, he told

20   myself and Travis on multiple occasions, you know,

21   scare the you-know-what out of them and get out.

22   So, it was just a pretty -- pretty bad deal.

23        And at the same time Insight was under a

24   tremendous amount of pressure.  So, you know, if you

25   take a look at their performance, you know, they had

Harry Smith                          June 2, 2017

1    a couple failures and there was a lot of pressure

2    from their investors to get a return.  And we had

3    the Blackstone dynamic with Brad Coleman wanting a

4    return.  The other thing that was the final, final

5    straw for me was I had not been given any equity to

6    run the company at repeated requests.  And this same

7    thing precipitated on my exit is, you know, Peter

8    came in and proceeded to borrow $20 million from

9    Blackstone at an enormous interest rate, which I

10   thought was a catastrophic decision for the company.

11          We were leveraged off the charts.  We were

12   paying enough interest to key and critical parties,

13   that being Insight and Blackstone, is where the cash

14   was going in my opinion.  And, you know, he came in

15   and threw his finger in the air and said I'm going

16   to get 20 million to clean all this up.  And we paid

17   an enormous rate.  I thought it was another bad

18   decision and I didn't support it.  And I didn't

19   support with Blackstone who I thought had taken

20   advantage of the company.

21          And so, you know, it was a series of

22   events that I couldn't support.  And so, you know,

23   I'm a heart guy and the heart wasn't there and I

24   tried my best to leave with grace and dignity and I

25   think I can prove readily I don't know what the

Harry Smith                          June 2, 2017

1    number is, ten or 20 million on that.  And I knew I

2    was leaving it.  But I have no desire to go back in

3    the air filter.  And I have every desire, as I do

4    today, to see the company be successful.

5          Q.   And you testified that this was completely

6    your decision?

7          A.   Absolutely.  Yeah, they -- they put a full

8    amount of pressure on me, Ken, to stay.

9          Q.   They wanted you to remain as the managing

10   director?

11         A.   Absolutely.  Yeah, they had fears on

12   multiple fronts but, you know, Home Depot, you know,

13   had told them point blank that if I exited, it was

14   going to, you know -- and so they were aware of

15   that.  What I did was said guys, I will help you.

16   So, I continued to work with Home Depot.  Said guys,

17   these guys are going to do great.  I'm here, if they

18   need me, I'm there.  And so, you know, I almost gave

19   the pretense that I was right there with them to

20   help them.

21             And I know I think I went twice on my own

22   to Home Depot.  I wasn't employed or anything,

23   wasn't getting a check or anything.  I'd just go up

24   there and see them and they were thankful for that.

25   I talked to the vendor base because the vendor base

Harry Smith                          June 2, 2017

1    had a lot of angst.

2         Q.   And these -- this visit to Home Depot and

3    the discussions with the vendor base, that was all

4    after --

5         A.   Yes, sir --

6         Q.   -- this equity buy-out?

7         A.   Yeah, I wasn't an employee, I didn't get

8    reimbursed.  I went up there and benefit, you know,

9    the company.  And I mean, you know, it was a pretty

10   tough deal for me.  I mean, you know, I'm telling

11   you I had personal attacks and internal attacks and

12   I went and rose above that.  And -- and but my

13   desire and intent was to see the company be

14   successful.  And by the way, I mean Insight knew I

15   was pretty hard on Peter.  And by the way, Victor

16   and Brad both said one of the worst decisions we

17   made -- you know.

18             So, at that point they were -- they

19   were -- the conversation when I exited was we're

20   going get out in the next 12 months.  And I said

21   guys, you need to exit and this is why you need to

22   exit, right?  And I also -- and I understand that

23   space, but I also said make sure that when you exit,

24   because you're going to make a return, I mean this

25   thing was singing, be up front so the next guy knows

Harry Smith                         June 2, 2017

1    exactly what he's getting into so it's a fair

2    deal -- I'm worried about my employees, right?

3          You know, I've had employees call me

4    crying.  I've had spouses call me crying.  So, you

5    know, I said let's keep this thing going, you guys

6    make a return on it.  But, you know, that was the

7    goal and I said I'll help you every step of the way,

8    right?  And I had given up everything at that point.

9    And my goal was just to help them.  Yeah.

10       Q.   And I want to focus -- and all this stuff

11   you're talking about in terms of the request for you

12   to buy back the company, the request for you sign --

13   co-sign on a loan, that all occurred in the week

14   prior to the 20th?

15       A.   It was -- I don't recall dates but it was

16   pretty much.  It was just almost like a wave.  And,

17   you know, I continued to say guys, this doesn't

18   work.  I was watching my company get grossly

19   leveraged.  I also watched Peter and Insight bring

20   in a whole new team of guys with zero experience, my

21   guys on this side of the table.

22          So, it was a culmination of events. and I

23   really got to the point that I thought it was the

24   very best thing for the corporation for me to exit

25   and try to pull it together.  In fact, I told Brad I

Harry Smith                           June 2, 2017

1       said Brad, the only way this thing has any shot for

2       you -- and I said, I'm going to help you.  I never

3       left them.

4            Q.   You could have stayed on the Board.

5            A.    Absolutely I could have.  And -- and look,

6       you know, I think they'll tell you that they would

7       have done anything I offered them to do.  I mean,

8       you know, those guys were gratuitous in everything

9       they were trying to do.  I will also tell you

10      Insight fully understanded (sic) the dynamics that

11      they had created.  I think they'll tell you they

12      made a massive mistake in bringing Peter in.  I

13      think they'll tell you they made a massive mistake

14      in lining up that side of the table against my side

15      of the table.

16           So, you know, and they did not -- they

17      didn't try to run from that.  I mean we had

18      conversations that, you know, and they needed --

19      they felt like they needed me to exit.  I think, you

20      know, it -- my actions proved out to be the best

21      thing.  There was some -- some chaos there but I

22      never left them.  I mean employees knew I was there.

23      Everybody said, he's there, I was like a comfort

24      factor, if you will, for employees, customers, and

25      vendors.

1        Q.   Let me -- I think you said something that
2   confused me a little bit.
3        A.   Okay.
4        Q.   Did they ask you to step down as Managing
5   Director?
6        A.   No.
7        Q.   Okay.
8        A.   No.
9        Q.   To make sure.  They didn't ask you to step
10  down from the Board?
11       A.   No, uh-uh.
12       Q.   So, basically the only thing I've heard
13  you say so far that you didn't get out of this
14  agreement is that you didn't get as much for your
15  stock as you would have liked to have.
16       A.   Yeah, I mean I knew what the company was
17  worth.  I grew it 100 million.  I mean I thought
18  that was fair, right?  You know, look, on the long
19  term incentive compensation plan, Ken, I wanted that
20  money to go to my employees.  I voluntarily gave
21  that up.  These are people that have been with me a
22  long time that are -- that are -- these are mean
23  income people.  I made a specific request to Brad
24  User and Victor Vescovo that that LTIC went back to
25  my employees in entirety.  I also knew what the

Harry Smith                        June 2, 2017

1    value was, right?

2          And so, I did want to keep my $660,000

3    because I thought that was fair.  I mean it's money

4    that I left and the growth of the company was on my

5    back.  And they -- they wanted me to completely exit

6    the ownership structure.  I personally think Brad

7    Coleman was in that conversation.  I can't prove

8    that but there was still angst there.

9          And, you know, I think it was probably a

10   Wall Street guy against Harry, right.  And I didn't

11   like mezzanine, I didn't like high interest, I

12   didn't like the fact I couldn't get employees

13   raises.  I mean so, you know, that was the piece

14   that I wanted because I knew it was a gain that I

15   deserved that.  And but, that's okay.  I mean I left

16   that day, and I think I was at Home Depot the next

17   week as I recall as a non-paid employee.

18       Q.   And were saying positive things about the

19   company?

20       A.   Absolutely, yeah.  I mean look, Flanders

21   is a great corporation.  I'm not saying that because

22   I was integral in building it.  It's people place

23   things provide a needed benefit.  I am a little bit

24   keen in the fact of how many jobs we created in

25   North Carolina including this asset.  So, you know,

Harry Smith                          June 2, 2017

 1    we took a tier one county where it hadn't had any

 2    jobs created in 15 or 20 years.  We brought 150 jobs

 3    to the county.

 4            So, that was a big deal to me.  It's also

 5    the reason I moved the floor to office in North

 6    Carolina because I wanted to created jobs in this

 7    state.  And so, I wanted -- I had nothing but desire

 8    for the company to be successful, and again, will

 9    tell you about if I'm going in the air filtration

10    business or not, my goal -- my preference would be

11    for Flanders to go on do great things.  Customers be

12    happy, vendors be happy, my employees be happy.

13            Now, my entire executive team's gone now,

14    right?  So, you know, and there's pieces of the

15    company being torn apart.  Some of that's going to

16    happen and transactions.  But it's my opinion that

17    the overall atmosphere is pretty bad.  By the way, I

18    think they can fix it.  I really do.  I think it's

19    very fixable.  I think the numbers, if you pull

20    them, from what Daikin pro formaed on what this

21    thing was going to do to when they bought it to what

22    it's pro formaing for today will prove everything I

23    just said.

24            I think if you look at turnover to prove

25    everything I said.  I think if you look at the

Harry Smith                        June 2, 2017

1    factual datas of what they actually got today versus

2    what they thought they bought, I think every I said

3    will be factual.  And everything I said to, Ken,

4    Phil Whitaker, I think will be factual - turnover,

5    morale, degradation in EBITDA, so.

6        Q.   Okay.  When you say everything you said to

7    Phil Whitaker you think will turn out to be factual,

8    are you referring to the email --

9        A.   Yes, sir.

10       Q.   -- that you sent to Phil Whitaker?

11       A.   That's correct, yeah.

12       Q.   And we'll talk about those emails in just

13   a moment.  Now, in regard to this equity buy-out

14   they agreed to pay you the full amount of the March

15   Board of Directors amount?

16       A.   I don't recall.  Yeah, that would be

17   correct.

18       Q.   And that's -- they didn't have to do that,

19   did they?

20       A.   I don't really recall.

21       Q.   And they didn't have to actually redeem

22   your shares -- I mean because you actually didn't

23   want them redeemed.

