IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:16-CV-00289-FL

| | | |
|---|---|---|
| HARRY L. SMITH, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| FLANDERS HOLDINGS LLC, | ) | (SEALED)[1] |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the parties' cross-motions for summary judgment. (DE 21, 28). Also pending before the court is plaintiff's motion to seal, as amended (DE 23 and DE 39), and defendant's motion to seal. (DE 32). The motions have been briefed fully, and in this posture the issues raised are ripe for ruling. For the reasons that follow, the court grants defendant's motion for summary judgment and denies plaintiff's motion for summary judgment.

**BACKGROUND**

On December 16, 2016, plaintiff initiated this action, seeking declaratory judgment that certain restrictive covenants included within an Equity Buy-Out and Board of Directors Resignation Agreement (the "Buy-Out Agreement") executed between the parties are unenforceable under North Carolina law. Defendant answered the complaint on February 8, 2017, denying that the restrictive covenants in question were over broad and unenforceable.

---

[1] Certain filings on which the parties rely are sealed in accordance with a protective order. Within 14 days, the parties jointly shall return to the court by U.S. Mail, addressed to the case manager, a copy of this order marked to reflect any perceived necessary redactions. Upon the court's inspection and approval, a redacted copy of this sealed order will be made a part of the public record.

Discovery commenced on February 27, 2017, pursuant to this court's case management order and concluded on June 16, 2017. On June 20, 2017, plaintiff filed the instant motion for summary judgment, accompanied by a memorandum in support thereof and exhibits comprising of 1)the Buy-Out Agreement; 2) an Asset Purchase Agreement executed by Pronamic Industries, LLC, defendant, several individual guarantors, and Blue Goose, LLC (the "APA"), and amendment thereto; 3) Plaintiff's employment agreement with defendant; 4) a Confidential Separation Agreement executed by the parties; 5) a November 25, 2016, letter to plaintiff's counsel from defense counsel; 6) two closing certificates executed in connection with the APA; 7) email correspondence from plaintiff to Philip Whitaker ("Whitaker"), the president and CEO of defendant; and 8) an affidavit of plaintiff. Plaintiff filed a statement of material facts in support thereof on June 23, 2017. Plaintiff contends that certain restrictive covenants contained within the Buy-Out Agreement are overly broad and unenforceable under North Carolina law.

Defendant filed the instant cross-motion for summary judgment on July 14, 2017, accompanied by a statement of material facts, appendix thereto, memorandum of law, and exhibits comprised of 1) a partial transcript from plaintiff's deposition; 2) plaintiff's responses to defendant's first set of requests for admission; 3) two letters from plaintiff's counsel to Whitaker; 4) email correspondence between plaintiff and Brad Buser; 5) an affidavit of defendant's General Counsel, Ryan McGary; 6) transcript from Whitaker's deposition; 7) email correspondence between plaintiff and Whitaker; 8) email correspondence between plaintiff and defendant's former CEO, Peter Jones; and 9) a letter from plaintiff to one of defendant's directors, Yoshihiro Mineno. Defendant contends that the restrictive covenants are enforceable. To the extent the court finds the covenants unenforceable, defendant contends such unenforceable provisions can be severed.

# STATEMENT OF UNDISPUTED FACTS

Defendant is a company in the air filtration business. Plaintiff has been employed in the air filtration industry since 1992. (DE 29, ¶ 9). From approximately 1992 through 1995, plaintiff was employed by Industrial Construction. (Id. ¶ 10). As an employee of Industrial Construction, plaintiff supplied air filtration products to defendant. (Id.). In 1995, plaintiff began working as a Branch Manager for Cameron and Barkley. (Id. ¶ 11). Defendant was one of plaintiff's larger accounts at Cameron and Barkley. (Id. ¶ 12).