24       A.   I sure didn't.  I knew what it was worth,

25   right?  I mean, you know, I watched the company.  I

Harry Smith                          June 2, 2017

1    knew the value and by the way, I knew the space was

2    really hot.  So, I mean I thought it would sell for

3    ten times.  I had that conversation with Brad.

4         And we actually had it pro formaed out for 45

5    million that we thought we could do.  So, you know,

6    I knew what my shares were.  And but, you know, I

7    acquiesced to, you know, on that one.

8         Q.   And they gave you a release of any claims

9    that they could potentially have against you as part

10   of this deal; is that correct?

11        A.   Yeah, and vice-versa.

12        Q.   And vice-versa.

13        A.   Yeah, I need to send one text real quick.

14             MR. GRAY:     Let's go off the record.

15        (Off the record from 1:11 p.m. until 1:25 p.m.)

16             BY MR. GRAY:

17        Q.   In the Buy-Out Agreement it also talks

18   about that nothing in this document reduces or

19   eliminates your promises or obligations regarding

20   non-competition or non-solicitation and other

21   related provisions in your prior agreements, is that

22   correct?

23        A.   That's correct.

24        Q.   And also as part of the consideration of

25   this document did Flanders agree to repay the

Harry Smith                          June 2, 2017

1    principal that was under that promissory noted dated

2    March 31, 2015 made by Flanders Solution in favor of

3    Pronamics and pay it off basically a year early?

4        A.   I don't recall.  I do recall I owner

5    financed it and I was fine with that.  So, I was not

6    worried about that in any way, shape, form, or

7    fashion because the reason I had no fear is because

8    I knew what the plant and equipment were worth.  So,

9    I didn't have any risk.  So, I didn't care if they

10   paid if off or not.  If they'd defaulted I'd been

11   happy to took the plant back because I knew what it

12   was worth.

13        But I also knew doing the right thing was

14   to give them the asset.  So, you know, I was fine

15   with -- with the -- with the repayment note.  And I

16   don't remember the specifics of it but I think they

17   just paid me off.  But I think as part of the --

18   part of, you know -- I'm just cleaning up.

19        MR. CEGLOWSKI: You've got to stay near the

20   microphone or it's not going to pick you up.

21        THE WITNESS:   Oh.

22        BY MR. GRAY:

23       Q.   But that's something that the company did

24   not have to do.  They did not have to pay you in an

25   accelerated manner.

Harry Smith                          June 2, 2017

1       A.   I didn't care if they did or didn't.  I

2   mean, you know, from an asset standpoint the asset

3   was worth a lot more than the Note.  So, they just

4   made that decision.

5       Q.   But, Mr. Smith, the question is they

6   didn't have to do it?

7       A.   No, not at all.

8       Q.   Correct?

9       A.   I would preferred they not.

10      Q.   This document also contains restrictive

11  covenants, are you aware of that?

12      A.   I am

13      Q.   And were you aware of it at the time you

14  signed the document?

15      A.   I was.

16      Q.   Did you have any problem with those

17  restrictive covenants?

18      A.   The conversation I had in specificity with

19  Brad, and I'm not sure Victor but I think so and

20  certainly Peter, was that as long as I was treated

21  with respect and dignity and the company was

22  performing well, I never had any intent, desire,

23  intention to go back in the air filtration business.

24  That is the same premise I am today.

25           I do remember having conversations where I

Harry Smith                        June 2, 2017

1    told Brad North Carolina doesn't even recognize five

2    years, Brad.  And so, for me my desire to be here

3    today was based on what I think was a preeminent

4    attack on myself and my guys.  And I think actions

5    and comments prove that, and what I contest is a

6    significant degradation of the company.

7              I have no desire to go back in the air

8    filtration business.  It's not something that I want

9    to do and prefer not to.  So, you know, it's my hope

10   is that the company can gain traction, move forward,

11   and thus my email to you is I'm willing to help for

12   free, I think I can bring you significant advice to

13   help get the company back on -- on traction.

14             I also think that the employees,

15   customers, and vendors will say okay, he's helping

16   and it would help them a lot.  So, I've offered that

17   for free.  And I've also offered to mitigate my non-

18   compete, as you know.  I mean I would -- I would say

19   stop this, I won't compete you, just let me help you

20   get back going and I got to the house.  So, you

21   know, as I executed all this -- well, I never

22   intended to go back in the air filtration business.

23       Q.   Now, you just said something about you've

24   offered to mitigate the non-compete.  What do you

25   mean by that?

Harry Smith                          June 2, 2017

1          A.    That is a email that I sent you where I

2    said I'm willing to stop -- I don't remember the

3    exact words -- stop the non-compete, you know, and

4    let the Board know I'm willing to help them.  I want

5    the company to get back on track.  But I actually --

6    the email I think I sent was I would stop the

7    process, not try to move back in air filtration and

8    my number one goal was to see the company move

9    forward.

10          I think I said that a couple weeks ago.

11   And that, you know, that was a legitimate offer at

12   no charge, you know, to help them get back on track.

13   I mean they've chosen obviously not to respond to

14   that.  I respect that.  But my -- my gesture there

15   was very genuine in the fact that if they could get

16   on track and move forward, I've got no desire to go

17   back in the air filtration business, Ken, in any

18   way, shape, form, or fashion.

19          I'm 47, I've been there, I've done it,

20   I've checked the box, I got enough money in life.

21   You know, I'm concerned on multiple fronts;

22   employees that gave their heart and soul to me that

23   are losing their jobs.  I think facts will show

24   that.  Jobs moving out of North Carolina, I think

25   facts will show that.  I think degradation and

Case 4:16-cv-00289-FL   Document 30-1   Filed 07/14/17   Page 192 of 254

1     financial performance of the company, I think facts

2     will show that.  Concern in the customer and vendor

3     base who put a lot of trust in me.

4             So, those are my concerns.  And, you know,

5     I've offered to help.  That email was a legitimate

6     attempt to say hey, we want to stop all this and

7     help you for free and go back to the house.  So, I

8     offered to stop this and help them.  That was, you

9     know, I want to see the company be successful.  And

10    I'm willing to stop this process today, finish

11    paying Kevin, and give them free advice to help them

12    move that asset forward, which by the way, I can.

13            I can give them significant advice on the

14    model from distribution to the reg.  an help them

15    with the customer base keeping them intact, there's

16    a comfort level there.  Willing to do it for free.

17    So, I've offered to stop, cease, and desist.  I have

18    no desire to go back in the air filtration business.

19    You know, was I attacked and defamed?  I know I was.

20    Was action taken against companies I owned?  I know

21    it was.  I don't understand it, I didn't understand

22    it, and I don't understand it today.

23            I'm willing to move past all that and

24    really try to do the right thing and I would help

25    them for free.  I would go see customers for them

Harry Smith                         June 2, 2017

1    free today.  I would talk to vendors for free today.

2    I would be a free advisor to ensure that Daikin

3    investment is intact and the company moves forward.

4            There's nobody in the United States that

5    knows the space better than I do and there's nobody

6    that knows the customers, vendors, and employees

7    like I do.  That is my number one goal is to see the

8    company move forward.  Facts and data will show that

9    it is not.  And so, you know, today if I left the

10   building, Ken, and I saw a turn, customer say okay,

11   things are coming together, vendors say we're

12   getting comfortable, look, I -- I don't golf but I

13   can go to the house.

14           I don't -- what -- I don't care to go back

15   in this space.  You know, to some degree, you know,

16   my initial thoughts was I felt like I was getting

17   attacked.  So, that's just complete transparency, I

18   didn't understand it and still don't understand it

19   today.  I offered to help, you know, initially.  I

20   sent an email to their CEO before I ever knew Phil

21   Whitaker and said hey, I'm Harry Smith, I built the

22   company, call me anytime, glad to help you.  You

23   know, that's document's out there, we can dig it up

24   I'm sure and I'm sure they got it.

25           But I sent it to the CEO in Japan said

Harry Smith                         June 2, 2017

1    hey, I'm glad to help you any time, call me, here's

2    my contact information.  My intent was to help the

3    company.  Got attacked, actions will prove that.

4    And look, today I can put all that behind me.  I

5    promise you I can be humble with Phil Whitaker.  You

6    know, I was disappointed in the approach in

7    Louisville.  I mean I've never seen that at this

8    level.

9             But I also owed him an apology and I

10   extended that because what I did on those emails was

11   wrong.  You know, I took a wrong approach because

12   I -- I took a personal, you know, on the actions he

13   took against me, and I was getting emotional phone

14   calls.  So, my actions there was not good and that's

15   why I extended the apology that I sent to you and

16   said please let him know -- because I owed him an

17   apology on that.  But, you know, today I wish they'd

18   just get it together, I'd go home.  I have no desire

19   to go back in this business.

20      Q.   So, is the reason that you filed this

21   Declaratory Judgment Action because you felt like

22   you were being attacked and you felt like some of

23   your colleagues that you used to work with were

24   being attacked?

25      A.   I think it's -- I think -- I think it's

Harry Smith                                June 2, 2017

1       multiple, Ken.  You know, to begin with, you know, I

2       mean I was -- that absolutely happened.  So, Oak

3       Ridge immediately lost business.  We didn't

4       understand, right?  We tried to reach out, Kevin was

5       calling, no return phone calls.  Employees saying we

6       can't talk to you and these are people we grew up

7       with that went with us.

8              So, and then on top of that it was almost

9       an immediate it seemed like an attack internally

10      within my group.  So, if you were aligned with Harry

11      Smith and this word was going around pretty

12      significantly if they know we're talking to you, you

13      know, we'll lose our job.  I mean we -- that's what

14      the feedback we were getting.

15             And by the way, I think his actions have

16      shown that.  I mean this guy -- the sentiment within

17      the company now is don't text, call, or email Harry

18      because they're watching emails, phones, you'll get

19      fired.  I mean that's the -- today if you walk in

20      there, that's what people will tell you.

21             And so, he's created whether intentionally

22      or not so I'm not putting this on him but that --

23      that's the atmosphere that's been created in the

24      company and it's unfortunate.  So, I think it's

25      that's culmination and also in the fact that, you

Harry Smith                          June 2, 2017

1    know, I started getting calls from customers,

2    vendors, and employees -- and of course, these guys

3    are going to get it together, big company, tons of

4    security, got great benefits, right?  So, you know,

5    this is going to be good for you, transition.