Following plaintiff's employment with Cameron and Barkley, plaintiff started his own company, which provided sales and marketing services to various businesses, including defendant. (Id. ¶ 13). In or around 2002, defendant hired plaintiff as Manger of Direct Offices. (Id. ¶ 15). Sometime thereafter, plaintiff was promoted to Chief Operating Officer ("COO"), and later Chief Executive Officer ("CEO").[2] (Id. ¶ 16). At the time plaintiff was promoted to COO, defendant appointed plaintiff to its Board of Directors. (Id. ¶ 17). After plaintiff became CEO, he served as Chairman of defendant's Board of Directors. (Id. ). During his employment with defendant, plaintiff "oversaw every facet of [defendant's] business." (Id. ¶ 19). Plaintiff also played a large role in overseeing, managing, and securing defendant's largest accounts. (Id. ¶¶ 20–39).

Sometime in or around 2012, Insight Equity Holdings ("Insight") acquired defendant. (Id. ¶ 40). Following Insight's acquisition of defendant, plaintiff and Insight were defendant's only two shareholders, with plaintiff owning 660,000 shares, valued at $1.00 per share. (Id.).

At Insight's request, plaintiff, together with two other individuals, purchased the company ECN, later renamed Pronamic Industries, LLC. (Id. ¶ 43). On May 16, 2012, the parties executed

---

[2] Plaintiff served as CEO for defendant from approximately May 2007 through July 1, 2014, when he resigned pursuant to a Confidential Separation Agreement.

3

an employment agreement, which contained non-competition and non-solicitation provisions. (Id. ¶ 3). On July 1, 2014, plaintiff executed a resignation agreement, titled the Confidential Separation Agreement, which terminated his employment with defendant. (Id. ¶ 4). The resignation agreement reiterated the non-competition and non-solicitation provisions contained within the employment agreement. (Id.). After plaintiff resigned, he continued to serve on defendant's Board of Directors as Vice Chairman, and defendant named Peter Jones as its CEO. (Id. ¶¶ 45–48). Defendant later named plaintiff Managing Director. (Id. ¶ 47).

On February 20, 2015, the parties executed the APA, whereby defendant purchased Pronamic Industries, LLC from plaintiff and the other owners. (Id. ¶ 49). The Asset Purchase Agreement contained several restrictive covenants, including a non-competition provision, a non-solicitation of customers and suppliers provision, and a non-solicitation of employees provision. (Id. ¶ 51). Pursuant to the Asset Purchase Agreement, defendant executed a Promissory Note (the "Note"), dated March 13, 2015, in favor of Pronamic Industries, LLC. (Id. ¶ 54). Under the terms of the Note, defendant agreed to make equal payments of $250,000 prior to June 13, 2015, September 13, 2015, and December 13, 2015, respectively, with any remaining amounts due March 13, 2016. (Id. ¶ 55).

On March 20, 2015, the parties executed the Buy-Out Agreement. (Id. ¶ 57). At the time the parties executed the Buy-Out Agreement, plaintiff was not an employee of defendant. Pursuant to the Buy-Out Agreement, plaintiff agreed to resign from defendant's Board of Directors in exchange for payment for redemption of 660,000 shares of non-voting stock plaintiff owned. (DE 1-1). The Buy-Out Agreement also obligated defendant to repay the principal due under the

4

Promissory Note, approximately one year earlier than initially required. (Id.). In connection with the Buy-Out Agreement, plaintiff voluntarily gave up his long-term incentive compensation. (Id.).