6              And those -- the emotions escalated.  And

7    then, you know, I started getting feedback on

8    comments made by Phil Whitaker, you know, that were

9    not very kind in regards to me and I've never met

10   him.  I've offered to help him.  I never took a

11   single action against Flanders in any way, shape,

12   form, or fashion.  And so, I think it was a

13   culmination of events where I finally said okay,

14   that's it, right?

15             And a lot of it was Travis and Kevin who

16   felt, you know, pretty -- pretty beat up, too.  You

17   know, Travis runs Pitt which I own 50 percent of.  I

18   bought that business for Travis who left with me.  I

19   helped Kevin with Oak Ridge.  I gave him Oak Ridge

20   and I think, I don't know the numbers, but, you

21   know, I probably had 700, a million bucks in it that

22   I gave him because he was with me a long time.  It

23   was the right thing to do, he's doing well with it.

24   Those guys are very happy.

25             So, we had two businesses for Kevin and

Harry Smith                           June 2, 2017

1    Travis, they were doing them.  Pitt's a great

2    business and we were happy.  No intention in going

3    back in the air filtration business in any way,

4    shape, form, or fashion.  Both of those guys said

5    we're in the last leg, 47, 57, 67.

6              So, you know, it was a culmination of

7    events, you know, where we were attacked, actions

8    taken against us, degradation of performance of the

9    company.  I think all those things will play out.

10   The email I sent you was a absolute, I will stop

11   today, I don't want to go back in the space.  I

12   offered to help.

13             I can you tell a magnitude.  I can move

14   the company forward today for free for those guys,

15   you know, and calm down all their fractions.  It's

16   my opinion if they stay on track today, and I think

17   this opinion will play out, they're going to lose

18   partial because those big customers are not going to

19   single source.  They're not comfortable right now.

20   I'm getting those vibrations through the industry.

21             I think they're going to lose significant

22   market share.  If you lose significant market share,

23   that model does not survive, people lose their jobs.

24   And so, you know, I want to see it gel up, you know.

25   I think I built it so I got some emotion there.

Case 4:16-cv-00289-FL   Document 30-1   Filed 07/14/17   Page 198 of 254

1   Some of that's going to change, right, you're going

2   to move this piece, move that piece, I understand

3   it.

4          I just want to see the company be

5   successful.  I want to see employees not to have to

6   worry about their jobs.  I want to see people that

7   are close to me stop being attacked.  Charlie

8   Kwiatkowski case in point.  Charlie Kwiatkowski is

9   one of the most key and critical people in the

10  company, you know.  Charlie will tell you today that

11  the reason he's exiting is because he feels like he

12  was attacked because he was still considered aligned

13  with me.

14         There's other people that told me the same

15  thing - Miles Bragg's termination.  Miles Bragg is a

16  key and critical player for American Air Filter.

17  He's now gone to work for Superior Fibers.  Miles

18  will tell you today he said Harry, I lost my job

19  because of the email search where you and I emailed

20  back and forth three years ago.  He said I'm

21  convinced of it and everybody -- and that went

22  through the company as well, you know.  And they

23  told him they fired him over an email I think

24  between he and I.

25         It was a conversation I had I think is

Harry Smith                          June 2, 2017

1     what he told me.  I feel pretty good about that.

2     So, then it appears that they were taking action

3     and -- against people that they even thought were

4     aligned with me.  And so, look, I think it's a he

5     said/she said, I'm willing to stop today.

6     Completely stop, help them for free.  Don't want

7     anything out of it and help them with Home Depot,

8     Grainger, the model, customers, vendors and help him

9     set it up, explain to him distribution versus that.

10            I'm going to be right, it's going to be

11     a -- you know, they're just going to collide.

12     Charlie Kwiatkowski told him you can't run this

13     model.  You can't have 65 and compete with my guys

14     because Charlie ran the Flanders side.  And, you

15     know, so that -- my ultimate goal is for the company

16     to be successful.  I will quit today.  I'll go back

17     to -- to working out every morning at eight o'clock.

18     So, I -- I will stop this action today.  I am of the

19     100 percent opinion I am the premier expert in this

20     space in this country.  My history and actions prove

21     that.  I have significant relationships.

22            I've offered to help them for free.  I've

23     apologized for my misdeeds in the emails.  I was a

24     mistake by me, I hate I did it.  I just want -- but

25     if I can't help him, I also feel like that they're

Harry Smith                              June 2, 2017

1       going -- they're going to continue to denigrate.

2       And I think if you just looked at the numbers and

3       said okay, American Air, how is thing doing,

4       everything I've said is going to be correct.

5               Key of significant turnover, loss of

6       customers, vendors angst, prices going up on the raw

7       materials side, collapse in the price on the

8       customer base side.  And part of that is they were

9       not in retail.  So, American Air exited retail in

10      totality and, you know, I don't think they

11      understand that space in any way, shape, form, or

12      fashion on how to negotiate there.

13              I think some free coaching would help.  By

14      the way, Travis sent multiple emails to Phil

15      Whitaker offering to help for free.  No response.

16      By the way, they were also told they couldn't do

17      business with Pitt or (Indiscernible) we didn't

18      understand.  But we had employees say hey, man, we

19      really can't do business with you guys.  None of

20      that understood.

21              Look, I can move past it all today.  And

22      I'm happy to stop today and go sit down, they buy

23      the coffee, and I'll pick up my own nickel to go see

24      customers with them.  I just want to see the company

25      be successful.  That's my main driving point.  If

Harry Smith                        June 2, 2017

1    they can't do that, I feel some kind of commitment

2    or responsibility, I think is a fair word, to

3    people, and especially in eastern North Carolina,

4    that have been with me that are scared and are

5    losing their job.  I mean, you know, they just moved

6    research and development from Washington to

7    Louisville.  Those people have been with me a long

8    time.  Some of that's going to happen.  But, you

9    know --

10       Q.    Some of that happened under your

11   leadership in some of the business that you shut?

12       A.    Absolutely, yeah.  But keep in mind, you

13   know, when I sold those distribution offices, those

14   guys remained.  You know, we bought the machine

15   shop.  Now, we pared down some employment from time

16   to time but I think if you'll look at our actions

17   through the years, we built a company.

18            So, from head count perspective I took it

19   head count.  I don't know if I doubled it but I came

20   pretty close.  So, you know, our goal was always to

21   lead in that effort and to grow the company.  So, we

22   created a significant amount of jobs.  And we also

23   made a -- we created a significant amount of jobs in

24   this state that are leaving.

25            Now, as you and I discussed, that is going

Harry Smith                           June 2, 2017

1    to be somewhat of what it's going to be.  I think

2    some of it is not healthy and I think I can bear

3    some conversation into that.  And that was my offer

4    last week.  It was a legitimate offer to stop all of

5    this, I help them for free.  Not looking anything

6    out of it, I got enough zeros.

7        Q.   And just to be clear this email that

8    you're referring to that you sent me a couple weeks

9    ago, your attorney was also copied on that.

10       A.   Yes, sir.

11       Q.   You and I have not had any --

12       A.   No.

13       Q.   -- one on one conversation or

14   communications, is that correct?

15       A.   No, sir, we have not.  But I can tell you

16   it was a legitimate offer.  I mean, you know -- and

17   by the way, I don't recall the premises of it but,

18   you know, even though I've got a great relationship

19   with Insight, I gave Insight fair and prudent value

20   on things they needed to disclose to American Air

21   that I didn't think I disclosed.  And one of them

22   was the comment that Phil Whitaker made last on the

23   relationship with key accounts.

24            You know, I said you need to make sure

25   those guys know what they're getting here.  And I

Harry Smith                        June 2, 2017

1    don't think that was disclosed, right, which is a

2    key element of the business because it's my opinion

3    that there was very poor due diligence done.  So,

4    you know, and I think I could prove that as well.

5            So, plant, people, equipment not lining

6    up, different marketing strategy not lining up,

7    totally different model not lining up, two different

8    cultures not lining up.  I would have advised them

9    totally different in the -- in the alignment of it.

10   If they want to write the check that's fine.

11           But I think they'll also tell you that

12   today.  I think if you saw internal communication

13   and talk to them, they'll tell you they grossly feel

14   like they overpaid for it.  Now, I will tell you

15   this, if the company was properly structured today,

16   I think you'd get the return.

17           You know, this thing can do 55, 65, 70

18   million in EBITDA properly ran.  But you've got to

19   keep the volume in place, right?  And you've got to

20   figure out how to embody the American Air direct

21   piece.  And so, there needs to be a different

22   strategy employed because you got two different

23   cultures, two different families and they're

24   colliding.

25           It's really not Phil Whitaker's fault, you

Harry Smith                              June 2, 2017

1    know.  If you look at Phil's history and background,

2    he's just a high purity guy from Europe.  It's a

3    totally different market over here, especially with

4    wholesalers and retailers.  And so, to some degree I

5    think, in Phil's defense, he probably came in and

6    said I can do this.  I don't fault him for that.

7    You know, I don't think he had the experience here

8    because Europe's a different market.  And by the

9    way, Flanders is a different culture in eastern

10   North Carolina.

11          So, I think he's probably got really quick

12   and got wide-eyed.  I think there's probably a ton

13   of pressure on him.  I know how that feels.  But I

14   would stop today.  I got no desire -- I mean I don't

15   want to leave here today saying I can't wait to get

16   in the air filter business.  That -- that -- I sold

17   the company because I wanted to get out.  And by the

18   way, the right thing for me to do would not be to

19   attack that company.  Do I think I'm going to win

20   this?  Yeah, I mean I think it's a five-year non-

21   compete not tied to a business in any way, shape,

22   form, or fashion, two totally separate transactions.

23   By the way, I gave up massive consideration.

24          I think that I will be -- you know, but I

25   mean the court's going to rule what the court's

Harry Smith                          June 2, 2017

1   going to rule.  I got no desire, you know,  If I won

2   this thing and they called me up and said okay, you

3   won it, will you help us.  I won't start an air

4   filter company.  So, that's it in a nutshell, right?

5       Q.  Did anybody advise you other than legal

6   counsel, and I'm not asking if you if legal counsel

7   advised you, but did anybody tell you that there

8   can't be a five-year non-compete in North Carolina

9   if it's --

10      A.  No, not -- not -- not that I recall in any

11  way, shape, form, or fashion.  I think as I was

12  doing some of that stuff and then you Google it like

13  your website says North Carolina doesn't recognize a

14  five-year non-compete.  So, you know, I mean a lot

15  of those websites, you know, that's pretty out

16  there, right?   I mean that's on your website that

17  North Carolina doesn't recognize a five-year non-

18  compete.