As relevant here, the Buy-Out Agreement contained several restrictive covenants, including a "Non-Competition" covenant, a "Non-Solicitation of Customers and Suppliers" covenant, and a "Non-Solicitation and Non-Hiring of Employees" covenant. The "Non-Competition" covenant provides:

> Smith hereby agrees that for a period of five (5) years after the Effective Date of this Agreement (as defined below), he shall not for himself or through any Person, directly or indirectly, engage in, participate in any business activity or enterprise that would compete in any way with the Business in the geographic areas and locations where: (ii) Flanders Corp. carries on or transacts the Business, (ii) Flanders Corp. sells or markets its products or services, or (iii) Flanders Corp.'s customers are located; including without limitation (A) the world, (B) the United States of America, (C) each of the states of the United States of America, (D) the State of North Carolina, (E) each county within the State of North Carolina, (F) the territory within a 100 mile radius of Smith's office in Washington, North Carolina, and (G) the territory within a 100 mile radius of each other office of Smith (whether now existing or hereafter established). For purposes of this Agreement, the term "participate" includes any direct or indirect interest in the enterprise , whether as a stockholder, member, partner, joint venturer, franchisor, [sic] franchisee, executive, consultant or otherwise (other than by ownership of less than one percent (1%) of the stock of a publicly held corporation) or lending money to or rendering any direct or indirect service or assistance to any person or entity.

(Buy-Out Agreement, Section 6(c), DE 1-1). The "Non-Solicitation of Customers or Suppliers" covenant provides,

> Smith shall not, for a period of five (5) years following the Effective Date, either directly or indirectly, for his own benefit or the benefit of any other person or entity, solicit, attempt to solicit, divert or attempt to divert, accept or attempt to accept the business or patronage of any customers or suppliers of Flanders Corp., or in any way interfere with, disrupt or attempt to disrupt any such relationships.

(Id. at Section 6(d)).

5

Plaintiff has indicated to defendant that he intends to re-enter the air filtration business, which defendant maintains would violate terms of the restrictive covenants included within the Buy-Out Agreement.

## DISCUSSION

A. Standard of Review

 1. Declaratory Judgment

Under the Declaratory Judgment Act, a district court "may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[T]he Declaratory Judgment Act [is] an enabling Act, which confers discretion on the courts rather than an absolute right upon the litigant." Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995) (internal quotations omitted). Exercise of this discretion "is appropriate when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 493–94 (4th Cir. 1998) (internal quotations omitted).

 2. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any material fact. Celotex Corp. V. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd v.

Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). Only disputes over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

"[A]t the summary judgment state the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant Is to be believed, and all justifiable inferences are to be drawn in the [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inferences is so tenuous that is rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (internal quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489.

7

Case 4:16-cv-00289-FL   Document 45   Filed 03/30/18   Page 7 of 15

B. Analysis

    1. Motions for Summary Judgment

As a threshold matter, this court has jurisdiction to enter declaratory judgment. In North Carolina, "[a]ny person interested under a . . . written contract or other writing[] constituting a contract . . . may have determined any question of construction or validity arising under the instrument . . . [or] contract, . . . and obtain a declaration of rights, status, or other legal relations . . . ." N.C. Gen. Stat. § 1-254. Where plaintiff is interested under the Buy-Out Agreement, the court may determine whether the restrictive covenants contained therein are enforceable as a matter of law. Furthermore, here, the parties agree that North Carolina law governs the interpretation and application of the restrictive covenants. (See DE 29 ¶ 8).

The court must first determine whether the restrictive covenants presently at issue are ancillary to an employment contract or ancillary to the sale of a business. In North Carolina, a non-competition agreement is only enforceable if it is ancillary to an employment contract or ancillary to the sale of a business. See Whittaker Gen. Corp. v. Daniel, 324 N.C. 523, 525 (1989) (noting that a covenant not to compete must be "made part of a contract of employment"); Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC, 368 N.C. 693, 698 (2016) (indicating that courts in North Carolina will also enforce "covenant[s] not to compete made in connection with the sale of a business"); see also Chemimetals Processing, Inc. v. McEneny, 124 N.C. App. 194, 197 (1996) ("[C]ovenants [not to compete], to be valid, are required to be . . . part of the contract of employment or the sale of a business"). Courts are more lenient analyzing restrictive covenants ancillary to the sale of a business than analyzing covenants ancillary to an employment contract. Welcome Wagon Int'l, Inc. v. Pender, 255 N.C. 244, 251 (1961) ("Covenants by employers not to

8

compete with their former employer are more carefully scrutinized by the courts, and relief more readily denied than similar covenants ancillary to the sale of a business, since enforcement of the former may deprive the covenantor of the means of livelihood").