19          And so, I mean that was pretty much out

20  there.  And we -- I had a discussion with Brad, you

21  know.  He and I had a discussion just like you and I

22  are talking.  But I will tell you, you know, with

23  all due respect I would have signed a ten-year non-

24  compete.  I had no interest in going back in this

25  business.  I mean I -- when I exited, Ken --

Harry Smith                        June 2, 2017

1        Q.    You still really don't have an interest in
2    going into business, do you?
3        A.    I do not, Ken.  I mean look, you know, I
4    built a company that I'm proud of with a lot of
5    people that helped me get there that need these
6    jobs.  I'm very close to the customer base.  These
7    are people that invested in me because they believed
8    in where we were going.
9              I sold the company.  It's not worked out
10   so well.  I feel responsible for that whether you --
11   whether everybody likes it or not.  I'm built a
12   little differently.  I feel a responsibility to
13   people that are calling me say man, what the heck,
14   you know, we trusted -- and so, to some degree I
15   feel pretty responsible for that.
16             You know, these are people that I sat down
17   with and said do business with me and this is why.
18   And they put lock, stock, and barrel with me.  And
19   so, I would have been ecstatic if this thing would
20   have exploded and took off.  I mean hallelujah.  By
21   the way, if he would have tripled it, Christmas
22   card, right.  I mean look, there's people can run
23   this thing a lot better than me.  I do believe that
24   by the way.  I mean I absolutely believe that.
25             So, I don't -- I have no desire today to

Harry Smith                              June 2, 2017

1    go out and -- and develop an air filter company to

2    compete with a company that I built.  I will also

3    tell you today because, you know, in complete

4    transparency I think if I do that, I will crush them

5    because I'll build a low overhead disruption model

6    with less plants, highly automation led by me with

7    customers, vendors, and employees.  I mean what do I

8    think.  I mean, Ken, I think I'll take hundreds of

9    employees from them.  Haven't talked to anybody.

10           I've honored my non-compete through and

11   through and through and through, right?  And so to

12   that degree, you know, I have a phenomenal

13   relationship.  We talk soccer, we talk golf, we

14   don't talk -- and part of that is because, you know,

15   I had a genuine relationship.  It wasn't that I was

16   using a customer, vendor, or employee.  I really was

17   close to these guys.

18           And -- but I've honored my non-compete and

19   I'd be happy today to -- to cease and desist.  I

20   mean obviously that's not going to happen and that's

21   okay.  But that's -- that's just real straight talk.

22   I think I've gone above and beyond.  I think this

23   shows I went above and beyond, you know.  And, you

24   know, I'm telling you I was personally attacked, my

25   companies were personally attacked, my two key guys

Harry Smith                          June 2, 2017

1    were personally.

2            People within the company that they

3    thought were aligned with me were personally

4    attacked.  I think we can prove all that.  There

5    were comments made about me and my guys within the

6    company, you know, right.  So, look, I can rise

7    above all that.  I mean I -- here's the one thing

8    I'll tell you about air filtration as Miles Bragg

9    said and Miles said, Harry, you were such a force in

10   this industry I think this guy don't like being in

11   your shadow because he heard my name all the time.

12   I get that.

13           What he's going to find out is I'm a

14   pretty humble guy.  I'm not going to tell you I was

15   always a pretty humble guy.  You know, when I first

16   got in, you know, I was pretty tough.  But as I

17   matured, you know, I also realized what leadership

18   was more about.  I made a lot of mistakes in my

19   career and there's a lot of them I wish I could

20   undo.

21           But I got no desire today but to -- my

22   number one desire would be to help Phil Whitaker

23   despite his angst toward me to be successful.  And I

24   can -- and I think my actions will prove that.  So,

25   that's it in a nutshell, you know.  That's complete

Harry Smith                          June 2, 2017

1    transparency.  I would cease and desist today, Ken.

2         Q.   So, you would drop this Declaratory

3    Judgment Action if Flanders would consult with you

4    and take your advice?

5         A.   I don't know that they've got to take my

6    advice because I don't think that's fair.  I mean I

7    wouldn't say if you guys don't listen to me, I'm

8    going to start back because I mean I don't think

9    that's a fair conversation.  What I am telling you

10   is, you know, is I've offered to help and I think I

11   can, right?  So, if they take a look at the current

12   performance, I think some of those guys would say

13   this thing ain't working.  And right?

14        And so if everybody will take their egos

15   out, I'm willing to come back in a very humble

16   manner and say let me explain to you what you've got

17   going on in retail, wholesale, ARW, high purity

18   where you have strategic advantage at, right?  You

19   know, how your model and this model don't line up,

20   right?  Probably the actions that I would take if I

21   was CEO and then I would try to quantify those

22   actions on what I think they'll get from a

23   performance standpoint.

24        So, maybe it would be a quantification on

25   things that I would do.  But there's, you know, I

Harry Smith                          June 2, 2017

1     would take it on a different model and I think you

2     will see the model they've got now is not working.

3     So, I think that would prove out.  But I'm not say

4     they've got to take my advice.  I think when I gave

5     them the roadmap, I genuinely believe they'd say

6     right.  The other thing is there is an immediate

7     calming; customers, vendors, and employees, right.

8          So, they say okay, hold on a second, this

9     guy's a pro, we trusted him for years. So, you know,

10    I think they get -- you know, I think it costs them

11    nothing to -- you know.  And so, what you got is a

12    genuine offer to help.  And I also respect the fact

13    that Phil says I don't need him.  That's his choice.

14    I think if you look at the performance, that's not

15    true.  And that's okay.

16          I mean in my opinion, and this is my

17    opinion, he's taking his personal ego in front of

18    the benefit of thousands of employees, customers,

19    and vendors and I think the performance of the

20    company shows that, right?  I understand it, you

21    know, and the fact that he's trying to prove he can

22    do it.  In my opinion there's a lot of people

23    getting hurt.  I just want that to stop.

24          Q.  I'm going to show you what I've marked as

25    Exhibit 27 and do you recognize this email?

Harry Smith                              June 2, 2017

1                    (Deposition Exhibit Number 27

2                     was marked for the record.)

3        A.   I do not.

4        Q.   Does it appear to be from you?

5        A.   It does to Brad Buser.

6        Q.   And what date does it have?

7        A.   March 17th.

8        Q.   Okay.  And could you read what you said?

9        A.   Says thanks, prefer my bonus issue of

10   payment of balance my severance of 660 glass plant

11   note.  I'm happy to give you a non-compete, work

12   with you any way that works for both of us.  And

13   that was culminated on a bunch of conversation

14   between Brad and I going back and forth.

15        Q.   Okay.  Let me just stop you there.

16        A.   Yeah.

17        Q.   First of all, did you send this email?

18        A.   Yes.  Yeah.  And, you know, this was Brad

19   and I, who is a great guy.  We were back and forth

20   on what would work and I said I'm happy to do that.

21   And I was happy to do that, right.  I mean as you

22   can see, I was exiting without any angst.  So, and

23   look, my intent on exiting was to do it as

24   copecetically, I don't know the right word, Ken, but

25   as nice as I could, right?

Harry Smith                        June 2, 2017

1          Q.    You don't have any remaining interest in

2     Flanders, do you?

3          A.    No, I still buy their products.

4          Q.    But no stock?

5          A.    No, sir.

6          Q.    Do you have any interest in any business

7     that's doing business with Flanders?

8          A.    No.  I mean I had 50 percent interest in

9     Oak Ridge and, you know, again part of the angst and

10    probably part of the emotion, Ken, was, you know, we

11    bought all of the machine shop assets and put a

12    bunch of 20 and 25 years guys to work and, you know,

13    we had a great agreement with Insight.

14          You know, Kevin was bringing a lot of

15    value over there with equipment and people and we

16    were doing a tremendous amount of business with

17    Insight and Peter -- I mean at transaction time it

18    literally went well.

19          Q.    Let me ask you this.  In regard to the

20    Equity Buy-Out and Board Resignation Agreement who

21    approached whom about entering into that agreement?

22    Did you approach somebody or did somebody approach

23    you?

24          A.    When I exited?

25          Q.    Who -- well, I'll rephrase.

1          A.    Okay.

2          Q.    In regard to this Equity Buy-Out and Board

3    of Directors Resignation Agreement labeled Exhibit

4    26, are we on the same page?

5          A.    Yes.

6          Q.    Okay.  In regard to that document who is

7    the one that initiated the discussion about the need

8    for the document?

9          A.    That would be me.  Yeah, I -- I contacted

10   Brad, culminated on the conversations that you and I

11   had and said Brad, I just can't do it anymore.

12         Q.    And just for the record Brad is --

13         A.    Brad Buser was the Vice President of

14   Insight Equity that led the purchase of Flanders

15   Corporation.

16         Q.    And you've indicated that you didn't make

17   any profit in regard to this Buy-Out Agreement but

18   that was at your choosing, correct?

19         A.    Yes.  You know, when I exited, you know,

20   what I wanted to do was to exit -- in all my actions

21   I wanted to be in what would be the benefit of

22   Flanders and its employees.  I had built an asset

23   that, you know, was a cornerstone in raw material

24   supply for Flanders.  And there was a massive amount

25   of angst in the industry about supply.  All of

Harry Smith                          June 2, 2017

1      Flanders' competitors were having supply problems

2      and we had an asset that took -- would have took

3      somebody two years to build.  So, you know, I wanted

4      my actions to be congruent with the success of

5      Flanders corporation.

6           Q.   In regard to the Buy-Out Agreement were

7      you represented by counsel?

8           A.   From a negotiation standpoint, no, Ken.

9      From a legalese and to get all those paragraphs

10     right Christian helped me.  But, you know, nobody

11     sat down and said do this or do that.

12          Q.   So, the answer is yes?

13          A.   Yes, right.  This -- the glass plant was a

14     harmonious non-negotiation transaction.  My

15     transaction I did with SWM that Ward and Smith

16     handled was much more of a negotiation standpoint.

17     So, I had two different skill sets at the table, all

18     right.  This one was just we're working together,

19     let's figure out.  I was -- you know, and the other

20     one was much more negotiation.