Here, the restrictive covenants contained within the Buy-Out Agreement are ancillary to the sale of a business. Pursuant to the Buy-Out Agreement, defendant purchased plaintiff's minority ownership interest for the price of $660,000.00. At the time the parties executed the Buy-Out Agreement, plaintiff was not an employee of defendant. Pursuant to the Buy-Out Agreement, plaintiff, agreed, among other things, to resign from defendant's board of directors in exchange for the repurchase of his minority ownership interest, a bonus, and defendant's release of claims against him. (See DE 1-1). Plaintiff had significant bargaining power in executing the Buy-Out Agreement, which was executed independently from the agreements governing plaintiff's employment with defendant. (See DE 29 ¶¶ 14, 16, 18, 50, 58–61). While North Carolina courts have not explicitly considered the issue at hand, courts in other jurisdictions have applied a more lenient standard of review analyzing restrictive covenants executed in connection with a shareholder's sale of his or her interest in a company. See e.g., Durham v. Lewis, 231 Ky. 601, 601 (1929) ("[A] stockholder, who has been in active charge of a corporate business, and who has, by reason thereof, acquired knowledge of and wide acquaintance with producers of the commodities the corporation deals in, may increase the vendibility of his stock by agreeing with the buyer that he will refrain from carrying on and engaging in the same sort of business for a limited time and within reasonable limits."); Bonney v. Northern Ariz. Amusement Co., 78 Ariz 155, 158 (1954) (upholding a restrictive covenant against seller of stock not to engage in business in competition with the former stockholder's corporation).

9

Relying on Hartman v. W.H. Odell & Assocs., 117 N.C. App. 307 (1994), plaintiff contends that defendant's repurchase of plaintiff's shares does not make the restrictive covenants at issue ancillary to the sale of a business. In Hartman, the North Carolina Court of Appeals rejected the defendant's argument that the covenant at issue was ancillary to the sale of a business where an independent buy-sell agreement existed which required plaintiff to resell his shares of stock to defendant. However, unlike the restrictive covenants here, the restrictive covenant at issue in Hartman was contained in the plaintiff's employment agreement. In the instant case plaintiff challenges the enforceability of the restrictive covenants contained in the Buy-Out Agreement; he does not challenge the restrictive covenants contained in his employment agreement. Accordingly, contrary to plaintiff's suggestion, Hartman is distinguishable from the present case. Thus, the covenants contained within the Buy-Out Agreement are ancillary to the sale of a business.

Having established that the more lenient standard for covenants executed ancillary to the sale of a business is applicable here, the court must next determine whether the covenants are enforceable under North Carolina law.

With regard to the covenant not to compete, in North Carolina, "when one sells a trade or business and, as an incident of the sale, covenants not to engage in the same business in competition with the purchaser, the covenant is valid and enforceable (1) if it is reasonably necessary to protect the legitimate interest of the purchaser; (2) if it is reasonable with respect to both time and territory; and (3) if it does not interfere with the interest of the public." Jewel Box Stores Corp. v. Morrow, 272 N.C. 659, 661–62 (1968). The restrictive covenant must also be supported by valuable consideration. Id. at 663. Thus, covenants not to compete are enforceable if they are no broader than

reasonably necessary to protect the covenantee's business and if they do not impose an undue hardship on the covenanter. See Harwell Enters., Inc., v. Heim, 276 N.C. 475, 478–79 (1970).