21          Q.   Why do you believe you should not be

22     subject to the non-compete that's set forth in that

23     Equity Buy-Out Agreement?

24          A.   Well, you know, I mean I think it's a

25     culmination of everything we talked about.  You

Harry Smith                           June 2, 2017

1    know, I mean one, you know, North Carolina law

2    doesn't recognize a non-compete except, you know

3    precipitously with the sale of the business it was

4    two different -- totally different transactions.

5    Also, I didn't -- I not only not got consideration,

6    I gave up millions in the benefit of the company.

7         I had no desire to go back in the space.

8    The reason I am here today is because I think the

9    fact and data will say that I was attacked, defamed,

10   actions taken against me, and I got customers,

11   vendors, and employees with a tremendous amount of

12   angst that I feel responsible for.

13        I think further my actions say today I

14   don't want to get back in the air filter business.

15   So, I'm not sitting here today -- and by the way, I

16   think I can build a $200 million company in 24 to 30

17   months with limited capital.  I mean I -- it's a low

18   bearing entry business.

19        Did I make ten, 12, 15 percent and I think

20   I got to tear apart what I built doing it, I'm not

21   just going to go after Flanders, I'd go after the

22   space.  I mean we would go after everybody in air

23   filtration.  So, it wouldn't be a targeted event,

24   you know.

25        So, but I obviously going to impact that

Harry Smith                              June 2, 2017

1    company so I'm not going to sit here and tell you

2    I'm not.  But, you know, I'm here today based on

3    actions taken against me and my team and significant

4    turnover of key and critical people that were with

5    me that I am convinced beyond a shadow of a doubt

6    were actions taken against them because they had a

7    relationship with me.

8           I think Phil Whitaker, in my opinion, has

9    taken personal actions against me and anybody

10   associated with me and I do not understand why.  I

11   offered to help.  Day one I wrote a letter to their

12   CEO offering to help.  I never, ever, you know,

13   solicited.  I've told customers it's going to be

14   okay.  I've told vendors it's going to be okay.

15   I've told employees it's going to be okay.

16          And for whatever reason, you know, the guy

17   and the other guys that could have helped this

18   company move forward for free, you know, were --

19   were -- actions taken against them.  You know, I was

20   told on the Oak Ridge piece of business that they

21   moved business at a higher cost to the company.

22          Sixty days ago, 60 days ago, this is

23   important, the purchasing agent in Smithfield, North

24   Carolina, okay, Kevin Boyd at Oak Ridge got a phone

25   call from another machine shop and said, hey, can

Harry Smith                            June 2, 2017

1    you make these parts for me.  Flanders will not buy

2    from you but if you'll make them I can mark them up

3    and sell them to them.

4             Kevin called the purchasing agent

5    Smithfield.  She said well, I'm not allowed to buy

6    from you.  He said so you're going to -- I'm going

7    to make them for this guy and you're going to pay

8    more and she said, yeah, I can't buy from you.

9    Kevin's never competed.  So, you know, Kevin called

10   me and said Harry, come on, right?  And so, this is

11   the same guy that two weeks ago that had a

12   significant failure and they came to him because he

13   got the company back running.  But they came to him

14   in an emergent situation.

15            This is a guy that gave 30 years of his

16   life to Flanders Corporation.  If you met him today,

17   he'd have tears in his eyes.  He was with me every

18   step of the way, Ken, and he's not deserved what's

19   happened to him.  He's been attacked and defamed and

20   maligned that people don't understand including

21   employees of Flanders Corporation.  He could move

22   the ball forward today at Flanders like you never --

23   he built and designed every piece of equipment we

24   got.

25            Travis Stephenson left.  We bought him a

Harry Smith                          June 2, 2017

1    business, he's happy, right?  He's running a great

2    very successful business that does really, really

3    well.  And, again, he as well was attacked,

4    maligned, and defamed.  And by the way, we were told

5    the same thing, we're not allowed to do business

6    with him.  This was out of the gate.  Ken, we never

7    any of us did anything to deserve that kind of

8    reproach.  Now, look, if they can explain it, that's

9    fine, I'm happy to put all that behind us.  I can

10   move above all that if we're talking about bettering

11   the company.

12           If we can fix customers, vendors,

13   employees, hey, I'm willing to stop and say we can

14   help you.  And by the way, those two guys can help

15   them, right?  And by the way, they're willing to

16   help for free, too.  So, if you look at the actions

17   taken, we had personal attacks and actual actions

18   taken against companies I owned, we never did

19   anything.

20           And so, that is why I'm here today, you

21   know.  I'm here today because I finally had enough

22   of people that were close to me being attacked.  And

23   they have been.  And that is the premise all through

24   the company.  And I'm going to tell you something,

25   Miles Bragg was terminated from an email from me

Harry Smith                              June 2, 2017

1    three or four years ago as a result of my action

2    here today.

3              That's why I told him no more, I'm not

4    going to hurt anybody else.  We didn't depose

5    anybody else.  I stopped depositions because people

6    were scared.  But Miles Bragg was terminated on an

7    email because I hired him from American Air when I

8    was a CEO of Flanders Corporation and they found

9    that email and they terminated him.  There was no

10   other reason to terminate him.

11             And he called me and said I've lost my job

12   because they think I'm aligned with you.  Hadn't

13   talked to Miles in years.  Years.  Charlie

14   Kwiatkowski lost his job, I believe this, because

15   they thought he was aligned with me.  I mean

16   everybody was saying that.  You know, they -- and

17   so -- and there's this general fear that if you go

18   into Flanders today and you said hey, are y'all

19   allowed to talk to Harry, right.  It's crazy.

20             I mean I built a company, I hadn't taken

21   any action against them, I did all -- everything in

22   the right manner.  I mean I'd love to go walk down

23   the hallway.  I think I could bring a lot of value

24   in calming people down.  For whatever reason, and I

25   think it's Phil Whitaker, he came in and I guess he

Harry Smith                              June 2, 2017

1    tried to push me down to push himself up, I don't

2    know.  But it made no sense.  I was done, I was out.

3    Look, Ken, I'll help him today.  I got no hard

4    feelings with him in any way, shape, form, or

5    fashion.  I'm going to be bigger than that, right?

6          I sent him some emails that I wish I would

7    have worded differently.  But at this point I have

8    sent multiple emails to help.  We were getting

9    attacked.  I was getting comments he was making.

10   And so, you know, at that point I said okay, I'm in,

11   if you want to -- if you want to do it, let's do it,

12   right?

13         Because I think what he said the other day

14   was probably the smartest thing he said all day is I

15   believe I do believe Mr. Smith can build a

16   $200,000,000 company.  I'm going to ask you

17   something, Ken, if you believe that and you're

18   responsible for the corporations and thousands of

19   people's livelihoods, do you say hey, Harry, will

20   you work with me when I send an email to offer to

21   help you?

22         Or do you ignore my email if you genuinely

23   believe that I can build a $200 million company,

24   which is what he said, and that I could hire his

25   employees, which is what he said, if he genuinely

Harry Smith                           June 2, 2017

1    believes what he said under oath, and I offer to

2    stop this process and help him for free, do you

3    think he's operating in the best interest of

4    American Air?  Or either he didn't say what he

5    meant.

6            Now, I think he believes I can do it.  But

7    what you're seeing because Harry Smith would have

8    said hey, come on, I need your help.  And so, that

9    again is the deal -- what I'm dealing with from a

10   persona standpoint.  I sent an apology.  I offered

11   to stop this today and go help him for free.  And

12   you know what, if he believes I can build a $200

13   million company, he ignored all that.  I'm willing

14   to stop today and come help for free.

15           MR. GRAY:     Let's go off the record.

16      (Off the record from 2:01 p.m. until 2:15 p.m.)

17           BY MR. GRAY:

18      Q.   Mr. Smith, isn't it true that you're a

19   sophisticated businessman?

20      A.   That's subjective.  You know, I think -- I

21   think through the years, Ken, I've developed a skill

22   set that's probably pretty unique.  You know, I've

23   been on NASDAQ, I've been in high leverage

24   situations.  I've done start ups.  I've built the

25   company from manufacture, people placing things, IT

Harry Smith                        June 2, 2017

1      platforms, human resources, negotiated benefits,

2      hired, retained, retracted, developed products.

3              And so, I would tell you that as my career

4      has progressed and my journey in life I think I have

5      a skill set that is very unique in all business

6      applications.  And so, I don't deny that in any way,

7      shape, form, or fashion that I -- without being

8      egotistically in any way, shape, form, or fashion, I

9      think I have a unique skill set.

10         Q.   And you -- over the years you have

11     participated in a large number of transactions?

12         A.   I've participated in a significant amount

13     of transactions from, you know, real estate to this

14     to numerous transactions.  That's correct.

15         Q.   You've had a lot of dealings with

16     attorneys as well, is that correct?

17         A.   That's correct.

18         Q.   I'm showing you what I've marked as

19     Exhibit 28, do you recognize that document?

20                  (Deposition Exhibit Number 28

21                   was marked for the record.)

22         A.   I don't recognize it per se but obviously

23     I sent it.  And so, I don't -- I don't -- but I did

24     send it, you know.

25         Q.   And you indicated earlier that you had

Harry Smith                          June 2, 2017

1      sent Phil Whitaker a number of emails?

2           A.   Yes, sir.

3           Q.   Do you have any idea how many?

4           A.   No, I mean, you know, I'm on the hundred

5      email a day routine and, you know, time, energy, and

6      effort 30 seconds here, 30 seconds there.  Here's

7      what I can speak to in any of the emails I sent.  I

8      stand firmly behind what I said, and I think that

9      the dynamics of the company will support that.  I

10     hate the delivery mechanism of that, Ken, and I

11     think I owe him an apology for that.  And I wish I

12     would have handled that differently.  I think it's a

13     mechanism of frustration that we had all reached out

14     and that again we all felt attacked and then acted

15     accordingly.  But look, my actions in that are why I

16     extended an apology.  I mean I think I made a

17     mistake there and my apology was genuine, and I can

18     only tell you that I regret it.

19          Q.   I've just handed you Exhibit Number 29, is

20     that another one of the emails that you sent Mr.

21     Whitaker?

22               (Deposition Exhibit Number 29

23                 was marked for the record.)