First, in determining whether a restrictive covenant is reasonably necessary for the protection of the covenantee's business, courts consider the particular facts and circumstances of the case. See Jewel Box, 272 N.C. at 663; see also Clyde Rudd & Assocs., Inc. v. Taylor, 29 N.C. App. 679, 684 (1976) (indicating that when evaluating the reasonableness of a restrictive covenant, courts consider, among other things, 1) the scope of the restriction; 2) the area in which the covenantor worked or was subject to work; 3) the area in which the covenantor operated; 4) the nature of the business involved; 5) the nature of the covenantee's duty and his knowledge of the covenantor's business operations).

Here, the covenant not to compete is reasonably necessary for the protection of defendant's business. Under the terms of the covenant, plaintiff agreed, for a period of five years, not to engage or participate in any business competitive with defendant in those geographic areas where defendant 1) carries on business; 2) sells or markets its products and/or services; and 3) has customers. For nearly a decade, plaintiff was involved extensively in defendant's business. Plaintiff served as defendant's CEO, the Chairman of its Board of Directors, and its Managing Director. In these roles, plaintiff helped maintain and secure defendant's most profitable customer accounts and gained significant knowledge of the air filtration industry and defendant's business operations. (DE 29 ¶¶ 17, 47–48, 32, 34, 77). In light of the extensive scope of plaintiff's involvement with defendant's business operations, the restrictive covenants are reasonably necessary to protect defendant's legitimate business interests.

11

Plaintiff contends that the covenant not to compete is over broad because it prohibits plaintiff from engaging in any activity "in any way tangentially related to [defendant's business] no matter whether or not it would create a competitive threat." (DE 22 at 13). However, given the amount of information plaintiff had access to through his participation on defendant's board of directors, the scope of the covenant is not over broad. Furthermore, upholding the covenant would not produce oppressive results. Plaintiff is a sophisticated business man who negotiated the terms of the Buy-Out Agreement. (DE 29 ¶¶ 59–61, 67). Additionally, plaintiff testified that the covenants contained in the Buy-Out Agreement do not hinder his ability to make a living. (Id. ¶ 84). Accordingly, the scope of activity prohibited by the covenant not to compete is not over broad. See e.g., Seaboard Indus., Inc. v. Blair, 10 N.C. App. 323, 335 (1971) (upholding restrictive covenant which prohibited the defendant from "directly or indirectly in any manner compet[ing] with [the plaintiff] [or] engag[ing] in the same . . . business [of the plaintiff] for himself or others in any capacity"). Accordingly, the restrictive covenant is reasonably necessary to protect defendant's legitimate business interests.

Second, "[i]n evaluating reasonableness as to time and territory, . . . [courts] consider each element in tandem." Farr Assocs., Inc. v. Baskin, 138 N.C. App. 276, 280 (2000). "Although either the time or territory restriction, standing alone, may be reasonable, the combined effect of the two may be unreasonable." Id. Considered in tandem, the instant time and territory restrictions are not unreasonable. First, the five year restriction is reasonable. See Welcome Wagon, 255 N.C. at 250 (noting that in cases involving covenants ancillary to the sale of a business, courts have upheld restrictions "for periods ranging from one to 20 years, and in one instance the life of the covenantor."); see also Seaboard Indus., 10 N.C. App. at 335 ("In cases where the covenants not to

12

compete accompanied the sale of a trade or business, time limitations of ten, fifteen, and twenty years, as well as limitations for the life of one of the parties, have been upheld by the Supreme Court of North Carolina."). Where the geographic limitations apply only to those areas defendant does business or maintains customers, the limitations, considered in tandem with the five year restriction, are also reasonable. See e.g., Beverage Sys. of the Carolinas, 368 N.C. at 698 ("Ordinarily, a covenant's geographic scope will be found reasonable if it encompasses area served by the business that the covenant protects.").