24          A.   Yeah, on the emails, Ken, I can't recall

25     what I sent and didn't send.  I can tell you I sent

Harry Smith                         June 2, 2017

1    him a fair amount of emails and -- and regret the

2    ones -- I wish I would have continued to put myself

3    in a position to help him and at some point it's the

4    reason I'm here today.  I felt like I had to turn

5    the corner.

6             And so, you know, I'm not sure I would

7    have ever broke through on the help side.  Maybe I

8    would have and that's a regret for me. But I'm here

9    today because I feel like that the company's getting

10   to a position that it -- that it needs some form of

11   help.  And I'm saying Phil Whitaker can't be

12   successful at it.  I just think my opinion is that

13   he needs some help and if they can -- I mean they

14   ain't got to show me anything but I think the

15   performance of the company is going to show it as

16   well.

17        Q.   I'm handing you Exhibit 30, is the top

18   email another email that you sent Mr. Whitaker?

19                  (Deposition Exhibit Number 30

20                   was marked for the record.)

21        A.   I don't recall any emails at all, Ken.  I

22   really don't.  I mean I -- I don't recall any emails

23   in specificity in any way, shape, form, or fashion

24   and that's where I'm at at this point.  I don't

25   recall any emails that I sent him.  I sent him

Harry Smith                          June 2, 2017

1    numerous emails, but I don't recall, Ken, in any

2    way, shape, form, or fashion.

3        Q.    All right.  Well, let me -- is that your

4    email address, the "from"?

5        A.    My email address hs681v@gmail.com.  But I

6    don't recall any emails, Ken.  And, you know, from

7    the email perspective, you know, I'm a little

8    sensitive to that because, you know, I had an

9    agreement on my emails.  But, you know, what I'll

10   attest to on emails is I sent emails that I regret.

11           I don't recall any specificity.  So, we

12   can sit here and go through a hundred.  I'm not

13   going to change that testimony in any way, shape,

14   form, or fashion.  I sent emails that I regret.  I

15   don't remember the specificity of them in any way,

16   shape, form, or fashion.

17       Q.    I understand.  Do you have an email

18   account highpurityair9999@aol.com?

19       A.    Not -- not that I recall in any way,

20   shape, form, or fashion.  I will tell you again,

21   Ken, I don't recall specificity on emails.  You

22   know, I regret the emails that I did send him that

23   I'm aware of I sent them.  But I don't recall --

24       Q.    Let me ask you do you deny sending this

25   one?

Harry Smith                          June 2, 2017

1        A.    I don't recall what I sent and didn't

2    send.

3        Q.    Okay.

4        A.    And I don't.  I mean I sent him emails,

5    Ken, you know, I don't recall what I send him and

6    don't send him.  And if I did, I would attest

7    accordingly, you know.  I don't deny sending him

8    emails but I don't -- I don't --

9        Q.    I'm showing you Exhibit 31, do you

10   remember sending Mr. Whitaker that email?

11                 (Deposition Exhibit Number 31

12                   was marked for the record.)

13       A.    I do not remember any email in

14   specificity.

15       Q.    Do you deny sending him that email, 31?

16       A.    I -- I have sent him emails that I regret.

17   I don't remember any specificity in any way, shape,

18   form, or fashion, Ken.

19       Q.    I'm showing you Exhibit 32, do you

20   recognize that as an email that you sent Mr.

21   Whitaker?

22                 (Deposition Exhibit Number 32

23                   was marked for the record.)

24       A.    I do not recall the email in any way,

25   shape, form, or fashion.  I sent him emails that I

1    regret, Ken, and wish I could re-frame it.  The
2    email I absolutely remember is the one I just sent.
3    I don't remember that either.
4         Q.   I just handed you 33 and I think that's
5    what you just said is you don't remember that one
6    either?
7                   (Deposition Exhibit Number 33
8                    was marked for the record.)
9         A.   Well, the one I sent last week I remember.
10   But, you know, through the period of this year but,
11   you know, I don't remember any specificity on any
12   emails I sent him.
13        Q.   Here's one in which you in Exhibit 34
14   you're offering to help, do you remember that one?
15                  (Deposition Exhibit Number 34
16                   was marked for the record.)
17        A.   I do remember this email, yeah.  You know,
18   it's one I sent recently and it -- it was a genuine
19   offer to build an accord.
20        Q.   Do you remember Exhibit 35?
21                  (Deposition Exhibit Number 35
22                   was marked for the record.)
23        A.   I do not.  Do not remember that.  I don't
24   remember any specificity of what I sent.
25        Q.   I'm going to hand -- you don't deny

Harry Smith                        June 2, 2017

1      sending him Exhibit 35?

2           A.   I don't deny but I don't recall.

3           Q.   Now I'm going to hand you Exhibit 33 (sic)

4      in which you're claiming that Mr. Whitaker is

5      continuing to disparage and slander you.  Do you

6      recall sending that one?

7                     (Deposition Exhibit Number 36

8                      was marked for the record.)

9           A.   I don't recall in specificity --

10          Q.   It's 36, I'm sorry.

11          A.   I don't recall in specificity on sending

12     any of the emails.  But I do know that I felt like

13     that that was happening and I was concerned about it

14     accordingly.  And but I don't recall the specificity

15     of any of the emails.

16          Q.   But you don't deny sending --

17          A.   I don't --

18          Q.   -- Exhibit 36?

19          A.   I don't deny it, no.  But I don't recall -

20          Q.   Now I'm handing you 37, do you deny

21     sending that one?

22                     (Deposition Exhibit Number 37

23                      was marked for the record.)

24          A.   I don't recall it, you know.  I don't

25     recall it.  I remember feeling, you know, that

Harry Smith                           June 2, 2017

1    Travis and those guys reached out.  But I don't

2    remember any of the emails.  I do know this, I

3    regret some of my tone of some of them.  But I don't

4    remember any specificity of emails in any way,

5    shape, form, or fashion.

6         Q.   Do you remember sending him 38, Exhibit

7    38, which I'm now handing you?

8                   (Deposition Exhibit Number 38

9                    was marked for the record.)

10        A.   I don't.  I don't remember that.  I don't

11   -- I don't -- I don't remember.  I think it's a fair

12   representation.  That's an easy one for me to read.

13        Q.   This email that I'm giving you is actually

14   dated November 15th, 2015 and it's to the folks at

15   Insight.  Do you recall sending that one?

16                   (Deposition Exhibit Number 39

17                    was marked for the record.)

18        A.   I do not.  I don't recall any -- any

19   specificity on emails.  Tons of communication back

20   and forth, lots of emotion.  So, you know, the

21   context I've given you --

22             MR. CEGLOWSKI: Hold on a second.  Will you

23   reference the exhibit number?  I don't think we got

24   that on the record.

25             BY MR. GRAY:

Harry Smith                              June 2, 2017

1          Q.   The exhibit that I just handed you is 39

2     and you said you don't have any recollection --

3          A.   No, uh-huh.

4          Q.   -- of the specificity but you don't deny

5     sending that email?

6          A.   No, not at all.

7          Q.   This is Exhibit 40 that I'm handing you,

8     do you deny sending that email?

9                    (Deposition Exhibit Number 40

10                        was marked for the record.)

11         A.   I don't recall any of the emails.  The

12    framework I've given you to today is the framework

13    of total transaction this, that, and the other.  I

14    don't recall any of the context of emails.  The

15    context I've given you has been total transparency,

16    total disclosure, and how everything went down.

17         Q.   I'm handing you Exhibit 41, do you deny

18    sending that email?

19                    (Deposition Exhibit Number 41

20                        was marked for the record.)

21         A.   I don't recall.

22         Q.   I'm handing you Exhibit 42.  This was

23    actually the day before Mr. Whitaker's deposition.

24    Do you recall sending that email?

25                    (Deposition Exhibit Number 42

1                        was marked for the record.)

2        A.    I do recall sending this email.  I think

3   this was, you know, I was trying to build an accord.

4   I don't remember the specificity of what I wrote but

5   I remember sending him an email.  As I recall, I was

6   trying to reach out.  And I think the way I wrapped

7   that up was pretty good - you had time to turn the

8   outcome on how you viewed the industry to a positive

9   position and you can drive EBITDA for Daikin.  And

10  you know.  A that's also why I reached out to try to

11  have an accord with him, Ken, when he walked in the

12  room.

13       Q.    Did you -- I'm handing you Exhibit 43, did

14  you send that to the parent company?

15                  (Deposition Exhibit Number 43

16                      was marked for the record.)

17       A.    Yes.  I don't remember the details of it

18  but I also wanted to make sure I was not being

19  labeled incorrectly.

20       Q.    Just to be clear, and I think you've

21  covered this but I want to give you this

22  opportunity; you have not in any way whatsoever

23  violated any of the non-competes whether or not you

24  think they're enforceable or not, correct?

25       A.    No.

Harry Smith                            June 2, 2017

1          Q.    Is that a correct statement?

2          A.    That's correct, yeah.  You know, it's kind

3    of what we talked about before, you know.  Actually,

4    you know, I think if their Board would take a look

5    around and understand the total dynamics of

6    everything, they would see I could help them for

7    free.  I don't -- I don't want a job anymore, I just

8    want to see the company be successful.

9          I think this thing's got off between Phil

10   and I for whatever reason.  I think I made mistakes

11   in feeding it that I wish I hadn't have done and I

12   think that was emotions involved.  And, you know,

13   I'll tell you I'd love to see them be successful.

14         You know, I don't by nature want to go

15   back in the space because I also understand the

16   time, energy, and effort it takes.  And I also feel

17   like I'm going to be back in the forefront of

18   customers, vendors, and, you know, I'm 47.  And I

19   also don't want to hurt the company.

20         And so, you know, my number one premise

21   would be is to see them be successful.  And I don't

22   want to go back in air filtration space.  I feel

23   like right now, you know, I have a responsibility to

24   customers, vendors, and employees.  I also feel like

25   I was attacked and actions taken against me that

Harry Smith                          June 2, 2017

1       were not fair and congruent.

2              I'm -- I'm willing to rise above all that.

3       I think I can prove it out pretty quickly and I

4       think the actions will show it on business stopping

5       without explanation, raw materials we had and

6       carried that we ate, so forth and so on.  You know,

7       I've gotten significant comments back from key and

8       critical people and comments made in staff meetings,

9       you know, about me.