Plaintiff contends that geographic scope of covenant not to compete is over broad. Plaintiff specifically contends that the worldwide territory is over broad since defendant does not operate worldwide. However, the worldwide territory contained within the covenant not to compete only includes those geographic areas where defendant's customers are located. Importantly, in North Carolina "protection of customer relationships and goodwill . . . is well recognized as a legitimate protectable interest of the employer. The greater the [covenantor's] opportunity to engage in personal contact with . . . customer[s], the greater the need . . . to protect those customer relationships." Kennedy v. Kennedy, 160 N.C. App. 1, 11-12 (2003) (citing United Labs., Inc. v. Kuykendall, 322 N.C. 643, 651 (1988)). Given plaintiff's role in maintaining and securing defendant's customer accounts, the geographic limitations contained within the covenant not to compete, considered in tandem with the five year restriction, are not over broad. See Beverage Sys. of the Carolinas, 368 N.C. at 698.

Lastly, the covenant not to compete is not against public policy. As previously mentioned, the covenant does not prohibit plaintiff from earning a living. Additionally, plaintiff had significant bargaining power negotiating the terms of the Buy-Out Agreement and the covenants contained therein. See generally, Brenner v. Little Red Sch. House, Ltd., 302 N.C. 207, 211 (1981) (finding

13

a contract to be enforceable where there was no inequality of bargaining power between the parties). Lastly, plaintiff "regarded [the covenant] as reasonable . . . when incorporated in the [Buy-Out Agreement]." Welcome Wagon, 255 N.C. at 250. Accordingly, the covenant not to compete does not offend public policy.

For the same reasons discussed herein with regard to the covenant not to compete, the non-solicitation covenants are also enforceable. See United Labs., 322 N.C. at 385 ("A restriction prohibiting a former employee from soliciting customers of his former employer will be upheld if it is 'reasonably related to the employer's interest in protection the customer relations that its employees developed as a direct result of the employment."); see also Asheboro Paper & Packaging, Inc. v. Dickinson, 599 F. Supp. 2d 664, 674 (M.D.N.C. 2009) ("It is true that a prohibition against soliciting customers is deemed *per se* reasonable.").

Finding the restrictive covenants to be enforceable, the court need not address the parties arguments concerning blue-penciling.

2.  Motions to Seal

Plaintiff moves to seal the following materials: 1) memorandum in support of his motion for summary judgment and several exhibits attached thereto (DE 22)[3]; 2) his statement of material facts (DE 25); 3) his response to defendant's statement of material facts (DE 35); 4) his supplemental statement of material facts (DE 36); and 5) a promissory note (DE 38). Defendant moves to seal its statement of material facts (DE 29) and appendix thereto (DE 30), as well as its memorandum in support of its motion for summary judgment. (DE 31). These motions are unopposed.

---

[3] Specifically, plaintiff seeks to seal the following exhibits attached to his memorandum in support of his motion for summary judgment 1) the APA (DE 22-2); 2) his employment agreement (DE 22-3); 3) closing certificates related to the sale of Pronamic Industries (DE 22-6 and DE 22-7); and 4) the first amendment to the APA (DE 22-8).

14

Upon careful review of the motions and applicable law, where the materials sought to be sealed include confidential business and proprietary information, disclosure of which would be harmful to the parties, for good cause shown, the motions to seal at DE 32 and DE 39 are granted. Where the plaintiff's motion to seal at DE 30 supersedes his motion to seal at DE 23, it is denied as moot.

## CONCLUSION

Based on the foregoing, the court GRANTS defendant's for summary judgment (DE 28), and DENIES plaintiff's motion for summary judgment. (DE 28). The court ADJUDGES AND DECLARES that the restrictive covenants contained within the Buy-Out Agreement, as defined herein, (DE 1-1), are valid and enforceable under North Carolina law. In addition, the court GRANTS plaintiff's motion to seal, as amended, (DE 39) and defendant's motion to seal. (DE 32). Plaintiff's first motion to seal is DENIED AS MOOT. (DE 23). The clerk is DIRECTED to close this case.

SO ORDERED, this the 30th day of March, 2018.

LOUISE W. FLANAGAN
United States District Judge