10             I think people have been terminated as a

11      result of me.  It's the reason I didn't depose

12      anybody else because I didn't want anybody else to

13      lose their job.  Look, Ken, this is not a thing

14      where I have any desire to -- here's what I don't

15      want.  I don't want my obviously challenged

16      relationship with Phil Whitaker, okay, and there's

17      no doubt it is.  And I tried to take that because I

18      made some mistakes in that and I admit those.  I

19      should have continued to rise above it, I regret it.

20             I don't want my angst with this guy, and

21      it's one of the reasons I reached out to his

22      supervision, I don't want my angst with this guy to

23      hurt the company, right.  And so, I want to be

24      cognitive of that, right?  And so, I want to rise

25      above that.  And then also is the reason I

Harry Smith                          June 2, 2017

1    apologized to Phil because I thought I owed him

2    that.  And, you know, so I tried to go back to where

3    I started this thing is can we help you.  And so, I

4    don't think the company should get hurt because me

5    and this guy are banging it out.  I actually would

6    like to see this guy be successful.

7          And so, if I can help -- and look, by the

8    way, if they say here, this is what you're missing

9    and this is why the people are calling you and, you

10   know, you're wrong here, I would love to hear that

11   because I could be.  I don't -- I don't think I am

12   based on what I'm seeing and I'm hearing but I could

13   be.

14         Some of that stuff is going to be what

15   it's going to be, right?  But, you know, I don't

16   want to do that.  I mean look, I just -- I don't

17   want to do that.  And so, you know, as much as

18   emotions in this thing for me and by the way, it is,

19   and I've always said separate your emotions and your

20   business making skills, I've got some emotional

21   decisions in this that I regret.

22         You know, in my journey through life I

23   looked at that said, you know, it was a mistake by

24   me.  I'm willing today to take Phil to McDonalds and

25   say how can I help you and continue the apology

1    path.  So, you know, because I do.  I mean I reacted
2    I think.  But I mean look, I don't -- I don't want
3    to go in the air filtration business.  I feel like
4    I'm being forced into it.  And maybe I'm wrong about
5    that, right.  But I'm not going to leave here today
6    doing back flips thinking I'm getting back in.  As
7    I've told Kevin all along, right, I've been there.
8        Q.   Don't say anything you've told your
9    attorney.
10       A.   Yeah, okay.  But I mean, you know, I've
11   been there.  This is full disclosure.  I mean
12   listen, we can do this process, that process, what
13   I've done today is total transparency, right?  And,
14   you know, I want to see the company be successful.
15   I want to see it flourish in North Carolina
16   specifically, I don't deny that.
17           And I'm not crazy about going back in air
18   filtration.  I'm really not.  In fact, I don't want
19   to go back in air filtration.  I feel like I'm being
20   forced back in air filtration.
21       Q.   Who's forcing you?
22       A.   I feel like I'm -- I have a responsibility
23   customers, vendors, and employees.  You know, I feel
24   like my two main guys who don't care to go back in
25   air filtration either have been attacked and harmed

Harry Smith                        June 2, 2017

1     financially.  I think they have some emotions on it
2     on how they feel like they've been treated.
3               I mean two great guys that gave nothing
4     but time, energy, and effort to the company and
5     exited with grace, style, and dignity.  I mean when
6     you have an exit like that there's some emotions,
7     right?  But at the end of the day we all -- I took
8     it up there, we took it up there, we worked through
9     and, you know, and we ended up all in a good place.
10              And so, you know, for whatever reason this
11    thing started off on the wrong track and it started
12    off with actions against us.  And what I would have
13    done is said hey, let me call those guys in so I can
14    understand everything that happened because I've
15    been told this, what's your story.
16              Travis, Kevin, and myself would have sat
17    down with Phil and said hey, whatever we can do to
18    help you.  By the way, you want me to go to Home
19    Depot with you and introduce those guys, let's go
20    next week.  So, I mean we would have all done that.
21    That offer's still there, right?
22              I mean, you know, I mean can we build a
23    machine?  Like you've never seen.  I mean Kevin, who
24    owns Oak Ridge, designed every piece of equipment
25    air filtration, right?  He's got the shop to build

Harry Smith                          June 2, 2017

1     it in.  We built it low cost, right?  He's happy,

2     Travis is happy, I'm really happy.  It's not what I

3     want to do.  So, I'm not -- I don't -- I don't --

4     that's not what I want to do.  And I feel like -- I

5     feel like I have a responsibility to people that,

6     you know, did a lot for me.

7          Q.   One thing you mentioned not as a reason is

8     money.  You don't need the money, do you?

9          A.   I don't need the money.  You know, and

10    I'll speak authoritatively on that subject.  So,

11    you're talking about a guy came from nothing, right?

12    Graduated from East Carolina broke.  And, you know,

13    I've built a significant net worth.  Outside of

14    Flanders as well I've had significant success.

15         And so, you know, I have a fair -- I mean

16    I would say enormous but a lot of wealth.  So, I

17    have no desire to go back in the -- I don't need any

18    more, right?  I mean I just don't need any more

19    money.  What I do want is my time.  And so, you

20    know, when I speak on that subject, I really wanted

21    to do civic stuff and take the stuff that I learned

22    and the mistakes I made in business and in life, and

23    I've got them, to the civic side of things and

24    that's what I've done, you know, as you're aware on

25    the Board of Governors.  I've taken that skill set

Harry Smith                          June 2, 2017

1    and by the way I've had some tremendous success for

2    the system.

3            And so, I enjoy that process.  I mean, you

4    know, pay's not good but I've enjoyed the process.

5    And, you know, and that's really what I'd like to

6    do.  Do I have some political ambitions?  Ken, I do,

7    and I think I'll have success there, right?  I

8    haven't vetted that out yet but it's part of the

9    reason I wanted to stay in higher education.

10           So, I've got things that I want to do.

11   This thing will take three or four years of my life

12   away from me.  So, I don't need any more money.  I

13   really enjoy my time and I want to be able to go

14   watch ACC soccer, I want to be able to go to

15   football games.  It is -- and by the way, my guys

16   feel the same way.  So, Travis has got a highly

17   successful business.  I own half of it, it does

18   really well.  Kevin now has taken Oak Ridge it's

19   doing really well.  So, I mean you're talking about

20   guys that own pretty nice businesses, you know, 20

21   million, 10 million that make nice -- I mean they're

22   fine.  They don't need any more money either.

23           And so we -- those two guys with me made a

24   massive push and got that thing where it was at.

25   And, you know, we feel like we've been attacked, we

Harry Smith                           June 2, 2017

1    feel like we've been defamed.  I think that's true.

2    We got customers, vendors, and employees calling us.

3            I will repeat to you again I've made

4    mistakes, I regret them.  Phil Whitaker said last

5    week Mr. Smith can take 200 million hire employees,

6    people, place, and things.  He's correct about that.

7    I left there, I slept, prayed on it, talked to my

8    wife about it.  I said I'm going to do the right

9    thing here.

10           I sent him an apology which was

11   meaningful.  I made a mistake, I wanted to correct

12   it.  I furthered that with I'll cease and desist and

13   come help you for free.  If he genuinely believed

14   and I think he does, then somebody at Daikin's Board

15   ought to say hold on a second here, if you believe

16   this guy can build a $200 million business, he's

17   offered to help you for free and stop.

18           So, who's at fault here, right?  And by

19   the way, he could have also ,said Harry, I don't

20   want your help but I'm going to ask you to stop, and

21   by the way, I owe you an apology, and he does, for

22   things that I did and actions I've taken against

23   people, place, and things with you, I would have

24   accepted his apology, right?

25           If he'd said, Harry, this is what I'm

Harry Smith                         June 2, 2017

1    going to do to fix the company so people quit

2    calling you, probably could have left there that

3    day, Ken, and went back to studying budget and

4    finance for the next Board of Governors meeting.

5    So, you know, I don't want to hurt this company by

6    hurting him.  Is that -- is that fair?  I just want

7    the company to be successful.  I don't -- I don't --

8    I don't want anybody to say that I've got some

9    massive pretense to crush Flanders and go in the air

10   filtration business.

11          I'm here today.  I spent a significant

12   amount of money to validate my name, to validate my

13   guys' name and to protect people that were very

14   important to me that I think are being hurt.  I

15   think the performance of the company will prove

16   that, right?  That's all I care about.  I -- I --

17   I -- that's all I care about.

18          I mean, you know, and I'm telling you this

19   guy did take action against me and my guys.  It's

20   very provable.  And there was comments made about

21   us.  It's very provable.  The performance of the

22   company is falling.  Jobs are being lost.  People

23   are scared, right, people that were deemed to be

24   aligned with me have been terminated, let go, or

25   punished.  That's all provable.

1              I don't understand why but I -- I -- I

2       want to help.  If they don't want my help then and

3       that's fine, you know, somebody get it on track.

4       And I'll go back to sending you guys post cards,

5       right?  It's the only reason that I didn't want you

6       guys not to have this engagement because win, lose,

7       or draw you should have it.

8              I mean you guys -- I mean so -- because I

9       mean I think it comes down to case law.  So, I'm not

10      going to hurt anybody.  One of the biggest problems

11      I've had with this thing was people got hurt because

12      of me.  There are people that have lost this job

13      since I filed this lawsuit a hundred percent because

14      they will prove -- they were thought to be aligned

15      with me.

16             There are people that I've known for 20-

17      plus years, their families, wives, daughters, went

18      to their kids' graduation, grew up with them, that

19      are afraid to talk to me today because they think

20      they'll be fired just for communicating with me,

21      right?  I mean there is a context in the company if

22      you're aligned with Harry, you get fired.  And his

23      actions prove that.  He's fired people because

24      they're aligned with me.

25             That's why I didn't depose anybody.  We

Harry Smith                          June 2, 2017

1    had stuff we could bring the table, Ken, and we

2    stopped.  I had people I could have brought to this

3    table that would have had significant testimony and

4    I stopped because I don't want anybody else hurt.

5          MR. GRAY:     Do you have any questions?

6          MR. CEGLOWSKI: Are you done?

7          MR. GRAY:     For this part.

8          C R O S S   E X A M I N A T I O N 2:40 P.M.

9          BY MR. CEGLOWSKI:

10   Q.   Mr. Smith, I'm going to pull back up

11   briefly Exhibit 26, which is the Agreement at issue

12   in the case, the primary one, the Equity Buy-Out and

13   Board of Directors Resignation Agreement.

14   A.   Uh-huh.

15   Q.   I just want to be clear for the record at

16   some point  you were holding or touching this

17   document and also talking at the sale of the glass

18   plant and Pronamics.

19   A.   Uh-huh.

20   Q.   Did that document, Exhibit 26, have any

21   connection to the sale of Pronamics?

22   A.   None whatsoever.  Two totally separate

23   transactions.

24   Q.   Did that document have any connection to

25   the sale of any business?

Harry Smith                         June 2, 2017

1       A.   None whatsoever.  And Insight will testify

2    accordingly.

3       Q.   Mr. Smith, do I understand your testimony

4    to be that one of your motivations for pursuing this

5    lawsuit is to stop people from being hurt,

6    specifically customers, vendors, and employees of

7    Flanders Corporation?

8       A.   That's correct.

9       Q.   Is it true that based on the current

10   dynamic between you and Phil Whitaker and/or you and

11   Flanders the only way for your stop them getting

12   hurt is to reenter the air filtration industry?

13          MR. GRAY:    Objection to the form of

14   these questions.  They're all leading.

15          THE WITNESS:  I believe that -- that is

16   absolutely correct.  I feel like I'm being forced

17   back into air filtration to -- on multiple fronts to

18   vindicate my name in the company, Travis

19   Stephenson's name in the company, Kevin Boyd's name

20   in the company, to vindicate personal actions taken

21   against Oak Ridge and Pitt, which are provable, and

22   to stop the flow of business as immediate as the

23   transactions.

24          We can also prove that the decisions made

25   to move business from Oak Ridge were a financial

Harry Smith                    June 2, 2017

1    detriment to the company and were personal in

2    nature.  I think you will find out that the actions

3    that Phil Whitaker has taken have been personal in

4    nature.  I also will tell you that -- and I was told

5    by Insight that there was never a question asked

6    about my non-compete in any way, shape, form, or

7    fashion when they bought the company.

8         Nobody asked about it, they never referred

9    to it.  And exactly what Brad Buser told me is

10   there's some attorney somewhere in a back room that

11   saw it but your name never came up, you were not an

12   issue.  They bought the company without ever

13   worrying about you.

14        I can also tell you that I was told by --

15   by a great source that they had to scramble to find

16   my non-compete and figure what it was all about. But

17   the premise of the thing is, you know, I'm here

18   today to validate myself, Travis, Kevin, and people,

19   place, and things that helped me be successful that

20   I think are under attack.  And I think people

21   specifically that it is deemed or aligned with me

22   that he has taken personal action again.  And I

23   think that's all provable.

24

25        BY MR. CEGLOWSKI:

Harry Smith                              June 2, 2017

1          Q.    Is it important to you to have the

2     flexibility to reenter the air filtration industry

3     if you choose to do so?

4          A.    Absolutely, yeah.  I mean I -- you know --

5     my main premise would be to see the company be

6     successful and me not enter the air filtration

7     business.  If the people that -- that know me and

8     that are perceived to be aligned with me, you know,

9     are not under threat or fear of intimidation because

10    of their alignment with me, and they don't have to

11    worry about coming to work, that the attacks on me

12    stop and the attacks on people, place, and things

13    stop then, you know, I have no desire to enter the

14    air filtration business.

15         Q.    Is it important to you to have guidance

16    from the court in this case about whether or not the

17    non-compete is enforceable?

18         A.    Absolutely.

19         Q.    And do you need that clarity so that you

20    can decide whether or not to reenter the air

21    filtration business?

22         A.    Absolutely.  I mean, you know, I -- again

23    last week I think I led in the fact that I issued an

24    apology.  I think -- I think this whole thing

25    precipitated on attacks.  I didn't lead that, you

Harry Smith                              June 2, 2017

1      know, I responded to it.  Over a long period of time

2      it continued and it's continued.  And so, you know,

3      my attempt last week was an attempt to peel that

4      divide, rise above that, issue Phil a personal

5      apology, and to also give him an opportunity on the

6      comment on the $200 million company and hiring

7      people to offer not to do that.  And if he feels

8      that way, then obviously he feels like I have a

9      tremendous amount of knowledge that he doesn't have

10     and the industry doesn't have or I couldn't do that

11     to bring that knowledge to them free of charge and

12     they've chosen not to act on that.  I'm happy to

13     help them today.

14           MR. CEGLOWSKI: I don't have any more

15     questions.

16     R E D I R E C T   E X A M I N A T I O N 2:43 p.m.

17           BY MR. GRAY:

18     Q.   Mr. Smith, you just said it was important

19     to you to have flexibility to enter the air

20     filtration business.  Was it important to you when

21     you signed this Equity Buy-out Agreement on March

22     20th, 2015?

23     A.   No, and, you know, at that time, you know,

24     what I discussed openly with Insight is treat me

25     with dignity and respect, treat my guys with dignity

Harry Smith                              June 2, 2017

1     and respect, and, you know, I'm here to help you

2     forever and they did that.

3          Q.   And you also testified that it was

4     important for you to have the court make a

5     determination as to the enforceability of the Non-

6     Compete Agreement and the Equity Buy-Out.  Was that

7     same thing important to you on March 20th, 2015?

8          A.   I wasn't under attack, my guys weren't

9     under attack, and I wasn't getting calls from

10    customers, vendors, and employees, people had not

11    lost their job as a result of alignment with me.

12    So, that was not an issue.  I will testify again I

13    have no desire to go back in the air filtration

14    business in in any way, shape, form, or fashion.

15         Q.   So, the answer is no, it was not important

16    at that time?

17         A.   Absolutely not.  I will also say as far as

18    an air filtration start up I mean, you know, I'm

19    three years now so I got two years left, 24 months

20    and now really isn't going to make any difference if

21    they don't change the model.  But what I will you is

22    no matter what the court decides if something

23    doesn't change course, Kevin and Travis are going to

24    reenter the space.  Their non-competes are clear and

25    they going to have the same kind of impact.  I don't

Harry Smith                              June 2, 2017

1    know the magnitude of the impact, but I think those

2    guys will have a significant impact whether I'm

3    involved or not.

4            So, you know, Travis and Kevin are

5    completely cleared and I think you'll see unless

6    something changes, those guys will enter the space

7    and -- on their own without me in any way, shape,

8    form, or fashion.  That's I think -- I think that's

9    what will happen if something doesn't change course.

10           MR. GRAY:     Anything else?

11           MR. CEGLOWSKI: No.

12           MR. GRAY:     Let's go off the record.

13   (Off the record 2:46 p.m. until 2:48 p.m.)

14           MR. GRAY:     I have no further questions

15   that are not going to be subject to the protective

16   order that we're getting ready to stipulate to.  Do

17   you have any additional questions, Kevin?

18           MR. CEGLOWSKI: I do not.

19           MR. GRAY:     Okay.  At this time we're

20   going to go through a few emails and there is a

21   protective order that's been entered by the court to

22   keep these documents confidential and just not to be

23   distributed beyond the parties.  And so, this next

24   section -- the remainder of the deposition will be

25   subject to that protective order.

Harry Smith                          June 2, 2017

1     (The following pages numbered 251 - 257 were

2     designated confidential by agreement of counsel.)

3     (These pages were redacted and deleted from this

4     transcript to be filed as CONFIDENTIAL/)

Harry Smith                          June 2, 2017

1       **(End of confidential portion of transcript.)**

Harry Smith                          June 2, 2017

1                MR. GRAY:      I have no further

2     questions.

3                MR. CEGLOWSKI: No more questions.

4                     (WHEREUPON, THE DEPOSITION TESTIMONY

5     OF

      HARRY L. SMITH, JR., CONCLUDED AT 2:58 p.m.)

      Harry Smith                          June 2, 2017

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

C E R T I F I C A T E

       I, JENNIFER PATTERSON, CVR-M, COURT
REPORTER-NOTARY PUBLIC, DO HEREBY CERTIFY THAT HARRY
L. SMITH, JR. PRESENTED A NORTH CAROLINA DRIVER'S
LICENSE AS FORM OF IDENTIFICATION, DULY SWORN OR
AFFIRMED BY ME PRIOR TO THE TAKING OF THE FOREGOING
DEPOSITION; AND THAT SAID DEPOSITION WAS TAKEN BY ME
AND TRANSCRIBED UNDER MY DIRECTION; AND THAT THE
FOREGOING 258 PAGES CONSTITUTE A TRUE AND CORRECT
TRANSCRIPT OF THE TESTIMONY OF THE WITNESS.

       I DO FURTHER CERTIFY THAT I AM NOT COUNSEL
FOR, OR IN THE EMPLOYMENT OF EITHER OF THE PARTIES
TO THIS ACTION, NOR AM I INTERESTED IN THE RESULTS
OF THIS ACTION.

       IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY
HAND THIS 23RD DAY OF JUNE, 2017.


_____
JENNIFER PATTERSON, CVR-M
CERTIFIED FREELANCE COURT REPORTER
NOTARY # 19940450121



Harry Smith                          June 2, 2017

## S I G N A T U R E

I have read the foregoing 259 pages which contain a correct transcript of the answers made by me to the questions herein recorded.  My signature is subject to corrections on the attached errata sheet, if any.


_____
(Signature of Harry L. Smith, Jr.)

State of _____
County of _____

I certify that the following person personally appeared before me this day and I have personal knowledge of the identity of the principal or have seen satisfactory evidence of the principal's identity in the form of a_____ or a credible witness has sworn to the identity of the principal, acknowledging to me that he or she voluntarily signed the foregoing document for the purpose stated herein and in the capacity indicated:_____.
                        (Name of Principal)


Date_____  _____
                (Official signature of Notary)

(Official Seal)  _____,
                Notary Public
                (Notary's printed or typed name)

        My commission expires_____.
        ***********************************

I, Jennifer Patterson, CVR-M the person before whom the foregoing deposition was taken, certify that the foregoing transcript was delivered to the witness on or about the 26th day of June 2017 and that as of this date, _____,I have not received the executed signature page.
    Therefore, more than 30 days having elapsed since receipt of the transcript by the witness, the sealed original transcript was filed with attorney for _____ on _____ by means of _____, in accordance with Rule 30(e) of the_____Rules of Civil Procedure.


_____  _____
Date                Jennifer Patterson, CVR-M
                    Certified Freelance Court Reporter


Harry Smith                          June 2, 2017